Abby Sullivan Engen (SBN 270698)
asullivanengen@centrolegal.org
CENTRO LEGAL DE LA RAZA
3400 E. 12th Street
Oakland, CA 94601
Telephone: (510) 244-4312

*Attorneys for Petitioner*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| Frescia Anthuane GARRO PINCHI,<br><br>Petitioner,<br><br>v.<br><br>POLLY KAISER, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD LYONS, Acting Director of United States Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security, PAMELA BONDI, Attorney General of the United States, acting in their official capacities,<br><br>Respondents. | CASE NO. _____<br><br>**PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

1.     Frescia Anthuane Garro Pinchi ("Petitioner") is an asylum seeker who fled Peru. After Petitioner arrived in the United States on April 14, 2023, federal agents briefly detained her, determined that she was not a flight risk or danger to the community, and released her on her own recognizance with a notice to appear for removal proceedings in immigration court. Since then, Petitioner has done everything the government asked her to do: she has diligently attended every immigration court hearing and filed an application for asylum, all without the assistance of legal representation. She has no criminal history anywhere in the world.

2.     Today, July 3, 2025, Petitioner again did what the government told her to do: She went to San Francisco Immigration Court for a routine hearing before Immigration Judge ("IJ") Patrick O'Brien, where the government orally moved to dismiss his case. On information and belief, the government did so for the purpose of placing her in so-called "expedited removal" proceedings. IJ O'Brien did not grant the motion to dismiss. Instead, the judge gave Petitioner time to respond and set a further hearing for July 31, 2025, ominously adding, "but I probably won't see you that day."

3.     Indeed, minutes after Petitioner exited the courtroom, a group of roughly four Department of Homeland Security ("DHS") agents, some of whom were masked to conceal their identitied, arrested her before she could leave the courthouse, violently separating her from her loved ones who were accompanying her in court. They did not present a warrant or tell Petitioner why they were arresting her.

4.     This arrest is part of a new, nationwide DHS strategy of sweeping up people who attend their immigration court hearings, detaining them, and unlawfully seeking to re-route them to fast-track deportations. Since mid-May, DHS has implemented a coordinated practice of leveraging immigration detention to strip people like Petitioner of their substantive and procedural rights and pressure them into deportation. Immigration detention is civil, and thus is permissible for only two reasons: to ensure a noncitizen's appearance at immigration hearings and to prevent danger to the community. But DHS did not arrest and detain Petitioner—who demonstrably poses no risk of absconding from immigration proceedings or danger to the community—for either of

these reasons. Instead, as part of its broader enforcement campaign, DHS detained Petitioner to strip her of his procedural rights, force her to forfeit his application for relief, and pressure her into fast-track removal.

5.      In immigration court, noncitizens have the right to pursue claims for relief from removal (including asylum), be represented by counsel, gather and present evidence, and pursue appeals. 8 U.S.C. § 1229(a). By dismissing an ongoing case, DHS—in its view—can transfer a noncitizen's case from removal proceedings in immigration court, governed by 8 U.S.C. § 1229a, to cursory proceedings under 8 U.S.C. § 1225(b)(1) called "expedited removal," where the procedural protections and opportunities to pursue relief from removal built into regular immigration-court proceedings do not apply. People like Petitioner, who have been here for longer than two years, cannot be placed in expedited removal, yet DHS has subjected her to their unlawful scheme.

6.      Petitioner's arrest and detention are causing her tremendous and ongoing harm. She has been torn away from her partner and her community.

7.      The Constitution protects Petitioner—and every other person present in this country—from arbitrary deprivations of her liberty, and guarantees her due process of law. The government's power over immigration is broad, but as the Supreme Court has declared, it "is subject to important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

8.      Petitioner respectfully seeks a writ of habeas corpus ordering the government to immediately release her from her ongoing, unlawful detention, prohibiting her re-arrest without a hearing to contest that re-arrest before a neutral decisionmaker, and prohibiting the government from placing her in expedited removal proceedings, as she is plainly exempt from the criteria. In addition, to preserve this Court's jurisdiction, Petitioner also requests that this Court order the government not to transfer her outside of the District or deport her for the duration of this proceeding.

**JURISDICTION AND VENUE**

9.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

10.    Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this district.

**PARTIES**

11.    Petitioner Frescia Anthuane Garro Pinchi is a 27-year-old woman resident of Hayward. She has no criminal history and is pursuing asylum based on a fear of persecution in Peru, which, if approved, would give her a permanent residency and, eventually, U.S. citizenship. She is presently in physical custody of Immigration and Customs Enforcement (ICE) at 630 Sansome Street in San Francisco, California.

