Abby Sullivan Engen (SBN 270698)
asullivanengen@centrolegal.org
CENTRO LEGAL DE LA RAZA
3400 E. 12th Street
Oakland, CA 94601
Telephone: (510) 244-4312

*Attorney for Petitioner*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Frescia Anthuane GARRO PINCHI,<br><br>Petitioner,<br><br>v.<br><br>POLLY KAISER, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD LYONS, Acting Director of United States Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security, PAMELA BONDI, Attorney General of the United States, acting in their official capacities,<br><br>Respondents. | CASE NO.  25-cv-05632<br><br>**DECLARATION OF ARIEL KOREN** |

I, Ariel Koren, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts. Where I do not have personal knowledge, I believe and am informed for the following information to be true.

2. I am a close friend of Ms. Garro Pinchi, the petitioner in this case. In addition to having a close friendship with her, I have done an extensive amount of interpreting work for her and for her roommate Brayan Santiago Ropero Cano, in my capacity as an interpreter and Executive Director of the international NGO Respond Crisis Translation.

3. As a result of this interpreting work, I have extensive knowledge about the severe life-threatening harm that forced Ms. Garro Pinchi to flee her home country. I also have borne witness to the indispensable role she plays in sustaining her family as the sole provider for her mother, daughter, and relatives; the esteem and praise she has earned in her place of work in San Francisco; and the grave and extensive medical conditions that pose a threat to her life should she remain in confinement.

4. On July 3, 2025 at 8:30 AM, I arrived at the San Francisco Immigration Court to accompany Ms. Garro Pinchi at her court hearing. As soon as her hearing began, the DHS attorney moved to dismiss her case. It has been my understanding that DHS is moving to dismiss cases like Ms. Garro Pinchi's, regardless of the strength of people's asylum claims, in order to take them out of immigration court jurisdiction and put them in a fast-track deportation process.

5. Ms. Garro Pinchi looked back at me with visible terror in her eyes. I believe she shared my understanding that DHS's motion to dismiss signified an intent to deport her immediately. Ms. Garro Pinchi responded to the motion by pleading with the presiding judge

DECLARATION OF ARIEL KOREN
CASE NO. 25-cv-05632

not to dismiss her case, stating that her life was at imminent risk should she be forced to return to her home country.

6. The judge responded by granting her a continuance to July 31, 2025 and instructing her to bring evidence to prove her case should not be dismissed.

7. The Judge also made a comment—that I understood to mean Ms. Garro Pinchi would likely be detained—along the lines of: "you are scheduled for July 31, 2025 but I might not be seeing you on that day or again in my court".

8. DHS provided no reason for its motion to dismiss. The DHS attorney did not acknowledge Ms. Garro Pinchi's plea that her life was under imminent threat.

9. After her hearing concluded, Ms. Garro Pinchi sat back down next to me. Ms. Garro Pinchi, who suffers from severe anxiety and PTSD, began to have shakes and heart palpitations. She was sweating profusely from her hands and head and her body was convulsing. She mentioned to me at this point that within a few hours she would need her medication, which was at her home.

10. Attempting to console her, I held her hand and we linked arms. When the judge stated that all were free to leave, we walked out of the court room to find four ICE officers, two of whom were masked, waiting outside of the door. Two officers aggressively physically separated us. I insisted that ICE had no reason to separate the two of us and that Ms. Garro Pinchi needed to leave for work and was planning to return for her court date on July 31, 2025.

11. The officers ignored me and forcefully pinned her against the wall, violently handcuffing her even though she was crying and was not resisting arrest.

12. The officers took her to a different floor in the building for processing. Shortly thereafter I arrived at that floor with my colleague Matthew Bridges. I insisted to the officers that Ms. Garro Pinchi now had an attorney representing her and that her attorney was on the

phone. I insisted that she had the right to consult with her attorney before being required to sign any documents.

13. After around an hour, Mr. Bridges and I were finally allowed visitation with Ms. Garro Pinchi through a glass window. At this point, her attorney had already filed a Habeas Corpus petition, as well as a request directly to ICE to release Ms. Garro Pinchi. In both filings, her attorney listed her dire health conditions, including a condition that requires her to take her medication every 8 hours, and emphasized that her medications were all at home.

14. Mr. Bridges and I repeatedly told every officer whom we encountered that a habeas corpus petition had been filed. Mr. Bridges even handed them a physical copy of the attorney's release request.