12.    Respondent Polly Kaiser is the Acting Field Office Director of the San Francisco ICE Field Office. She is the physical custodian of Petitioner. In this capacity, she is responsible for the administration of immigration laws and the execution of immigration enforcement and detention policy within ICE's San Francisco Area of Responsibility, including the detention of Petitioner. Respondent Kaiser maintains an office and regularly conducts business in this district. Respondent Kaiser is sued in her official capacity.

13.    Respondent Todd M. Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in this District; and is legally responsible for pursuing any effort to detain and remove the Petitioner. Respondent Lyons is sued in his official capacity.

14.    Respondent Kristi Noem is the Secretary of Homeland Security and has ultimate authority over DHS. In that capacity and through her agents, Respondent Noem has broad authority over and responsibility for the operation and enforcement of the immigration laws; routinely

transacts business in this District; and is legally responsible for pursuing any effort to detain and remove the Petitioner. Respondent Noem is sued in her official capacity.

15.    Respondent Pamela Bondi is the Attorney General of the United States and the most senior official at the Department of Justice. In that capacity and through her agents, she is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review, which administers the immigration courts and the BIA. Respondent Bondi is sued in her official capacity.

## EXHAUSTION

16.    There is no requirement to exhaust because no other forum exists in which Petitioner can raise the claims herein. There is no statutory exhaustion requirement prior to challenging the constitutionality of an arrest or detention, or challenging a policy under the Administrative Procedure Act. Prudential exhaustion is not required here because it would be futile, and Petitioner will "suffer irreparable harm if unable to secure immediate judicial consideration of [their] claim." *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992). Any further exhaustion requirements would be unreasonable.

## LEGAL BACKGROUND

*A.  The Constitution Protects Noncitizens Like Petitioner from Arbitrary Arrest and Detention.*

17.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Zadvydas*, 533 U.S. at 693). These due process rights are both substantive and procedural.

18.    *First¸* "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate government objective," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

19.    These protections extend to noncitizens facing detention, as "[i]n our society

liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

20.    Substantive due process thus requires that all forms of civil detention—including immigration detention—bear a "reasonable relation" to a non-punitive purpose. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972). The Supreme Court has recognized only two permissible non-punitive purposes for immigration detention: ensuring a noncitizen's appearance at immigration proceedings and preventing danger to the community. *Zadvydas*, 533 U.S. at 690–92; *see also Demore v. Kim*, 538 U.S. 510 at 519–20, 527–28, 31 (2003).

21.    *Second*, the procedural component of the Due Process Clause prohibits the government from imposing even permissible physical restraints without adequate procedural safeguards.

22.    Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). This is so even in cases where that freedom is lawfully revocable. *See Hurd v. D.C., Gov't*, 864 F.3d at 683 (citing *Young v. Harper*, 520 U.S. 143, 152 (1997) (re-detention after pre-parole conditional supervision requires pre-deprivation hearing)); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (same, in parole context).

23.    After an initial release from custody on conditions, even a person paroled following a conviction for a criminal offense for which they may lawfully have remained incarcerated has a protected liberty interest in that conditional release. *Morrissey* at 408 U.S. at 482. As the Supreme Court recognized, "[t]he parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* "By whatever name, the liberty is valuable and must be seen within the protection of the [Constitution]." *Id.*

24.    This reasoning applies with equal if not greater force to people released from civil immigration detention at the border, like Petitioner. After all, noncitizens living in the United States like Petitioner have a protected liberty interest in their ongoing freedom from confinement.

*See Zadvydas*, 533 U.S. at 690. And, "[g]iven the civil context [of immigration detention], [the] liberty interest [of noncitizens released from custody] is arguably greater than the interest of parolees." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019).

**B. Due Process and the Immigration and Nationality Act Protect Noncitizens like Petitioner from Summary Removal Without a Hearing.**

25.     Deportation, like detention, constitutes a deprivation of liberty protected by the Due Process Clause. As the Supreme Court has held, a noncitizen's interest in deportation proceedings "is, without question, a weighty one" because "[s]he stands to lose the right 'to stay and live and work in this land of freedom.'" *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)).