15. Additionally, we told every single officer whom we encountered that Ms. Garro Pinchi was facing acute medical risk as a result of her detention. I specified multiple times that she had been operated on twice in the past year alone, that she had recently undergone the removal of a vaginal tumor, and that she had severe breathing issues that would pose a risk to her life were she to be held in confinement without her medication.

16. I was also on the phone with Ms. Garro Pinchi's attorney during much of this time. I informed all of the ICE officers present that Ms. Garro Pinchi's attorney was on the phone and was insisting to speak to Ms. Garro Pinchi's deportation officer. In spite of this, all ICE officers present refused to speak to Ms. Garro Pinchi's attorney

17. At about 1:35 p.m., while Mr. Bridges and I were in the visitation room speaking to Ms. Garro Pinchi, an ICE officer opened the door and demanded that she come with him, pointing to handcuffs, which we understood to mean she would be restrained should she refuse. I insisted that we were in the middle of a consultation with her attorney via phone. She was taken away anyway.

18. While she was absent from the visitation room, Mr. Bridges and I insisted that we needed to continue our conversation with her and that she needed to be allowed immediate access to her attorney. She remained absent, her whereabouts undisclosed to us, for over half an hour.

19. When she finally reappeared in the visitation room, she reported that she had just been forced by ICE to sign a document. She told us that the document was in English and was not translated to her, and that she had insisted to the officers that she did not want to sign anything without first consulting with an attorney.

20. In addition to Mr. Bridges and my repeated requests to allow Ms. Garro Pinchi speak to her attorney, we had repeatedly told her that I was her Spanish-English interpreter. In spite of this, Ms. Garro Pinchi was forced to sign the document without speaking to her attorney and without having anyone to provide a translated version of this document.

21. In the visitation room, she reported to us that the ICE officer who had forced her to sign the document had told her that she had to sign off on one of two options: 1. Having the opportunity to pay a bond and speak with a judge or 2. Foregoing the opportunity to speak with a judge.

22. As her interpreter, and having her attorney on the phone, I insisted that I be allowed to facilitate her attorney's review of the document she had been forced to sign and that her attorney have the chance to review it. I was never allowed to do so and still am not privy to the contents of the document that she signed.

23. After sharing that she had been forced to sign this document, Ms. Garro Pinchi also shared that she had been told she would likely be transferred to a detention facility. In response, I escalated my concerns by reiterating to the ICE officers present that:

   a. Her life would be at risk should she be transferred due to her dire medical issues;

DECLARATION OF ARIEL KOREN
CASE NO. 25-cv-05632

b. She did not have her medication with her;

c. She had sufficient funds to pay an ICE bond;

d. The habeas corpus petition that had been filed meant that she should not be transferred anywhere outside of the Northern District of California; and

e. Her release was urgent and life-critical for all of the aforementioned reasons.

24. Despite my repeated protestations due to Ms. Garro Pinchi's medical condition, ICE officers entered the visitation room at 2:22 PM and forced her to leave with them under the threat of physical restraint.

25. Over the five-plus hours that I was in the ICE office, all officers with whom I spoke responded to my warnings about her critical medical condition by telling me I would need to speak to a different deportation officer. From roughly 10:30 AM until 3:40 PM, I remained present on the floor where Ms. Garro Pinchi was detained, requesting every 10-15 minutes for the duration of the entire day to speak with the deportation officer about her medical condition, about the habeas corpus petition, and about the fact that her attorney was on the phone insisting to speak to someone. Each time I requested this, I was told that the deportation officer would speak with me, Mr. Bridges, and her attorney within 20 to 30 minutes. However, at the end of each lapse of 20-30 minutes, we were told we would need to wait another 20-30 minutes.

26. Throughout the day, I was told countless times that I would be permitted to speak to an officer. At around 3:30 PM, I was told that business had closed and I should leave.

27. Since yesterday I have not been allowed any communication with Ms. Garro Pinchi and have been left in the dark as to her whereabouts. She has essentially been disappeared; I have no idea where she is being held and know only that she continues to be

DECLARATION OF ARIEL KOREN
CASE NO. 25-cv-05632

detained without access to the medications and medical interventions that she relies on for her survival.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 4, 2025.

_____
Ariel Koren

DECLARATION OF ARIEL KOREN
CASE NO. 25-cv-05632