26.     Indeed, modern-day removal proceedings developed in response to a series of Supreme Court decisions recognizing that the deportation of noncitizens already in the United States without a hearing before a neutral arbiter would violate due process. *See Yamataya v. Fisher*, 189 U.S. 86, 101 (1903) (construing immigration statutes to require hearing before deportation to "bring them into harmony with the constitution"); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49, *modified*, 339 U.S. 908 (1950) (same, reasoning that "the difficulty with any argument premised on the proposition that the deportation statute does not require a hearing is that, without such hearing, there would be no constitutional authority for deportation").

27.     Removal proceedings under Section 240 of the Immigration and Nationality Act ("Section 240" proceedings) accordingly provide important substantive and procedural protections. Noncitizens in Section 240 proceedings, like Petitioner when she was arrested, are entitled to full hearings in immigration court before immigration authorities can remove them. 8 U.S.C. § 1229a. They are statutorily afforded rights and procedural protections, including the right to be represented by counsel of their choice, and the right to present and confront evidence. *See id.* § 1229a(4). They are also entitled to administrative appellate review at the Board of Immigration Appeals and further judicial review in the federal Courts of Appeals. *See* 8 C.F.R. § 1003.1(b) (Board of Immigration Appeals); 8 U.S.C. § 1252(a)(5) (Courts of Appeals).

28.     Expedited removal is a form of summary removal historically applicable only to

recently-arrived noncitizens that sharply limits the rights and process available in Section 240 proceedings.

29.    In contrast to Section 240 proceedings, expedited removal takes place almost entirely outside of immigration court: A person subject to expedited removal can be removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). At this stage, the person is typically detained and unable to access counsel. In effect, immigration enforcement agents from ICE or Border Patrol serve as judge, jury, and jailer; they detain the noncitizen, unilaterally determine whether they are subject to the expedited removal statute, and unilaterally order them removed.

30.    When a person in expedited removal expresses a fear of persecution or intent to seek asylum, the immigration officer refers the person to an asylum officer for a credible fear interview. 8 U.S.C. § 1225(b)(1)(A)(ii). If the asylum officer finds that the person has a credible fear, they are permitted to seek to apply for asylum through Section 240 proceedings. *Id.* § 1225(b)(1)(B)(ii). However, when an asylum officer determines that someone has not established a credible fear, the officer must order them removed "without further hearing or review," subject to highly limited review by an immigration judge that the person "does not have a credible fear of persecution." *Id.* § 1225(b)(1)(B)(iii).

## FACTUAL ALLEGATIONS

### A. DHS Dramatically Expands the Scope of Expedited Removal.

31.    For decades, DHS applied expedited removal exclusively in the border enforcement context, with only narrow exceptions to that general rule. From 1997 until 2002, expedited removal applied only to inadmissible noncitizens arriving at ports of entry. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures; Final Rule, 62 Fed. Reg. 10312 (Mar. 6, 1997).

32.    In 2002, the government for the first time invoked its authority to apply expedited removal to persons already inside the country, but only for a narrow group of people who arrived by sea, were not admitted or paroled, and were apprehended within two years of entry. *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the

Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002).

33.    In 2004, the government authorized the application of expedited removal to individuals who entered by means other than sea, but only if they were apprehended within 100 miles of a land border and were unable to demonstrate that they had been continuously physically present in the United States for 14 days. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004).

34.    In 2019, at the direction of President Trump, DHS published a Federal Register Notice authorizing the application of expedited removal to certain noncitizens arrested anywhere in the country who could not affirmatively show that they had been continuously present for two years. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019). The District Court for the District of Columbia entered a preliminary injunction preventing the rule from taking effect, which the D.C. Circuit later vacated. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019), *vacated sub nom. Make the Rd. New York v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

35.    In 2021, President Biden directed the DHS Secretary to review the rule expanding expedited removal and consider whether it comported with legal and constitutional requirements, including due process. In 2022, DHS rescinded the rule. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).

36.    While the 2019 expansion was in effect, the government applied expedited removal to persons inside the country in an exceedingly small number of cases. Thus, from 1997 to 2025, with limited exceptions, immigration authorities generally did not apply expedited removal to noncitizens apprehended far from the border, or individuals anywhere in the United States (including near the border) who had been residing in the country for more than fourteen days.

37.    This state of affairs changed drastically on January 20, 2025, the day that President Trump took office for his second term. That day, President Trump signed Executive Order 14159, "Protecting the American People Against Invasion," the purpose of which was "to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." Exec. Order No. 14,159, 90

C.F.R. § 8443 (Jan. 20, 2025). The order directed the Secretary of Homeland Security to take various actions "to ensure the efficient and expedited removal of aliens from the United States." *Id*.

38.     To implement this Executive Order, DHS issued a notice immediately authorizing application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for at least two years. 90 Fed. Reg. 8139 (published Jan. 24, 2025).

39.     On January 23, 2025, the Acting Secretary of Homeland Security issued a memorandum "provid[ing] guidance regarding how to exercise enforcement discretion in implementing" the new expedited-removal rule. The guidance directed federal immigration officers to "consider . . . whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." As part of that process, the guidance encourages officers to "take steps to terminate any ongoing removal proceeding and/or any active parole status."[1]

40.     Under the administration's expanded approach to expedited removal, hundreds of thousands of noncitizens who have lived in the country for less than two years are at imminent risk of summary removal without any hearing, meaningful process, access to counsel, or judicial review—regardless of the strength of their ties to the United States.

**B. To Place More People in Expedited Removal, DHS Undertakes New Campaign of Courthouse Arrests and Detention.**

41.     Since mid-May 2025, DHS has initiated an aggressive new enforcement campaign targeting people who are in regular removal proceedings in immigration court, many of whom have pending applications for asylum or other relief. This "coordinated operation" is "aimed at dramatically accelerating deportations" by arresting people at the courthouse and placing them into expedited removal.[2]

---

[1] Benjamine C. Huffman, *Guidance Regarding How to Exercise Enforcement Discretion*, Dep't of Homeland Sec. (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf.

[2] Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic*

42.    The first step of this enforcement operation typically takes place inside the immigration court. When people arrive in court for their master calendar hearings, DHS attorneys orally file a motion to dismiss the proceedings—without any notice to the affected individual. Although DHS regulations do not permit such motions to dismiss absent a showing that the "[c]ircumstances of the case have changed," 8 C.F.R. § 239.2(a)(7), (c), DHS attorneys do not conduct any case-specific analysis of changed circumstances before filing these motions to dismiss.

43.    Even though individuals are supposed to have ten days to respond to a motion to dismiss, some IJs have granted the government's oral motion on the spot and immediately dismissed the case. This is consistent with recent instructions from the Department of Justice to immigration judges stating that they may allow the government to move to dismiss cases orally, in court, without a written motion, and to decide that motion without allowing the noncitizen an opportunity to file a response.

44.    Despite these instructions, some IJs have still asked DHS to re-file the motion as a written motion and continued proceedings to allow individuals to file their response. A smaller group of IJs have expressly denied the motion to dismiss on the record or in a written order.

45.    The next step of DHS's new campaign takes place outside the courtroom. ICE officers, in consultation with DHS attorneys and officials, station themselves in courthouse waiting rooms, hallways, and elevator banks. When an individual exits their immigration hearings, ICE officers—typically masked and in plainclothes—immediately arrest the person and detain them. ICE officers execute these arrests regardless of how the IJ rules on the government's motion to dismiss. On information and belief, they typically do not have an arrest warrant.

46.    Once the person has been transferred to a detention facility, the government places the individual in expedited removal. In cases in which the IJ did not dismiss the person's removal

---

*in Trump's Deportation Push*, Wash. Post, May 23, 2025,
https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/;
*see also* Hamed Aleaziz, Luis Ferré-Sadurní, & Miriam Jordan, *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. Times, May 30, 2025,
https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

proceedings, DHS attorneys unilaterally transfer venue of the case to a "detained" immigration court, where they renew their motions to dismiss—again with the goal of putting the person in expedited removal.

47.    DHS is aggressively pursuing this arrest and detention campaign at courthouses throughout the country. In New York City, for example, "ICE agents have apprehended so many people showing up for routine appointments this month that the facilities" are "overcrowded," with "[h]undreds of migrants . . . sle[eping] on the floor or sitting upright, sometimes for days."[3]

48.    The same is true at the San Francisco Immigration Court, where Petitioner was arrested. Over the past two months, dozens of people have been arrested and detained after attending their routine immigration hearings.[4]

49.    DHS's aggressive tactics at immigration courts appear to be motivated by the Administration's imposition of a new daily quota of 3,000 ICE arrests.[5] In part as a result of this campaign, ICE's arrests of noncitizens with no criminal record have increased more than 800% since before January.[6]

50.    The new courthouse arrest and detention campaign is a sharp break from DHS's previous practices, when immigration officers avoided arrests at courthouses given the concern

---

[3] Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times, June 12, 2025, https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html.

[4] Sarah Ravani, *ICE Arrests Two More at S.F. Immigration Court, Advocates Say*, S.F. Chron., June 12, 2025, https://www.sfchronicle.com/bayarea/article/sf-immigration-court-arrests-20374755.php; Margaret Kadifa & Gustavo Hernandez, *Immigrants fearful as ICE Nabs at least 15 in S.F., Including Toddler*, Mission Local, June 5, 2025, https://missionlocal.org/2025/06/ice-arrest-san-francisco-toddler/; Tomoki Chien, *Undercover ICE Agents Begin Making Arrests at SF Immigration Court*, S.F. Standard, May 27, 2025, https://sfstandard.com/2025/05/27/undercover-ice-agents-make-arrests-san-francisco-court/.

[5] Ted Hesson & Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets*, Reuters, June 10, 2025, https://www.reuters.com/world/us/ices-tactics-draw-criticism-it-triples-daily-arrest-targets-2025-06-10/; Alayna Alvarez & Brittany Gibson, *ICE Ramps Up Immigration Arrests in Courthouses Across the U.S.*, Axios, June 12, 2025, https://www.axios.com/2025/06/12/ice-courthouse-arrests-trump.

[6] José Olivares & Will Craft, *ICE Arrests of Migrants with No Criminal History Surging under Trump*, The Guardian, June 14, 2025, https://www.theguardian.com/us-news/2025/jun/14/ice-arrests-migrants-trump-figures.

that such enforcement actions would deter people from appearing for their proceedings and complying with court orders.[7]

51.    In fact, DHS officials previously permitted ICE officers to conduct "civil immigration enforcement action . . . in or near a courthouse" only in highly limited circumstances, such as when "it involves a national security threat," or "there is an imminent risk of death, violence, or physical harm." These limitations were necessary, DHS explained, because "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and, as a result, impair the fair administration of justice." The new policy includes no such limiting language.

52.    The government's new campaign is also a significant shift from previous DHS practice of re-detaining noncitizens only after a material change in circumstances. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (describing prior practice).

**C.  Petitioner is Unlawfully Arrested and Detained Pursuant to DHS's New Policy.**

53.    Petitioner is a 27-year-old citizen of Peru.

54.    In early 2023, Petitioner fled to the United States. She was initially arrested by DHS officers, but was released on her own recognizance with a notice to appear for removal proceedings. In granting her release, DHS determined that she posed little if any risk of flight or danger to the community.

55.    Petitioner thereafter moved to Hayward, California. On information and belief, she informed the immigration court about her change of address. She attended her first immigration court hearing in the San Francisco Immigration Court, the only hearing scheduled for her before today.

56.    Just over one year after her arrival in the United States, Petitioner applied for asylum, withholding of removal, and relief under the Convention Against Torture.

---

[7] Hamed Aleaziz, Luis Ferré-Sadurní, & Miriam Jordan, *How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. Times, May 30, 2025, https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

57.     Ever since Petitioner entered the country, she has fully complied with court and supervision requirements. She has no criminal history.

58.     On July 3, 2025, Petitioner appeared at San Francisco Immigration Court for her second master calendar hearing in immigration court. She appeared pro se, without the representation of counsel.

59.     The DHS attorney orally moved to dismiss Petitioner's case.

60.     Petitioner's opposed the motion. The IJ gave Petitioner time to file a response and continued the hearing until July 31, 2025. Although the IJ had continued the hearing, he told petitioner "but I probably won't see you then"—suggesting that he had received notice that she would be arrested pursuant to ICE's new tactics. The IJ stated that he believed Petitioner's case was being dismissed for the purpose of putting her in expedited removal, even though she has been in the United States for more than two years and thus cannot be placed in expedited removal. Petitioner did not receive notice that she would be arrested and had no opportunity to oppose her re-arrest or re-detention on the record.

61.     When Petitioner left the courtroom, she was arrested by ICE agents. On information and belief, the agents did not have a warrant and did not tell Petitioner why she was being arrested.

62.     Because Petitioner has never been determined to be a flight risk or danger to the community, her detention is not related to either of the permissible justifications for civil immigration litigation. Her detention does not further any legitimate government interest.

**D. As a Result of Her Arrest and Detention, Petitioner is Suffering Ongoing and Irreparable Harm.**

63.     Petitioner is being deprived of her liberty without any permissible justification. The government previously released her on her own recognizance because she did not pose sufficient risk of flight or danger to the community to warrant detention.

64.     None of that has changed. Petitioner has no criminal record, and there is no basis to believe that she poses any public-safety risk. Nor is Petitioner, who was arrested *while appearing in court for her immigration case*, conceivably a flight risk. To the contrary, Petitioner appeared for every immigration court hearing and other requirement.

65.    Petitioner is now separated from her friends and partner. She suffers from severe medical conditions, including:

a.    She recently underwent an operation for a vaginal tumor which continues to be monitored, requiring medication to prevent recurrence.

b.    Generalized anxiety disorder, clinical depression, post-traumatic stress disorder: These conditions require medication every 8 hours. She is currently in ICE custody; her medication is at home; and she does not know the name of it.

c.    As of the submission of this document, she is experiencing physical withdrawal symptoms from her anxiety medication, including shakes and shortness of breath.

d.    She has Helicobacter pylori, a bacterium that infects the stomach and is a major cause of stomach cancer and peptic ulcers, requiring a strict dietary regimen prescribed by a medical doctor.

e.    Gastritis, which required an appendectomy last year.

f.    Asthma.

66.    Petitioner hold steady employment and works 40 hours per week. She is the primary provider for her mother, daughter, and other relatives in Peru, who live in hiding due to the same factors leading Ms. Garro Pinchi to seek asylum in the U.S. Her mother has diabetes and is completely dependent on Ms. Garro Pinchi for insulin. Other relatives in Peru are disabled and rely exclusively on Ms. Garro Pinchi for financial support.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Fifth Amendment to the United States Constitution**

**(Substantive Due Process—Detention)**

67.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

68.    The Due Process Clause of the Fifth Amendment protects all "person[s]" from deprivation of liberty "without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at

the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

69.    Immigration detention is constitutionally permissible only when it furthers the government's legitimate goals of ensuring the noncitizen's appearance during removal proceedings and preventing danger to the community. *See id.*

70.    Petitioner is not a flight risk or danger to the community. Respondents' detention of Petitioner is therefore unjustified and unlawful. Accordingly, Petitioner is being detained in violation of the Due Process Clause of the Fifth Amendment.

71.    Moreover, Petitioner's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Id.* (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Here, the purpose of Petitioner's detention appears to be "not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons"—namely, to meet newly-imposed DHS quotas and transfer immigration court venue away from an IJ who refused to facilitate DHS's new expedited removal scheme. *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring).

## SECOND CLAIM FOR RELIEF

### Violation of the Fifth Amendment to the United States Constitution

### (Procedural Due Process—Detention)

72.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

73.    As part of the liberty protected by the Due Process Clause, Petitioner has a weighty liberty interest in avoiding re-incarceration after his release. *See Young v. Harper*, 520 U.S. 143, 146–47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482–83 (1972); *see also Ortega*, 415 F. Supp. 3d at 969–70 (holding that a noncitizen has a protected liberty interest in remaining out of custody following an IJ's bond determination).

74.    Accordingly, "[i]n the context of immigration detention, it is well-settled that due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Hernandez*, 872 F.3d at 990 (cleaned up); *Zinerman*, 494

U.S. at 127 (Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."). In the immigration context, for such hearings to comply with due process, the government must bear the burden to demonstrate, by clear and convincing evidence, that the noncitizen poses a flight risk or danger to the community. *See Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011); *see also Martinez v. Clark*, 124 F.4th 775, 785, 786 (9th Cir. 2024).

75. Petitioner's re-detention without a pre-deprivation hearing violated due process. Over two years after deciding to release Petitioner from custody on her own recognizance, Respondents re-detained Petitioner with no notice, no explanation of the justification of her re-detention, and no opportunity to contest her re-detention before a neutral adjudicator before being taken into custody.

76. Petitioner has a profound personal interest in her liberty. Because she received no procedural protections, the risk of erroneous deprivation is high. And the government has no legitimate interest in detaining Petitioner without a hearing; bond hearings are conducted as a matter of course in immigration proceedings, and nothing in Petitioner's record suggested that she would abscond or endanger the community before a bond hearing could be carried out. *See, e.g.*, *Jorge M.F. v. Wilkinson*, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021); *Vargas v. Jennings*, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020) ("the government's concern that delay in scheduling a hearing could exacerbate flight risk or danger is unsubstantiated in light of petitioner's strong family ties and his continued employment during the pandemic as an essential agricultural worker").

## THIRD CLAIM FOR RELIEF

### Violation of the Fourth Amendment to the United States Constitution

### (Unlawful Arrest)

77. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

78. The Fourth Amendment protects the right of persons present in the United States to be free from unreasonable seizures by government officials.

79.     As a corollary to that right, the Fourth Amendment prohibits government officials from conducting repeated arrests on the same probable cause.

> It is axiomatic that seizures have purposes. When those purposes are spent, further seizure is unreasonable. . . . [T]he primary purpose of an arrest is to ensure the arrestee appears to answer charges. . . . Once the arrestee appears before the court, the purpose of the initial seizure has been accomplished. Further seizure requires a court order or new cause; the original probable cause determination is no justification.

*Williams v. Dart*, 967 F.3d 625, 634 (7th Cir. 2020) (cleaned up); *see also United States v. Kordosky*, No. 88-CR-52-C, 1988 WL 238041, at *7 n.14 (W.D. Wis. Sept. 12, 1988) ("Absent some compelling justification, the repeated seizure of a person on the same probable cause cannot, by any standard, be regarded as reasonable under the Fourth Amendment.").

80.     In the immigration context, this prohibition means that a person who immigration authorities released from initial custody cannot be re-arrested "solely on the ground that he is subject to removal proceedings" and without some new, intervening cause. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1196 (N.D. Cal. 2017), *aff'd sub nom.*, *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Courts have long recognized that permitting such rearrests could result in "harassment by continual rearrests." *United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971).

81.     DHS agents arrested Petitioner in 2023 after she entered the United States, charged her with a violation of civil immigration law, and released her on his own recognizance with a notice to appear in immigration court. Petitioner appeared in immigration court as instructed, answered the charges, and diligently pursued an application for relief from removal.

82.     DHS re-arrested Petitioner on May 27, 2025, based on nothing more than the 2024 civil charge of violating immigration law for which she had *just appeared* in court. Petitioner had not engaged in any conduct in the intervening time that made her a flight risk or danger to the community. No material change in circumstances justified Petitioner's re-arrest.

83.     Petitioner's re-arrest and detention by Respondents after she had already appeared in court on his civil immigration charge and absent any material change in circumstances is thus an unreasonable seizure in violation of the Fourth Amendment.

**FOURTH CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act**

84.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

85.    The Administrative Procedure Act prohibits federal action that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A).

86.    The government's policy targeting people attending their immigration hearings at immigration court for arrest violates the longstanding common-law privilege against civil arrests in and around courthouses. That privilege extends to parties, witnesses, and all people attending the courts on business.

87.    Congress did not displace this privilege when it enacted the Immigration and Nationality Act, and the privilege was incorporated as a limit on ICE's arrest authority. The government's courthouse arrest policy therefore is in excess of statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

88.    The policy is also arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

89.    The government has provided no reasoned or adequate explanation for the policy, which is a dramatic shift from recent and longstanding agency policy and practice.

90.    Additionally, in adopting the policy, the government failed to adequately consider all relevant factors and crucial aspects of the issue. The policy will deter individuals from appearing as parties and witnesses at immigration and other judicial proceedings, preventing the adjudication of meritorious claims, impeding the administration of justice, and hindering cooperation with law enforcement.

91.    The policy is also in excess of the agency's authority, and arbitrary and capricious, because it violates the agency's own regulations making clear that the government cannot terminate a person's Section 240 proceedings absent a showing that the "[c]ircumstances of the case have changed after the notice to appear was issued." 8 C.F.R. § 239.2(a)(7), (c); *see United*

*States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

92.    Petitioner's arrest and detention pursuant to the government's policy is a final agency action that violates the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

<u>**FIFTH CLAIM FOR RELIEF**</u>

**Violation of the First and Fifth Amendments to the United States Constitution**

**(Right to Access Courts and Petition for Redress)**

93.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

94.    The First and Fifth Amendments to the United States Constitution guarantee the rights to access the courts and to petition for redress of grievances, which includes the right to participate as a party or witness in judicial and administrative proceedings.

95.    The Constitution as a corollary prohibits systemic official action that bans or obstructs meaningful access to the courts, including the filing or presenting of legal claims. *See Christopher v. Harbury*, 536 U.S. 403 (2002).

96.    Petitioner's arrest and detention have interfered with her ability to access immigration court and participate in his immigration proceedings—including pursuing his applications for asylum, withholding of removal, and relief under the Convention Against Torture.

97.    The government's arrest of Petitioner therefore deprived her of his First and Fifth Amendment rights to meaningfully access court and to petition for redress of grievances.

98.    Petitioner has no adequate remedy at law.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706**

**(Dismissal/Expedited Removal)**

99.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

100.    8 U.S.C. § 1225(b)(1) covers the "[i]nspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). Section 1225(b)(1)(A)(iii)(II) further clarifies that "[a]n alien described in this clause is an alien who is not

described in subparagraph (F), who has not … been physically present in the United States continuously for the 2-year period." 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

101.    The government's own records make clear that Petitioner entered the United States on April 14, 2023. Because Petitioner has been in the United States for more than two years, 8 U.S.C. § 1225(b)(1) cannot be applied to her.

102.    Dismissal of Petitioner's 240 proceedings case for the purpose of placing her in expedited removal would exceed statutory authority and be contrary to the Fifth Amendment's guarantee of due process in violation of 5 U.S.C. § 706(2)(A)-(B).

103.    Placing Petitioner in expedited removal proceedings would be contrary to the Fifth Amendment's guarantee of due process in violation of 5 U.S.C. § 706(2)(A)-(B).

## SEVENTH CLAIM FOR RELIEF

### Violation of the Fifth Amendment to the United States Constitution

### (Procedural Due Process—Dismissal/Expedited Removal)

104.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

105.    Petitioner has a liberty interest in protection from deportation. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (a noncitizen's interest in deportation proceedings "is, without question, a weighty one" because "she stands to lose the right 'to stay and live and work in this land of freedom'") (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)); *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 377 n.32 (C.D. Cal. 1982) ("It is well-settled that the right to a deportation hearing is of constitutional scope because deportation 'involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned perhaps to life itself.'") (quoting *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950)). Accordingly, "[a] person who faces deportation is entitled under our constitution to a full and fair deportation hearing," *Hartooni v. I.N.S.*, 21 F.3d 336, 339–40 (9th Cir. 1994), because "without such a hearing, there would be no constitutional authority for deportation." *Wong Yang Sung*, 339 U.S. at 49.

106.    Depriving Petitioner of her liberty interest is unconstitutional under the Fifth Amendment unless it is "accompanied by sufficient procedural protections." *See Johnson v. Ryan*,

55D F.4th 1167, 1179–80 (9th Cir. 2022) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

107.  Dismissing Petitioner's Section 240 proceedings for the purpose of placing her in expedited removal would violate due process by failing to provide adequate procedural protections to her weighty interests.

108.  Placing Petitioner in expedited removal would violate due process by failing to provide adequate procedural protections to her weighty interests.

### **PRAYER FOR RELIEF**

Petitioner respectfully requests that this Court:

1.  Assume jurisdiction over this matter;

2.  Issue a writ of habeas corpus ordering Respondents to immediately release Petitioner from custody;

3.  Declare that Petitioner's arrest and detention violate the Due Process Clause of the Fifth Amendment, the Fourth Amendment, the First Amendment, and the Administrative Procedure Act;

4.  Declare that dismissing Petitioner's Section 240 proceedings would violate the Due Process Clause of the Fifth Amendment;

5.  Declare that placing Petitioner in expedited removal proceedings would violate the Due Process Clause of the Fifth Amendment;

6.  Enjoin Respondents from transferring Petitioner outside this District or deporting Petitioner pending these proceedings;

7.  Enjoin Respondents from re-detaining Petitioner unless her re-detention is ordered at a custody hearing before a neutral arbiter in which the government bears the burden of proving, by clear and convincing evidence, that Petitioner is a flight risk or danger to the community;

8.  Order that Respondents may not dismiss Petitioner's Section 240 proceedings;

9.  Order that Respondents may not place Petitioner in expedited removal proceedings or remove Petitioner except based on a final, executable removal order issued through Section 240 removal proceedings;

10.     Award Petitioner his costs and reasonable attorneys' fees in this action as provided

for by the Equal Access to Justice Act and 28 U.S.C. § 2412; and

11.     Grant such further relief as the Court deems just and proper.

Date: July 3, 2025                                    Respectfully Submitted,

                                                      /s/ Abby Sullivan Engen
                                                      CENTRO LEGAL DE LA RAZA
                                                      3400 E. 12th Street
                                                      Oakland, CA 94601
                                                      Telephone: (510) 244-4312
                                                      asullivanengen@centrolegal.org

                                                      *Attorney for Petitioner*