# Exhibit 1

| | |
|---|---|
| 1 | ~~Abby Sullivan Engen (SBN 270698)~~ |
| | ~~ERIN~~asullivanengen@centrolegal.org |
| 2 | ~~CENTRO LEGAL DE LA RAZA~~ |
| | ~~3400~~ E. ~~12th~~MEYER - # 274244 |
| 3 | emeyer@keker.com |
| | JULIA L. ALLEN - # 286097 |
| 4 | jallen@keker.com |
| | CLAIRE C. BONELLI - #317735 |
| 5 | cbonelli@keker.com |
| | ELLEN WATLINGTON - # 336422 |
| 6 | ewatlington@keker.com |
| | JACQUIE P. ANDREANO - # 338354 |
| 7 | jandreano@keker.com |
| | KAYLA CROWELL - # 349061 |
| 8 | kcrowell@keker.com |
| | KEKER, VAN NEST & PETERS LLP |
| 9 | 633 Battery Street |
| | ~~Oakland~~San Francisco, CA ~~94601~~94111 |
| 10 | Telephone: (~~510) 244-4312~~415) 391-5400 |
| 11 | Attorneys for ~~Petitioner~~Plaintiffs-Petitioners |
| 12 | *[ADDITIONAL COUNSEL ON NEXT PAGE]* |
| 13 | |

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
NEIL K. SAWHNEY - # 300130
nsawhney@aclunc.org
LAUREN M. DAVIS - # 357292
ldavis@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

ABBY SULLIVAN ENGEN- # 270698
asullivanengen@centrolegal.org
JESSE NEWMARK - # 247488
jessenewmark@centrolegal.org
NIKOLAS DE BREMAEKER (pro hac vice
forthcoming)
ndebremaeker@centrolegal.org
CENTRO LEGAL DE LA RAZA
3400 E. 12th Street
Oakland, CA 94601
Telephone: (510) 437-1863

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

~~UNITED STATES DISTRICT COURT~~

~~NORTHERN DISTRICT OF CALIFORNIA~~

~~SAN FRANCISCO DIVISION~~



Case No. 5:25-cv-5632-PCP

CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS

~~Frescia Anthuane GARRO PINCHI,~~

~~Petitioner,~~

FRESCIA GARRO PINCHI, JUANY GALO SANTOS, and JOSE TELETOR SENTE, on behalf of themselves and others similarly situated,

Plaintiffs-Petitioners,

v.

~~POLLY KAISER, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD LYONS, Acting Director of United States Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security; PAMELA BONDI, Attorney General of the United States, acting in their official capacities,~~

~~Respondents.~~

SERGIO ALBARRAN, Field Office Director of the San Francisco Immigration and Customs Enforcement Office; KRISTI NOEM, Secretary of the United States Department of Homeland Security; TODD LYONS, Acting Director of United States Immigration and Customs Enforcement; PAMELA BONDI, Attorney General of the United States; SIRCE OWEN, Acting Director of Executive Office of Immigration Review, acting in their official capacities,

Defendants-Respondents.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JUDY RABINOVITZ (pro hac vice forthcoming)
jrabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660

Attorneys for Plaintiffs-Petitioners

**INTRODUCTION**

1.      This case challenges the Trump Administration's sweeping and unprecedented campaign to re-arrest and re-detain noncitizens living in the community—many for years—without any individualized determination that they now pose a flight risk or danger.

2.      Federal immigration officials have the authority to release apprehended noncitizens pending ongoing removal proceedings. Any decision to release a noncitizen—whether on parole, bond, other supervision conditions, or their own recognizance—necessitates a finding that the specific individual poses no flight risk or danger to the community that warrants detention. For decades, federal immigration officials have adhered to a policy of not re-arresting and re-detaining noncitizens previously released from federal custody, absent an individualized determination that there had been a material change in their circumstances that rendered them a danger or flight risk. This longstanding policy reflects a fundamental due process principle: When the government conditionally releases an individual, it makes "an implicit promise" that their liberty will not be revoked unless they fail to satisfy their conditions of release. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). It also conforms with the Fourth Amendment's prohibition on repeated seizures based on the same probable cause without a material change in circumstances.

3.      Countless noncitizens have relied on this implicit promise to build their lives. While their removal proceedings remain ongoing, they have pursued relief from removal, grown their families, paid taxes, invested in their education, and developed extensive community and family ties. The government's policy assured these individuals that they would retain their liberty while they litigated their claims for immigration relief, so long as they continued to pose no danger or flight risk, i.e., avoided criminal activity and complied with their obligations under the immigration laws.

4.      This all changed around May 2025, when Defendants initiated an aggressive new

CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
Case No. 5:25-cv-5632-PCP

3109854

1  campaign targeting noncitizens living in the community for re-arrest and re-detention. Most

2  visibly, Defendants have sent Immigration and Customs Enforcement ("ICE") officers to

3  immigration courts, including San Francisco, Concord, and Sacramento Immigration Courts, to

4  arrest and detain people after they exit their immigration hearings. In addition, ICE has been re-

5  arresting noncitizens when they attend required check-ins with ICE, its co-agencies within DHS,

6  and its contractors. In other words, this campaign specifically targets noncitizens who are doing

7  exactly what the government told them to do.

8       5.      These arrests and detentions continue to occur at immigration courts as well as at

9  required check-ins with ICE (including check-ins through the Intensive Supervision Appearance

10 Program, or ISAP) notwithstanding the current lapse in government appropriations.

11      6.      These enforcement actions arise from a new policy (the "Re-Detention Policy"),

12 which has drastically overturned longstanding federal policies and practices by authorizing re-

13 arrest and re-detention of noncitizens untethered from any basis in—or individualized assessment

14 of—their flight risk or danger to the community.

15      7.      Defendants' implementation of this policy in ICE's San Francisco Area of

16 Responsibility has torn apart families, interfered with people's ability to access counsel and to

17 pursue eligible claims for relief, caused trepidation and reluctance in noncitizens who otherwise

18 want to comply with their legal obligations to appear for court hearings and supervision check-

19 ins, and sown fear in immigrant communities throughout Northern and Central California.

20      8.      The Re-Detention Policy is unlawful. It radically upends longstanding federal

21 policy and practice without any reasoned explanation or consideration of the relevant factors—

22 including the reliance interests of those who have been released, fundamental due process

23 principles requiring an individualized determination of flight risk and danger to the community

24 prior to re-detention, and the Fourth Amendment's prohibition on unreasonable seizures. The

25 policy also cannot be reconciled with Defendants' statutory authority to arrest and detain

26 noncitizens under the Immigration and Nationality Act. The policy is therefore contrary to law

27 and arbitrary and capricious in violation of the Administrative Procedure Act.

28      9.      Plaintiffs/Petitioners now seek to represent a class of noncitizens, and one

PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. _____

subclass, who have been or will be harmed by this agency policy and practice. The class includes all noncitizens in the jurisdiction of the San Francisco ICE Field Office who (1) entered or will enter the United States without inspection; (2) have been or will be charged with inadmissibility under 8 U.S.C. § 1182 and have been or will be released from DHS custody; and who (3) are in removal proceedings under 8 U.S.C § 1229a, including any § 1229a proceedings that have been dismissed where the dismissal is not administratively final; and (4) are not subject to detention under 8 U.S.C. §1226(c) (the "Class"). The subclass includes all members of the Class whose release from DHS custody was or will be on bond, conditional parole, or on their own recognizance under 8 U.S.C. § 1226(a) and/or 8 C.F.R. § 236.1(c)(8) (the "Bond/RoR Subclass").

10.    Plaintiffs/Petitioners, the Class and Bond/RoR Subclass ask the Court to vacate the Re-Detention Policy because it violates the Administrative Procedure Act.

11.    Plaintiffs/Petitioners further ask the Court to exercise its habeas authority and enjoin Defendants from re-detaining them in violation of the Due Process Clause and Fourth Amendment.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 2241 (writ of habeas corpus) and 28 U.S.C. § 1331 (federal question) because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the United States Constitution. Because this suit seeks relief other than money damages and challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit under the APA. 5 U.S.C. § 702.

13.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this judicial district; each Defendant is an agency of the United States or an officer of the United States sued in their official capacity; and a substantial part of the events giving rise to the claims in this action took place in this District. parties

PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. _____

## ~~INTRODUCTION~~

1. ~~Frescia Anthuane Garro Pinchi ("Petitioner") is an asylum seeker who fled Peru. After Petitioner arrived in the United States on April 14, 2023, federal agents briefly detained her, determined that she was not a flight risk or danger to the community, and released her on her own recognizance with a notice to appear for removal proceedings in immigration court. Since then, Petitioner has done everything the government asked her to do: she has diligently attended every immigration court hearing and filed an application for asylum, all without the assistance of legal representation. She has no criminal history anywhere in the world.~~

2. ~~Today, July 3, 2025, Petitioner again did what the government told her to do: She went to San Francisco Immigration Court for a routine hearing before Immigration Judge ("IJ") Patrick O'Brien, where the government orally moved to dismiss his case. On information and belief, the government did so for the purpose of placing her in so-called "expedited removal" proceedings. IJ O'Brien did not grant the motion to dismiss. Instead, the judge gave Petitioner time to respond and set a further hearing for July 31, 2025, ominously adding, "but I probably won't see you that day."~~

3. ~~Indeed, minutes after Petitioner exited the courtroom, a group of roughly four Department of Homeland Security ("DHS") agents, some of whom were masked to conceal their identities, arrested her before she could leave the courthouse, violently separating her from her loved ones who were accompanying her in court. They did not present a warrant or tell Petitioner why they were arresting her.~~

4. ~~This arrest is part of a new, nationwide DHS strategy of sweeping up people who attend their immigration court hearings, detaining them, and unlawfully seeking to re-route them to fast-track deportations. Since mid-May, DHS has implemented a coordinated practice of leveraging immigration detention to strip people like Petitioner of their substantive and procedural rights and pressure them into deportation. Immigration detention is civil, and thus is permissible for only two reasons: to ensure a noncitizen's appearance at immigration hearings and to prevent danger to the community. But DHS did not arrest and detain Petitioner—who demonstrably poses no risk of absconding from immigration proceedings or danger to the community—for either of~~

~~PETITION FOR WRIT OF HABEAS CORPUS~~
~~CASE NO.~~ 1

1    these reasons. Instead, as part of its broader enforcement campaign, DHS detained Petitioner to

2    strip her of his procedural rights, force her to forfeit his application for relief, and pressure her into

3    fast-track removal.

4        5.    In immigration court, noncitizens have the right to pursue claims for relief from

5    removal (including asylum), be represented by counsel, gather and present evidence, and pursue

6    appeals. 8 U.S.C. § 1229(a). By dismissing an ongoing case, DHS—in its view—can transfer a

7    noncitizen's case from removal proceedings in immigration court, governed by 8 U.S.C. § 1229a,

8    to cursory proceedings under 8 U.S.C. § 1225(b)(1) called "expedited removal," where the

9    procedural protections and opportunities to pursue relief from removal built into regular

10   immigration court proceedings do not apply. People like Petitioner, who have been here for longer

11   than two years, cannot be placed in expedited removal, yet DHS has subjected her to their unlawful

12   scheme.

13       6.    Petitioner's arrest and detention are causing her tremendous and ongoing harm. She

14   has been torn away from her partner and her community.

15   **THE CONSTITUTION PROTECTS PETITIONER—AND EVERY OTHER PERSON
     PRESENT IN THIS COUNTRY—FROM ARBITRARY DEPRIVATIONS OF HER
16   LIBERTY, AND GUARANTEES HER DUE PROCESS OF LAW. THE
     GOVERNMENT'S POWER OVER IMMIGRATION IS BROAD, BUT AS THE
17   SUPREME COURT HAS DECLARED, IT "IS SUBJECT TO IMPORTANT
     CONSTITUTIONAL LIMITATIONS."**

18   **Plaintiffs/Petitioners**

19       7.    Plaintiff/*Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). "Freedom from bodily

20   restraint has always been at the core of the liberty protected by the Due Process Clause from

21   arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

22       8.    Petitioner respectfully seeks a writ of habeas corpus ordering the government to

23   immediately release her from her ongoing, unlawful detention, prohibiting her re-arrest without a

24   hearing to contest that re-arrest before a neutral decisionmaker, and prohibiting the government

25   from placing her in expedited removal proceedings, as she is plainly exempt from the criteria. In

26   addition, to preserve this Court's jurisdiction, Petitioner also requests that this Court order the

27   government not to transfer her outside of the District or deport her for the duration of this

28   PETITION FOR WRIT OF HABEAS CORPUS                    2
                                        CASE NO.                        2

3109854

proceeding.

**JURISDICTION AND VENUE**

9.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

10.    Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this district.

**PARTIES**

1.14.    Petitioner Frescia Anthuane Garro Pinchi is a 27-year-old woman resident of Hayward. who is a resident of Hayward, California. After entering the country without inspection in 2023, she was placed in removal proceedings under 8 U.S.C. § 1229a and charged with inadmissibility under 8 U.S.C. § 1182. Thereafter, DHS released her on her own recognizance pursuant to 8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(c)(8). Since that time, she has been working in the gig economy, studying English, and caring for her household as well as sending money to her mother and daughter in Peru. She has fully complied with the conditions of her release. She has no criminal history and is pursuing asylum based on a her fear of persecution in Peru, which, if approved, would give her a. If her application for asylum is granted, she will continue on the path to permanent residency and, eventually, U.S. citizenship. She is presently in physical custody of Immigration and Customs Enforcement (ICE) at 630 Sansome Street in San Francisco, California.

15.    Plaintiff/Petitioner Juany Galo Santos is a 42-year-old woman who resides in San Mateo, California. After entering the country without inspection in December 2023, she was placed in removal proceedings under 8 U.S.C. § 1229a and charged with inadmissibility under 8 U.S.C. § 1182. Thereafter, DHS released her on her own recognizance pursuant to 8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(c)(8). Since that time, she has built a life in the United States for herself and two of her daughters. Ms. Galo Santos is the sole caregiver and provider for her two daughters.

PETITION FOR WRIT OF HABEAS CORPUS    3    CASE NO.    3

daughters, one of whom has complex medical needs that require significant ongoing care. She has fully complied with the conditions of her release and has no criminal history. Ms. ~~Respondent Polly Kaiser is the Acting~~Galo Santos is currently pursuing asylum based on her fear of violence and persecution in Honduras. If her application for asylum is granted, she will continue on the path to permanent residency and, eventually, U.S. citizenship.

16.    Plaintiff/Petitioner Jose Waldemar Teletor Sente is a 37-year-old man who resides in San Francisco, California. After entering the country without inspection in 2019, Mr. Teletor Sente was placed in removal proceedings under 8 U.S.C. § 1229a and charged with inadmissibility under 8 U.S.C. § 1182. Thereafter, DHS released him on his own recognizance pursuant to 8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(c)(8). Since 2019, Mr. Teletor Sente has built a life in the United States with his son. Mr. Teletor Sente received a work permit and began working in construction to support his son and the members of his family who remained in Guatemala. Mr. Teletor Sente has fully complied with the conditions of his release. He has no criminal history and has filed an application for asylum based on his fear of violence in Guatemala. If his application for asylum is granted, he will continue on the path to permanent residency, and eventually U.S. citizenship.

**Defendants**

~~2.~~17.    Defendant Sergio Albarran, sued in his official capacity, is the Field Office Director of the San Francisco ICE Field Office. ~~She is the physical custodian of Petitioner.~~ In this capacity, ~~she~~he is responsible for the administration of immigration laws and the execution of immigration enforcement and detention policy within ICE's San Francisco Area of Responsibility, including the previous re-arrest and re-detention of Plaintiff~~Petitioner~~. ~~Respondent Kaiser~~ Garro Pinchi. Defendant Albarran maintains an office and regularly conducts business in this ~~district.~~ ~~Respondent Kaiser is sued in her official capacity~~District.

18.    ~~Respondent~~Defendant Kristi Noem, sued in her official capacity, is the Secretary of Homeland Security. As the highest-ranking officer for DHS, Defendant Noem has ultimate statutory authority over all of the policies challenged in this action. *See* 6 U.S.C. § 557 transferring functions from the Attorney General).

19.     Defendant U.S. Department of Homeland Security is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including Immigration and Customs Enforcement and Customs and Border Patrol. DHS, together with all of its component agencies, is responsible for administering and enforcing all of the policies challenged in this action.

20.     Defendant Todd M. Lyons, sued in his official capacity, is the Acting Director of U.S. Immigration and Customs Enforcement. As the highest-ranking officer for ICE. As the Senior Official Performing the Duties of the Director of, Defendant Lyons has authority over all of the policies challenged in this action.

21.     Defendant U.S. Immigration and Customs Enforcement is a component agency of DHS. ICE, he is responsible for the administration and is an "agency" within the meaning of 5 U.S.C. § 551(1). ICE's mission includes the enforcement of the civil laws related to immigration laws.  Among other things, ICE is responsible for arrest and detention related to civil immigration charges in the interior of the United States; routinely transacts business in this District; and is legally responsible for pursuing any effort administering and enforcing the policies challenged in this action.

## LEGAL BACKGROUND

3. 22.    Two mutually exclusive provisions of the Immigration and Nationality Act "INA") govern ICE's authority to detain and remove the Petitioner. Respondent Lyons is sued in his official capacity noncitizens who do not have administratively final orders of removal.

23.     8 U.S.C. § 1225(b) sets forth DHS's detention authority related to the "inspection" process. The first subsection, § 1225(b)(1), governs the detention of noncitizens placed in "expedited removal" proceedings, a fast-track form of removal that historically has applied only at the border and ports of entry. The second subsection, 8 U.S.C. § 1225(b)(2), governs the detention of noncitizens who are "applicant[s] for admission," are actively "seeking admission," and are "not clearly and beyond a doubt entitled to be admitted," but who are placed in removal proceedings before an immigration judge (also known as "Section 240 proceedings" or proceedings under 8 U.S.C. § 1229a rather than expedited removal).

24. In contrast, 8 U.S.C. § 1226 governs the detention of noncitizens "already in the country pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). When Congress enacted § 1226, it issued an interim regulation making clear that the statute applies to the subset of "applicants for admission" not covered by § 1225(b)(2): those "who are present without having been admitted or paroled." In other words, § 1226 applies to noncitizens who "entered [the U.S.] without inspection" between ports of entry. 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). Section 1226(a) creates a "default rule," which authorizes, but does not require, DHS to detain noncitizens in Section 240 proceedings. A narrower subsection, § 1226(c), mandates detention for certain noncitizens based on criminal conduct or terrorist activity that subjects them to removability or inadmissibility. This year, Congress amended § 1226(c) to also mandate the detention of noncitizens who are inadmissible not only because they entered without inspection, but who also have been arrested for or convicted of certain property crimes. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E).

25. The source of DHS's authority to release noncitizens from custody depends on which detention statute applies. Section 1226(c) is the most restrictive provision and authorizes release only when necessary under federal witness protection statutes. *See* 8 U.S.C. § 1226(c)(4). On its face, § 1225 also offers few paths to release. Noncitizens subject to either subsection of § 1225 are not statutorily eligible for bond—whether by DHS or an immigration judge—or release on their own recognizance. However, DHS can release them on humanitarian parole under 8 U.S.C. § 1182(d)(5)(A). Section 1226(a) is broader in scope. Under § 1226(a), DHS can release noncitizens on bond, on their own recognizance (formally called "conditional parole"), or on humanitarian parole. *See* 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 236.1(8). Noncitizens who are subject to § 1226(a) are also entitled to a bond hearing before an immigration judge.

26. Regardless of the statutory vehicle for release, a DHS officer may not release a noncitizen unless the individual does not pose a risk of flight or danger to the community. *See* 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8) (noncitizen must "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding"); *see also* 8 C.F.R. § 212.5 (humanitarian parole

available only when "the [noncitizens] present neither a security risk nor a risk of absconding").

27.     Similarly, in deciding whether to release a noncitizen on bond or their own recognizance, immigration judges consider whether the individual poses a danger to the community and whether they are likely to appear for future proceedings. 8 C.F.R. § 1003.19(h)(3); *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).

28.     As a result, any "[r]elease" of a noncitizen "reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

29.     Statutory and regulatory provisions governing re-arrest also depend on the manner of release. Under the text of the INA and federal regulations, certain DHS officials "at any time may revoke a bond or [conditional] parole authorized under [§ 1226(a)], rearrest the [noncitizen] under the original warrant, and detain the [noncitizen]." 8 U.S.C. § 1226(b); *see* 8 C.F.R. § 236.1(c)(9). Certain DHS officials may terminate humanitarian parole upon written notice when they determine that the purpose for parole has been "accomplish[ed]" or when "neither humanitarian reasons nor public benefit warrants the [noncitizen's] continued presence . . . in the United States[.]" 8 C.F.R. § 212.5(e)(2)(i). For decades, however, DHS has had a consistent policy and practice of re-detaining noncitizens in removal proceedings only when the individual circumstances related to their flight risk or danger to the community had materially changed.

30.     DHS has placed explicit limits on re-detention under 8 U.S.C. § 1226(b) by requiring authorization from a high-level official within the field office. By regulation, such revocations of release from custody may only be carried out in the "discretion of the district director, acting district director, deputy director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign)." 8 C.F.R. § 236.1(c)(9).

31.     Additionally, despite "the breadth of [the] statutory language" in 8 U.S.C. § 1226(b), the federal government's authority is subject to "an important implicit limitation": It cannot lawfully re-arrest or re-detain someone without "a material change in circumstances."

*Saravia*, 280 F. Supp. 3d at 1197; *see also, e.g., Matter of Sugay*, 17 I. & N. Dec. 637, 640 (B.I.A. 1981).

32.    In the immigration context, this limitation means that a person who immigration authorities released from initial custody cannot be re-arrested "solely on the ground that he is subject to removal proceedings[,]" without some new, intervening cause. *Saravia*, 280 F. Supp. at 1196. Indeed, the Fourth Amendment, which applies to seizures by immigration authorities, prohibits such re-arrests, which courts have long held could result in "harassment by continual rearrests." *United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971) (Stevens, J.) (prohibiting re-arrest without change in circumstances in criminal context); *see also U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (applying Fourth Amendment principles from criminal context to "limit" scope of immigration agents' seizure authority); *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 817 (9th Cir. 2020) (Fourth Amendment limits apply equally to seizures in criminal and civil immigration context).  The same applies here.

11.    This prohibition also derives from fundamental constitutional principles enshrined in the Due Process Clause of the Fifth Amendment. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678. Respondent Kristi Noem is the Secretary of Homeland Security and has ultimate authority over DHS. In that capacity and through her agents, Respondent Noem has broad authority over and responsibility for the operation and enforcement of the immigration laws; routinely transacts business in this District; and is legally responsible for pursuing any effort to detain and remove the Petitioner. Respondent Noem is sued in her official capacity.

12.    Respondent Pamela Bondi is the Attorney General of the United States and the most senior official at the Department of Justice. In that capacity and through her agents, she is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review, which administers the immigration courts and the BIA. Respondent Bondi is sued in her official capacity.

**EXHAUSTION**

13. There is no requirement to exhaust because no other forum exists in which Petitioner can raise the claims herein. There is no statutory exhaustion requirement prior to challenging the constitutionality of an arrest or detention, or challenging a policy under the Administrative Procedure Act. Prudential exhaustion is not required here because it would be futile, and Petitioner will "suffer irreparable harm if unable to secure immediate judicial consideration of [their] claim." *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992). Any further exhaustion requirements would be unreasonable.

**LEGAL BACKGROUND**

*A. The Constitution Protects Noncitizens Like Petitioner from Arbitrary Arrest and Detention.*

4.33. The Constitution establishes due process rights for690 (2001). And those due process protections extend to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Zadvydas*, 533 U.S. at 693). These due process rights are both substantive and procedural.

14. *First*, "[t]he"The touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate government objective," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

15. These protections extend to noncitizens facing detention, as "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

5.34. Substantive due process thusDue process requires that all forms of civil detention—including immigration detention—bear a "reasonable relation" to a non-punitive purpose. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

6.35. The Supreme Court has recognized only two permissible non-punitive purposes

PETITION FOR WRIT OF HABEAS CORPUS          9
                    CASE NO.              9

3109854

for immigration detention: ensuring a noncitizen's appearance at immigration proceedings (or, in the case of a removal order, at removal); and preventing danger to the community. *Zadvydas*, 533 U.S. at 690–92; *see* ~~also~~ *Demore v. Kim*, 538 U.S. 510 ~~at~~, 519–20, 527–28, ~~31~~531 (2003). It has also held that, in general, these purposes may not be assessed on a blanket or categorical basis. Instead, immigration custody decisions generally must be based on an "individualized determination" of flight risk and danger to the community. *See INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 194 (1991); *see also Zadvydas*, 533 U.S. at 690; *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188 (D.D.C. 2015).

~~16.    *Second*, the procedural component of the Due Process Clause prohibits the government from imposing even permissible physical restraints without adequate procedural safeguards.~~

36.    ~~Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon*~~Moreover, individuals who are released from government custody have a protected liberty interest in remaining out of custody. The government's decision to release an individual from custody creates "an implicit promise" that their liberty "will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release]." *Morrissey*, 408 U.S. at 482.

~~7.~~37.    Accordingly, in the criminal context, the Supreme Court has repeatedly recognized that re-detention after some form of conditional release requires a pre-deprivation hearing.~~ *v. Burch*, 494 U.S. 113, 127 (1990). This is so even in cases where that freedom is lawfully revocable. *See Hurd v. D.C. Gov't*, 864 F.3d at 683 (citing~~ *Young v. Harper*, 520 U.S. 143, 152 (1997) (re-detention after pre-parole conditional supervision ~~requires pre-deprivation hearing)~~);~~:~~ *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (same, in parole context).

~~17.    After an initial release from custody on conditions, even a person paroled following a conviction for a criminal offense for which they may lawfully have remained incarcerated has a protected liberty interest in that conditional release. *Morrissey* at 408 U.S. at 482. As the Supreme Court recognized, "[t]he parolee has relied on~~These principles apply with at least ~~an~~ implicit

promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* "By whatever name, the liberty is valuable and must be seen within the protection of the [Constitution]." *Id.*

8.38.   ~~This reasoning applies with~~ equal ~~if not greater~~ force to people released from civil immigration detention ~~at the border, like Petitioner.~~. After all, noncitizens living in the United States ~~like Petitioner~~ have a protected liberty interest in their ongoing freedom from confinement. *See Zadvydas*, 533 U.S. at 690. And, "[g]iven the civil context [of immigration detention], [the] liberty interest [of noncitizens released from custody] is arguably greater than the interest of parolees." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019).

~~*B.   Due Process*~~ Thus, if 8 U.S.C. § 1226(b) were construed as allowing ICE to re-arrest and re-detain noncitizens for any reason—or no reason at all—it would raise serious constitutional questions under both the ~~*Immigration*~~ Fourth Amendment and ~~*Nationality Act Protect Noncitizens like Petitioner from Summary Removal Without a Hearing.*~~

9.39.   ~~Deportation, like detention, constitutes a deprivation of liberty protected by~~ the Due Process Clause. ~~As the Supreme Court has held, a noncitizen's interest in deportation proceedings "is, without question, a weighty one" because "[s]he stands to lose the right 'to stay and live and work in this land of freedom.'" *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)).~~

40.   Until around May 2025, Defendants' policy and practice was consistent with this construction.

## FACTUAL ALLEGATIONS

**I.   For decades, Defendants required a material change in circumstances before invoking 1226(b)'s re-detention authority.**

41.   For decades, federal immigration officials have adhered to a policy of not re-arresting and re-detaining noncitizens who have been released pending removal proceedings, absent an individualized determination that there has been a material change with respect to whether a particular person poses a flight risk or danger to the community.

42.   As far back as 1981, the Board of Immigration Appeals made clear that the government could not re-arrest and re-detain a noncitizen released by an immigration judge on

~~PETITION FOR WRIT OF HABEAS CORPUS                    11~~
~~CASE NO.~~ 11

3109854

bond "absent a change of circumstance" warranting detention. *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981); *see also Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021).

43.    Federal immigration officials reiterated this policy on numerous occasions. For example, the head of the Immigration and Naturalization Service (ICE's predecessor agency) stated in a 1995 memorandum that: "[w]hen a[] [noncitizen] has been released from INS custody under bond, such bond can be revoked by the district director . . . but only based upon 'a change of circumstances.' . . . As such, INS must be able to justify any revocation decision, future detention or release condition." *Demore v. Kim*, 2002 WL 34705774 (U.S. Aug. 29, 2002), (No. 01-1491), Joint Appendix at 57.

~~18.~~    As a matter of policy and longstanding practice, DHS and its predecessor agencies applied the same rule to release decisions made by federal immigration officers, including ICE officers. As DHS previously represented to a court in this District, the government historically re-arrested previously released noncitizens only after "a material change in circumstances" as to whether they are a flight risk or dangerous. *Saravia*, 280 F. Supp. 3d at 1197; Federal Defendants' Supplemental Brief at 1, *Saravia v. Sessions*, No. 3:17-cv-03615-VC, (N.D. Cal. Nov. 3, 2017), Dkt. No. 90. Since then, courts in this District and nationwide have repeatedly acknowledged the existence of DHS's prior policy and practice. *See, e.g.*, *U.S. v. Cisneros*, No. 19-CR-00280-RS-5, 2021 WL 5908407, at *3-4 (N.D. Cal. Dec. 14, 2021); *Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2337099, (D. Ariz. Aug. ~~Indeed, modern-day removal proceedings developed in response to a series of Supreme Court decisions recognizing that the deportation of noncitizens already in the United States without a hearing before a neutral arbiter would violate due process. See Yamataya v. Fisher, 189 U.S. 86, 101 (1903) (construing immigration statutes to require hearing before deportation to "bring them into harmony with the constitution"); Wong Yang Sung v. McGrath, 339 U.S. 33, 49, modified, 339 U.S. 908 (1950) (same, reasoning that "the difficulty with any argument premised on the proposition that the deportation statute does not require a hearing is that, without such hearing, there would be no constitutional authority for deportation").~~

~~19.    Removal proceedings under Section 240 of the Immigration and Nationality Act~~

("Section 240" proceedings) accordingly provide important substantive and procedural protections. Noncitizens in Section 240 proceedings, like Petitioner when she was arrested, are entitled to full hearings in immigration court before immigration authorities can remove them. 8 U.S.C. § 1229a. They are statutorily afforded rights and procedural protections, including the right to be represented by counsel of their choice, and the right to present and confront evidence. *See id.* § 1229a(4). They are also entitled to administrative appellate review at the Board of Immigration Appeals and further judicial review in the federal Courts of Appeals. *See* 8 C.F.R. § 1003.1(b) (Board of Immigration Appeals); 8 U.S.C. § 1252(a)(5) (Courts of Appeals).

44.    Expedited removal is a 11, 2025); *Dos Santos v. Noem*, No. 1:25-CV-12052-JEK, 2025 WL 2370988, at *9 (D. Mass. Aug. 14, 2025).

45.    Under DHS's prior policy and practice, and across presidential administrations, ICE officers in the San Francisco Area of Responsibility generally would not re-arrest or re-detain a non-detained noncitizen in removal proceedings without conducting an individualized assessment and determining that their flight risk or danger to the community had materially changed since their release or their last check-in appointment. This policy and practice applied regardless of whether a noncitizen had previously been released on bond, conditional parole, or humanitarian parole.

46.    For example, if a noncitizen became involved with the criminal justice system, violated a condition of ICE supervision, or violated a condition of the Intensive Supervision Appearance Program (ISAP), which is run by a private contractor, ICE generally would set an appointment and interview the non-citizen about the changed circumstance before making an individualized decision as to whether re-detention was warranted. If the noncitizen affirmatively sought to remedy the violation or returned to compliance, ICE often would not re-detain the noncitizen.

47.    Countless noncitizens released pending removal proceedings have relied on the government's policy against indiscriminate re-arrest and re-detention to plan their lives. So long as they complied with their legal obligations to attend immigration proceedings and avoid criminal activity, noncitizens could confidently assume they would be able to litigate their right to remain

PETITION FOR WRIT OF HABEAS CORPUS    13
CASE NO.    13

in the United States while living in the community and with their families, rather than from detention. This meant they could access and consult with legal representatives, enter into leases for residential housing, seek work authorization and lawful employment, invest in their education, develop community ties, participate in religious life, and grow and take care of their families (including U.S. citizen family members).

**II.    Around May 2025, Defendants adopted and implemented the Re-Detention Policy, which abandoned their longstanding policy and practice.**

48.    In or around May 2025, Defendants reversed this longstanding policy and adopted the Re-Detention Policy, which authorizes re-arrest and re-detention of previously released noncitizens without any individualized assessment of a person's flight risk or danger—indeed, without any individualized justification at all.

49.    The Re-Detention Policy does away with the previous policy's requirement that, *before* a person previously released from immigration custody on recognizance, parole, or bond can be re-arrested and re-detained, DHS must conduct an individualized determination of materially changed circumstances (*e.g.*, danger to the community and/or flight risk) to justify the re-arrest and re-detention. In fact, the government has admitted in some cases that there was *no* change in circumstance justifying re-detention. *See, e.g.*, *Maklad v. Murray*, No. 1:25-cv-00946, 2025 WL 2299376, at *3 (E.D. Cal. Aug. 8, 2025) ("[T]he government conceded that [prior to her re-detention] there were no changes in circumstances since the original determination that Ms. Maklad does not pose a flight risk or a danger to the community[.]").

50.    ICE has implemented its new policy in an unprecedented campaign of re-arrests at immigration courthouses, ICE offices, and myriad other locations within this District, the broader region, and nationwide. These re-arrests have targeted individuals who have not had any material change in circumstances with respect to whether they posed a flight risk or danger to the community since their release from DHS custody. On the contrary, these individuals complied with the requirements that the government imposed on them, including attending immigration court hearings and ICE supervision check-ins.

~~20.~~    This campaign substantially materialized in the form of ~~summary removal~~

CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
Case No. 5:25-cv-5632-PCP

3109854

historically applicable only to recently-arrived noncitizens that sharply limits the rights and process available in Section 240 proceedings.

21.    In contrast to Section 240 proceedings, expedited removal takes place almost entirely outside of immigration court. A person subject to expedited removal can be removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). At this stage, the person is typically detained and unable to access counsel. In effect, immigration aggressive enforcement agents from ICE or Border Patrol serve as judge, jury, and jailer; they detain the noncitizen, unilaterally determine whether they are subject to the expedited removal statute, and unilaterally order them removed.

22.    When a person in expedited removal expresses a fear of persecution or intent to seek asylum, the immigration officer refers the person to an asylum officer for a credible fear interview. 8 U.S.C. § 1225(b)(1)(A)(ii). If the asylum officer finds that the person has a credible fear, they are permitted to seek to apply for asylum through Section 240 proceedings. *Id.* § 1225(b)(1)(B)(ii). However, when an asylum officer determines that someone has not established a credible fear, the officer must order them removed "without further hearing or review," subject to highly limited review by an immigration judge that the person "does not have a credible fear of persecution." *Id.* § 1225(b)(1)(B)(iii).

**FACTUAL ALLEGATIONS**

*A.  DHS Dramatically Expands the Scope of Expedited Removal.*

23.    For decades, DHS applied expedited removal exclusively in the border enforcement context, with only narrow exceptions to that general rule. From 1997 until 2002, expedited removal applied only to inadmissible noncitizens arriving at ports of entry. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures; Final Rule, actions at immigration courts, including the San Francisco, Concord, and Sacramento Immigration Courts. Since May 2025, ICE has arrested noncitizens who are in removal proceedings as 62 Fed. Reg. 10312 (Mar. 6, 1997).

24.    In 2002, the government for the first time invoked its authority to apply expedited removal to persons already inside the country, but only for a narrow group of people who arrived

PETITION FOR WRIT OF HABEAS CORPUS        15
                    CASE NO.                    15

by sea, were not admitted or paroled, and were apprehended within two years of entry. *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002).

25.    In 2004, the government authorized the application of expedited removal to individuals who entered by means other than sea, but only if they were apprehended within 100 miles of a land border and were unable to demonstrate that they had been continuously physically present in the United States for 14 days. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004).

26.    In 2019, at the direction of President Trump, DHS published a Federal Register Notice authorizing the application of expedited removal to certain noncitizens arrested anywhere in the country who could not affirmatively show that they had been continuously present for two years. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019). The District Court for the District of Columbia entered a preliminary injunction preventing the rule from taking effect, which the D.C. Circuit later vacated. *Make the Rd. New York v. McAleenan*, 405 F. leave routine Supp. 3d 1, 11 (D.D.C. 2019), *vacated sub nom. Make the Rd. New York v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

27.    In 2021, President Biden directed the DHS Secretary to review the rule expanding expedited removal and consider whether it comported with legal and constitutional requirements, including due process. In 2022, DHS rescinded the rule. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).

28.    While the 2019 expansion was in effect, the government applied expedited removal to persons inside the country in an exceedingly small number of cases. Thus, from 1997 to 2025, with limited exceptions, immigration authorities generally did not apply expedited removal to noncitizens apprehended far from the border, or individuals anywhere in the United States (including near the border) who had been residing in the country for more than fourteen days.

29.    This state of affairs changed drastically on January 20, 2025, the day that President Trump took office for his second term. That day, President Trump signed Executive Order 14159, "Protecting the American People Against Invasion," the purpose of which was "to faithfully

1  execute the immigration laws against all inadmissible and removable aliens, particularly those
2  aliens who threaten the safety or security of the American people." Exec. Order No. 14,159, 90
3  C.F.R. § 8443 (Jan. 20, 2025). The order directed the Secretary of Homeland Security to take
4  various actions "to ensure the efficient and expedited removal of aliens from the United States." *Id.*

5      30.    To implement this Executive Order, DHS issued a notice immediately authorizing
6  application of expedited removal to certain noncitizens arrested anywhere in the country who
7  cannot show "to the satisfaction of an immigration officer" that they have been continuously present
8  in the United States for at least two years. 90 Fed. Reg. 8139 (published Jan. 24, 2025).

9      31.    On January 23, 2025, the Acting Secretary of Homeland Security issued a
10  memorandum "provid[ing] guidance regarding how to exercise enforcement discretion in
11  implementing" the new expedited-removal rule. The guidance directed federal immigration officers
12  to "consider . . . whether to apply expedited removal" to "any alien DHS is aware of who is
13  amenable to expedited removal but to whom expedited removal has not been applied." As part of
14  that process, the guidance encourages officers to "take steps to terminate any ongoing removal
15  proceeding and/or any active parole status."[1]

16      32.    Under the administration's expanded approach to expedited removal, hundreds of
17  thousands of noncitizens who have lived in the country for less than two years are at imminent risk
18  of summary removal without any hearing, meaningful process, access to counsel, or judicial
19  review—regardless of the strength of their ties to the United States.

20  *B.  To Place More People in Expedited Removal, DHS Undertakes New Campaign of*
      *Courthouse Arrests and Detention.*

21      33.    Since mid-May 2025, DHS has initiated an aggressive new enforcement campaign
22  targeting people who are in regular removal proceedings in immigration court, many of whom have
23  pending applications for asylum or other relief. This "coordinated operation" is "aimed at
24  dramatically accelerating deportations" by arresting people at the courthouse and placing them into
25

26  _____
27  [1] Benjamine C. Huffman, *Guidance Regarding How to Exercise Enforcement Discretion*, Dep't
    of Homeland Sec. (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-
    and-parole-guidance.pdf.
28  PETITION FOR WRIT OF HABEAS CORPUS          17
                         CASE NO.

1    expedited removal.²

2        10.51.  The first step of this enforcement operation typically takes place inside the

3    immigration court. When people arrive in court for their master calendar hearings. Generally, DHS

4    attorneys orally file a make an oral motion to dismiss the proceedings—without any notice to the

5    affected individual—in advance of a re-arrest. Although DHS regulations do not permit such

6    motions to dismiss absent a showing that the "[c]ircumstances of the case have changed," 8 C.F.R.

7    § 239.2(a)(7), (c), DHS attorneys do not conduct any case-specific analysis of changed

8    circumstances before filing these motions to dismiss or offer case-specific reasons for dismissal.

9    ICE agents then re-arrest noncitizens, often as they leave the courtroom, regardless of whether the

    immigration judge grants the motion.

10

11       34.   Even though individuals are supposed to have ten days to respond to a motion to

12   dismiss, some IJs have granted the government's oral motion on the spot and immediately

13   dismissed the case. This is consistent with recent instructions from the Department of Justice to

14   immigration judges stating that they may allow the government to move to dismiss cases orally, in

15   court, without a written motion, and to decide that motion without allowing the noncitizen an

16   opportunity to file a response.

17       35.   Despite these instructions, some IJs have still asked DHS to re-file the motion as a

18   written motion and continued proceedings to allow individuals to file their response. A smaller

19   group of IJs have expressly denied the motion to dismiss on the record or in a written order.

20       36.   The next step of DHS's new campaign takes place outside the courtroom. ICE

21   officers, in consultation with DHS attorneys and officials, station themselves in courthouse waiting

22   rooms, hallways, and elevator banks. When an individual exits their immigration hearings, ICE

23   officers - typically masked and in plainclothes - immediately arrest the person and detain them.

24   ICE officers execute these arrests regardless of how the IJ rules on the government's motion to

25   ² Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in
     Trump's Deportation Push*, Wash. Post, May 23, 2025,
26   https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/;
     *see also* Hamed Aleaziz, Luis Ferré-Sadurní, & Miriam Jordan, *How ICE is Seeking to Ramp Up
27   Deportations Through Courthouse Arrests*, N.Y. Times, May 30, 2025,
     https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

28   PETITION FOR WRIT OF HABEAS CORPUS              18
                                   CASE NO.                     18
     CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
                         Case No. 5:25-cv-5632-PCP

3109854

dismiss. On information and belief, they typically do not have an arrest warrant.

37.    Once the person has been transferred to a detention facility, the government places the individual in expedited removal. In cases in which the IJ did not dismiss the person's removal proceedings, DHS attorneys unilaterally transfer venue of the case to a "detained" immigration court, where they renew their motions to dismiss—again with the goal of putting the person in expedited removal.

52.    DHS is aggressively pursuing this arrest and detention campaign at courthouses throughout the country. This "coordinated operation" is "aimed at dramatically accelerating deportations" by re-arresting people, many of whom have pending applications for asylum or other relief, while they are attending immigration court hearings in their cases.[3] In addition, Defendants' sweeping re-arrest and re-detention campaign has expanded past its initial targeting of people at or near immigration courthouses to sweep up people at numerous other locations. For example, many noncitizens have regularly attended "check-in" appointments with ICE or its contractor ISAP for months or years while they pursue their immigration cases. Like immigration court hearings, these previously routine appointments have become hotbeds for re-arrest and re-detention. When noncitizens arrive at their local ICE Field Office or ISAP office, rather than conducting the regular "check-in," Defendants instead have begun to re-arrest and re-detain them. Like the re-arrests at immigration courthouses, Defendants conduct arrests at these check-in appointments without requiring or considering any change in the individualized circumstances of the noncitizen.

53.    Additionally, on information and belief, the Re-Detention Policy allows the re-arrest and re-detention of non-citizens released pursuant to 8 U.S.C. § 1226(a) without the authorization of "the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or

---

[3] Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in Trump's Deportation Push*, Wash. Post, May 23, 2025, https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/; *see also* Hamed Aleaziz, Luis Ferré-Sadurní, & Miriam Jordan, *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. Times, May 30, 2025, https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html; Dani Anguiano, *Mother Arrested at LA Court Alongside Six-Year-Old Son with Cancer Sues ICE*, Guardian, June 27, 2025, https://www.theguardian.com/us-news/2025/jun/27/honduras-mother-ice-arrest-lawsuit.

PETITION FOR WRIT OF HABEAS CORPUS                    19
CASE NO.

3109854

officer in charge," as is required by 8 C.F.R. § 236.1(c)(9).

54.     Defendants adopted and implemented the Re-Detention Policy amid a nationwide push to dramatically increase immigration arrests and detention, regardless of the individual circumstances of the people arrested and detained.

55.     For example, in late May 2025, the White House and the Department of Homeland Security imposed a "goal" on federal immigration agencies of 3,000 immigration-related arrests per day—with "consequences for not hitting arrest targets."[4]

56.     In order to reach these targets, White House Deputy Chief of Staff Stephen Miller directed high-level officials to change their approach to stops and arrests in the field. Agents and officers, according to him, should no longer conduct targeted operations based on investigations. Instead, they should "just go out there and arrest [unauthorized noncitizens]" by rounding up people in public spaces like "Home Depot" and "7-Eleven" convenience stores.[5] Agents received instructions that arrests were "all about the numbers, not the level of criminality."[6]

57.     In a May 28, 2025 interview with Fox News, Mr. Miller stated that "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day."[7]

58.     Re-arrests and re-detentions without any individualized assessment of changed circumstances related to flight risk or danger have skyrocketed because of these enforcement operations. Since May 2025, dozens of people, including Plaintiff/Petitioner Garro Pinchi, have been detained at the San Francisco Immigration Court following their routine immigration

---

[4] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[5] *Id.*

[6] Ted Hesson & Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets*, Reuters, June 10, 2025, https://www.reuters.com/world/us/ices-tactics-draw-criticism-it-triples-daily-arrest-targets-2025-06-10/; Alayna Alvarez & Brittany Gibson, *ICE Ramps Up Immigration Arrests in Courthouses Across the U.S.*, Axios, June 12, 2025, https://www.axios.com/2025/06/12/ice-courthouse-arrests-trump

[7] *See, e.g., Vasquez Perdomo v. Noem*, 148 F. 4th 656, 665 n. 2 (9th Cir. Aug. 1, 2025).

PETITION FOR WRIT OF HABEAS CORPUS     20
CASE NO.     20

3109854

hearings and without any assertion that an individualized material change in circumstances justified their detention.[8] In addition to these courthouse arrests, dozens more have been detained since May 2025 at ICE and ISAP check-ins without any assertion of materially changed circumstances. These arrests have extended to other Northern California immigration courthouses too, including at least several dozen arrests at the Sacramento Immigration Court[9] and, at minimum, four more arrests within a single day at the Concord Immigration Court.[10] On information and belief, ICE arrests at these immigration courts and at ICE and ISAP check-ins in the San Francisco Area of Responsibility have increased by more than 500% since May 2025. These re-arrests and re-detentions would not have been permissible under DHS's prior policy.

11.59.   These same trends have materialized nationwide. In New York City, for example, "ICE agents have[] apprehended so many people showing up for routine appointments this month, . that the facilities" arewere "overcrowded,"[,]" with "[h]undreds of migrants . . . sle[eping] on the floor or sitting upright, sometimes for days."[.]"[11]

38.     The same is true at the San Francisco Immigration Court, where Petitioner was

---

[8] Sarah Ravani, *ICE Arrests Two More at S.F. Immigration Court, Advocates Say*, S.F. Chron., June 12, 2025, https://www.sfchronicle.com/bayarea/article/sf-immigration-court-arrests-20374755.php; Margaret Kadifa & Gustavo Hernandez, *Immigrants fearful as ICE Nabs at least 15 in S.F., Including Toddler*, Mission Local, June 5, 2025, https://missionlocal.com/2025/06/ice-arrest-san-francisco-toddler/; Tomoki Chien, *Undercover ICE Agents Begin Making Arrests at SF Immigration Court*, S.F. Standard, May 27, 2025, https://sfstandard.com/2025/05/27/undercover-ice-agents-make-arrests-san-francisco-court/; Mariana Garcia, *ICE Makes Largest Single-Court Arrest in S.F., Detaining 8*, MISSION LOCAL, Sept. 12, 2025, https://missionlocal.com/2025/09/ice-arrests-8-asylum-seekers-at-s-f-immigration-court-most-ever-in-single-morning/.

[9] Sharon Bernstein, *Sacramento Courthouse Immigration Stops, Some Violent, Detailed in Legal Filing*, Sept. 29, 2025, https://www.sacbee.com/news/local/article312274458.html.

[10] Megan Cassidy & Jessica Flores, *S.F. East Bay Immigration Courts Abruptly Shut Down After ICE Arrests*, June 10, 2025, https://www.sfchronicle.com/sf/article/ice-arrest-courthouse-immigration-trump-20370459.php.

[11] Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times, June 12, 2025, https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html—; Jasmine Garsd, *In Recorded Calls, Reports of Overcrowding and Lack of Food at ICE Detention Centers*, NPR, June 6, 2025, https://www.npr.org/2025/06/05/nx-s1-5413364/concerns-over-conditions-in-u-s-immigration-detention-were-hearing-the-word-starving (estimating ICE is at 125% capacity and reporting nation-wide "overcrowding, illness and hunger in detention facilities"); Luis Ferré-Sadurní, *Deportation of 6-Year-Old Puts Spotlight on ICE's Detention of Families*, N.Y. Times, Aug. 20, 2025, https://www.nytimes.com/2025/08/20/nyregion/ice-6-year-old-nyc.html (reporting that immigration authorities have detained about 50 children and deported at least 38 in the New York City area since January).

PETITION FOR WRIT OF HABEAS CORPUS              21
CASE NO.                    21
CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
Case No. 5:25-cv-5632-PCP

arrested. Over the past two months, dozens of people have been arrested and detained after attending their routine immigration hearings.[12]

39.   DHS's aggressive tactics at immigration courts appear to be motivated by the Administration's imposition of a new daily quota of 3,000 ICE arrests.[13] In part as a result of this campaign, ICE's arrests Indeed, in part because of these operations, ICE's arrests nationwide of noncitizens with no criminal record have increased more than 800 1,100% since before January.[14]

12.60.   The new courthouse arrest and detention campaign is a sharp break from DHS's previous practices, when immigration officers avoided arrests at courthouses given the concern that such enforcement actions would deter people from appearing for their proceedings and complying 79% of ICE's weekly non-custodial arrests involved people with court orders no criminal convictions, up 23 percentage points from January.[15] ICE arrests in total have increased 123 percent since 2024.[16]

40.   In fact, DHS officials previously permitted ICE officers to conduct "civil immigration enforcement action . . . in or near a courthouse" only in highly limited circumstances,

---

[12] Sarah Ravani, *ICE Arrests Two More at S.F. Immigration Court, Advocates Say*, S.F. Chron., June 12, 2025, https://www.sfchronicle.com/bayarea/article/sf immigration court arrests 20374755.php; Margaret Kadifa & Gustavo Hernandez, *Immigrants fearful as ICE Nabs at least 15 in S.F., Including Toddler*, Mission Local, June 5, 2025, https://missionlocal.org/2025/06/ice arrest san francisco toddler/; Tomoki Chien, *Undercover ICE Agents Begin Making Arrests at SF Immigration Court*, S.F. Standard, May 27, 2025, https://sfstandard.com/2025/05/27/undercover ice agents make arrests san francisco court/.

[13] Ted Hesson & Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets*, Reuters, June 10, 2025, https://www.reuters.com/world/us/ices tactics draw criticism it triples daily arrest targets 2025 06 10/; Alayna Alvarez & Brittany Gibson, *ICE Ramps Up Immigration Arrests in Courthouses Across the U.S.*, Axios, June 12, 2025, https://www.axios.com/2025/06/12/ice courthouse arrests trump.

[14] José Olivares & Will Craft David J. Bier, *ICE Arrests of Migrants with No Criminal History Surging under Trump*, The Guardian *Is Arresting 1,100 Percent More Noncriminals on the Streets Than in 2017*, Cato at Liberty Blog, June 14 24, 2025, https://www.theguardian.com/us news/2025/jun/14 cato.org/blog/ice arrests migrants trump figures. arresting-1100-percent-more-noncriminals-streets-2017.

[15] *Id.*

[16] Hamed Aleaziz, Luis Ferré Sadurní, & Miriam Jordan, *How ICE Is Seeking to Ramp Up Deportations Through Courthouse* Albert Sun, *Immigration* Arrests. *Are Up Sharply in Every State. Here Are the Numbers.*, N.Y. Times, May 30 June 27, 2025, https://www.nytimes.com/interactive/2025/05/30 06/27/us/politics ice courthouse arrests trump.html.

~~such as when "it involves a national security threat," or "there is an imminent risk of death, violence, or physical harm." These limitations were necessary, DHS explained, because "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses, and, as a result, impair the fair administration of justice." The new policy includes no such limiting language.~~

61. ~~The government's new campaign is also a significant shift from previous DHS practice of re-detaining noncitizens only after a material change in circumstances. *See*~~ At the same time as it has increased immigration arrests, the Administration has moved forward with radically increasing immigration detention capacity nationwide.

62. On July 4, 2025, President Trump signed the "Big Beautiful Bill" into law. The legislation makes U.S Immigration and Customs and Enforcement the largest federal law enforcement agency, giving it $45 billion for building new detention centers in addition to $14 billion for deportation operations. In addition, the legislation includes $3.5 billion for reimbursements to state and local governments for costs related to immigration-related enforcement and detention.[17]

63. In explaining the need for the legislation, "border czar" Tom Homan told reporters that the bill needed to pass so the federal government could buy more detention beds because "the more beds we have, the more bad guys we arrest."[18] The Trump administration has already opened new immigration detention facilities, such as the South Florida Detention Facility—nicknamed Alligator Alcatraz.[19] In California, the administration has repurposed a former state prison in

---

[17] Lauren-Brooke Eisen, *Budget Bill Massively Increases Funding for Immigration Detention*, Brennan Center for Justice, July 3, 2025, https://www.brennancenter.org/our-work/analysis-opinion/budget-bill-massively-increases-funding-immigration-detention.

[18] Juliana Kim, *How Trump's tax cut and policy bill aims to 'supercharge' immigration enforcement*, NPR, July 3, 2025, https://www.npr.org/2025/07/03/g-s1-75609/big-beautiful-bill-ice-funding-immigration.

[19] *Florida's Secretive Immigration Detention Center, Explained*, August 15, 2025, https://www.aclu.org/news/immigrants-rights/floridas-secretive-immigration-detention-center-explained.

~~PETITION FOR WRIT OF HABEAS CORPUS          23~~
~~CASE NO.~~

California City as an ICE detention center.[20] California City Detention Facility is now the largest immigration detention center in the state, with over 2,500 beds.[21]

64.    Government officials have also suggested their motivation in their massive detention efforts is to pressure individuals to give up their right to contest removal and agree to deportation, rather than either of the two constitutionally permissible bases for detention: preventing flight risk or danger to the community. For instance, Secretary Noem in discussing how the administration has opened detention facilities in seemingly treacherous locations, indicated the administration's goal of ensuring that people know "if they are detained, they [wi]ll be removed" and offered that detention is an effective strategy to encourage people, including those with meritorious claims for immigration relief, to deport themselves "voluntarily."[22]

**III.    Plaintiffs/Petitioners and members of the proposed class who pose no flight risk or danger to the community now face re-detention under Defendants' unlawful Re-Detention Policy.**

65.    The Re-Detention Policy has resulted in the sudden, no-notice re-detention of countless noncitizens whom the government has already determined are neither dangerous nor flight risks, without any individualized consideration of whether any new facts exist to justify a different determination. Indeed, the facts show that the people caught up in the new policy overwhelmingly lack any criminal history and have a proven record of compliance with immigration check-ins and court appearances. Through this conduct, they have shown that the government's initial assessment of them was accurate—they are neither dangerous nor flight risks. Nevertheless, they now face arbitrary re-arrest and indefinite re-detention. Plaintiffs'/Petitioners' cases illustrate these very concerns.

66.    Plaintiff/Petitioner Garro Pinchi, for example, is an asylum seeker who fled Peru

---

[20] U.S. Immigration and Customs Enforcement, *California, Detention Facilities, California City Detention Facility*, https://www.ice.gov/detain/detention-facilities/california-city-detention-facility (Last Updated Sep. 5, 2025).

[21] Tyche Hendricks, *California's Newest Immigration Facility Is Also Its Biggest. Is It Operating Legally?*, Sep. 4, 2025, https://www.kqed.org/news/12054544/californias-newest-immigration-facility-is-also-its-biggest-is-it-operating-legally.

[22] Nicole Sganga, *Kristi Noem says "Alligator Alcatraz" to be model for ICE state-run detention centers*, CBS News, Aug. 4, 2025, https://www.cbsnews.com/news/alligator-alcatraz-model-kristi-noem-homeland-security/.

PETITION FOR WRIT OF HABEAS CORPUS                    24
CASE NO.                              24

and entered the United States without inspection on or around April 14, 2023. After entering the country, she encountered federal agents and turned herself in. The agents briefly detained her, determined that she was subject to discretionary detention under 8 U.S.C. § 1226(a) and that she was not a flight risk or danger to the community, and released her on her own recognizance pursuant to 8 C.F.R. § 236.1(c)(8), with a notice to appear for removal proceedings in the San Francisco immigration court. On the Notice to Appear, DHS classified her as "an alien present in the United States who has not been admitted or paroled" and did not classify her as an "arriving alien." DHS charged her as inadmissible only under 8 U.S.C. § 1182(a)(6)(A)(i), which applies to noncitizens physically present in the country without admission or parole.

67.     DHS agents issued Ms. Garro Pinchi an "Order of Release on Recognizance" using a standard DHS form, setting forth the conditions of Ms. Garro Pinchi's conditional parole. Among other requirements, the form stated that Ms. Garro Pinchi must attend "any hearing or interview" required by DHS or the immigration court, comply with state and federal laws, and report to supervision appointments. The order also states that Ms. Garro Pinchi would remain released on her own recognizance as long as she "compl[ied]" with the listed conditions. The order states that "[f]ailure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by [DHS]," but includes no other possible reasons for which Ms. Garro Pinchi could have been re-detained.

41.     Ms. Garro Pinchi relocated ~~Saravia v. Sessions, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), aff'd sub nom. Saravia for A.H. v. Sessions, 905 F.3d 1137 (9th Cir. 2018) (describing prior practice).~~

~~C.   Petitioner is Unlawfully Arrested and Detained Pursuant to DHS's New Policy.~~

~~42.     Petitioner is a 27-year-old citizen of Peru.~~

~~43.     In early 2023, Petitioner fled to the United States. She was initially arrested by DHS officers, but was released on her own recognizance with a notice to appear for removal proceedings. In granting her release, DHS determined that she posed little if any risk of flight or danger to the community.~~

44.     ~~Petitioner thereafter moved~~ to Hayward, California. ~~On information~~ and ~~belief~~built

her life there. After her initial release from custody, she ~~informed the~~ did everything immigration ~~court about her change~~authorities required her to do—all without the assistance of counsel. She updated her address. ~~She attended her first~~ with the immigration court ~~hearing~~as required, and in ~~the San Francisco Immigration Court, the only hearing scheduled for her before today.~~

~~13.~~68.   ~~Just over one year after her arrival in the United States, Petitioner applied~~April 2024, she filed an application for asylum, withholding of removal, and ~~relief~~protection under the Convention Against Torture.-, with the immigration court, which remains pending. She has no criminal history.

~~45.   Ever since Petitioner entered the country, she has fully complied with court and supervision requirements. She has no criminal history.~~

~~46.~~   On July 3, 2025, ~~Petitioner appeared at San Francisco Immigration Court for her second~~Ms. Garro Pinchi attended a master calendar hearing ~~in immigration court. She appeared pro se, without the representation of counsel.~~

~~14.~~69.   ~~The~~ at the San Francisco Immigration Court. Without any warning, the DHS attorney orally moved to dismiss ~~Petitioner's~~her case.

70.   ~~Petitioner's opposed the motion.~~ The ~~IJ~~immigration judge gave ~~Petitioner~~Ms. Garro Pinchi time to file a response and continued the hearing until July 31, 2025. Although the ~~IJ~~immigration judge had continued the hearing, he told ~~petitioner "but~~Ms. Garro Pinchi "I probably won't see you then"—suggesting that he ~~had received notice~~expected that she would be arrested pursuant to ~~ICE's~~DHS's new ~~tactics. The IJ stated that he believed Petitioner's case was being dismissed for the purpose of putting her in expedited removal, even though she has been in the United States for more than two years and thus cannot be placed in expedited removal. Petitioner did not receive notice that she would be~~policy.

~~47.~~   ICE officers arrested ~~and had no opportunity to oppose her re-arrest or re-detention on the record.~~

~~48.~~   When Petitioner ~~left~~her minutes after she exited the courtroom,~~ she was arrested by ICE agents. On information and belief, the agents did not have a warrant and did not tell Petitioner why she was being arrested.~~

71.    ~~Because Petitioner has never been determined to be a~~ The government then detained her without any individualized basis or claim that her re-detention was justified to prevent flight risk or danger to the community ~~her~~. Absent this Court's orders mandating her release, she would have remained in detention ~~is not related to either of the permissible~~, and she remains at risk of re-detention absent final court intervention. Dkt. Nos. 6, 33.

72.    In connection with her re-arrest, ICE issued a Form I-200 "Warrant for Arrest of Alien" purporting to authorize her arrest under 8 U.S.C. § 1226 and 8 U.S.C. § 1357. The document is dated July 3, 2025. The sole basis for arrest identified on the warrant is "the pendency of ongoing removal proceedings" against Ms. Garro Pinchi. In the space for a signature from an "Authorized Immigration Officer," the warrant bears the signature of "S 3602 RILI – SDDO." "SDDO" stands for "Supervisory Detention and Deportation Officer."

73.    Following her release from custody pursuant to this Court's Order, ICE agents required Ms. Garro Pinchi to attend a check-in the next day. ICE imposed conditions of release, including an annual check-in with ICE and in-person check-ins with ISAP, a private contractor. Ms. Garro Pinchi has complied with all conditions of release. Soon after her initial check-in, ICE de-escalated her supervision from in-person check-ins to weekly monitoring by phone. She has continued to comply with every requirement. After her release from custody, Ms. Garro Pinchi secured counsel for her removal proceedings and filed a written opposition to the government's motion to dismiss. The immigration judge denied the motion to dismiss, and her removal proceedings are ongoing.

~~49.~~    ~~Defendants detained Ms. Garro Pinchi pursuant to the unlawful Re-Detention Policy despite her posing no danger or flight risk – the two principal~~ justifications for ~~civil~~ immigration ~~litigation. Her~~ detention ~~does not further any legitimate government interest.~~

~~D.  As a Result of Her Arrest and Detention, Petitioner is Suffering Ongoing and Irreparable Harm.~~

~~15.~~74.    ~~Petitioner is being deprived of her liberty without any permissible justification~~ recognized by the Supreme Court. *See Zadvydas*, 533 U.S. at 690-92; *Demore*, 538 U.S. at 519-20, 527-28, 531. The government previously released ~~her~~ Ms. Garro Pinchi on her own

3109854

recognizance because she did not pose sufficient risk of flight or danger to the community to warrant detention.

16. 75.   None of that has changed. ~~Petitioner~~Ms. Garro Pinchi has no criminal record, and there is no basis to believe that she poses any public-safety risk. Nor is ~~Petitioner~~Ms. Garro Pinchi, *who was arrested while appearing in court for her immigration case*, conceivably a flight risk. ~~To the contrary, Petitioner appeared for every immigration court hearing~~Ms. Garro Pinchi's detention is not related to any permissible purpose under these circumstances and ~~other requirement.~~ deprived her of a protected interest in her ongoing liberty without sufficient procedural protections.

76.     Plaintiff/Petitioner Juany Galo Santos is an asylum seeker who fled Honduras in 2023. Immigration agents apprehended Ms. Galo Santos and her two young daughters after they crossed the border and detained them overnight. The next day, after determining that Ms. Santos was not a flight risk or a danger to the community, agents released her on her own recognizance under 8 C.F.R. § 236.1(c)(8). The agents also fitted her with an ankle monitor.

77.     Ms. Galo Santos attended her first check-in with ICE in January 2024, at which time her ankle monitor was removed. Since that time, Ms. Galo Santos has complied with all reporting, supervision, and immigration court requirements, including in-person check-ins and updating ICE and the immigration court with her correct address. She has no criminal history. Since settling in San Mateo, California, Ms. Galo Santos has built a life for herself and her two daughters. She has an upcoming ICE check-in on January 16, 2026, and a master calendar hearing at the San Francisco Immigration Court on February 19, 2026. Under Defendants' prior policy, Ms. Galo Santos could attend her hearing and future supervision appointments confident that she would not be re-detained, based on her compliance with her terms of release and lack of any criminal history. But under Defendants' Re-Detention Policy, she now risks being ripped from her daughters, leaving them with no one to care for them or provide for them, for no reason.

78.     The government previously released Ms. Galo Santos after finding that she did not pose a flight risk or danger to the community. Her conduct since she was released has only reinforced the accuracy of that determination. Her re-detention under Defendants' unlawful Re-

Detention Policy would deprive her of her protected interest in her ongoing liberty without any procedural protections.

79.    Plaintiff/Petitioner Jose Waldemar Teletor Sente is an asylum seeker who fled Guatemala in 2019 and entered the United States without inspection in 2019. Mr. Teletor Sente and his then-nine-year-old son were apprehended by border patrol agents and were briefly detained before being released on their own recognizance under 8 C.F.R. § 236.1(c)(8).

80.    Mr. Teletor Sente moved to San Francisco, California and built a life there for himself and his son. After receiving his work permit, he began working in construction, rented an apartment, and enrolled his son in school. At first, Mr. Teletor Sente was required to report to the ICE office in person once a month. He has since been enrolled in a remote monitoring program that requires him to check-in through the SmartLink application weekly. Mr. Teletor Sente has complied with all reporting, supervision, and immigration court requirements, both in person and remote. Mr. Teletor Sente has no criminal history.

81.    Mr. Teletor Sente has an upcoming master calendar hearing at the San Francisco Immigration Court in November 2025. Concerned that he might be re-detained at his hearing under Defendants' Re-Detention Policy, Mr. Teletor Sente requested to appear via video instead of in person. Judge Ila Deiss granted Mr. Teletor Sente's request. However, Mr. Teletor Sente was subsequently notified that his hearing date had moved by several weeks to November 18, 2025, in front of a different immigration judge (Judge Elisa Brasil), and that he would need to appear in person. This in-person requirement may be due to the fact that Judge Brasil was recently fired, and, on information and belief, an attorney from the Armed Forces' Judge Advocate General's (JAG) Corps will be replacing her.

82.    Under Defendants' prior policy, Mr. Teletor Sente could attend his upcoming hearing without worrying that he would be re-detained, based on his compliance with his terms of release and lack of any criminal history. But under Defendants' Re-Detention Policy, he now risks re-detention, which would upend the life he has built here, leaving his son with no one to care for him, and losing his apartment, car, and the ability to support his family in Guatemala.

83.    The government previously released Mr. Teletor Sente after finding that he did not

pose a flight risk or danger to the community. Since that time, he has complied with all his immigration requirements and given the government no reason to question that determination. His re-detention under Defendants' unlawful Re-Detention Policy would deprive him of his protected interest in his ongoing liberty without any procedural protections.

84.     On information and belief, more than 100 other noncitizens in the San Francisco Area of Responsibility with similar facts and circumstances have had the same experience as Plaintiffs/Petitioners.

85.     For example, Salam Maklad is a 28-year-old asylum seeker who entered the United States without inspection in 2022. Ms. Maklad was briefly detained, during which time immigration officials interviewed her before releasing her in September 2022 under humanitarian parole. For the next three years, Ms. Maklad remained out of custody. She obtained a valid work permit and enrolled in school to improve her employment opportunities. Ms. Maklad met her now husband in the United States, and she is actively involved in her community, including attending church regularly. Despite no change in circumstances that would warrant taking her into custody, in July 2025, Ms. Maklad was arrested by ICE while appearing for her scheduled check-in at the San Francisco ICE Office. Ms. Maklad was kept in a holding cell for the entire day before being transported, in chains and handcuffs, to a detention center in Bakersfield, California. Ms. Maklad remained in the detention center for almost a month, during which time she lived with nearly one hundred women in a dormitory. For the majority of her detention, Ms. Maklad did not receive her medication, which exacerbated her chronic medical conditions. Like Ms. Garro Pinchi, Ms. Maklad was released only after filing a habeas petition to challenge her arbitrary re-detention.

86.     As another example, Gabriela Vargas Plasencia is a 21-year-old asylum seeker who entered the U.S. without inspection in 2024. In her home country of Peru, she had been an engineering student. Ms. Vargas Plasencia also was briefly detained before immigration officials released her on her own recognizance, with conditions including that she attend her immigration court hearings and avoid criminal conduct. As Ms. Vargas Plasencia understood it, she could be re-detained while her immigration case was pending if she violated those conditions, but not if she complied. Ms. Vargas Plasencia settled in Oakland, California and has built her life there. She

ook English classes at Berkeley Adult School. She filed an asylum application within her first year in the United States, received employment authorization, and secured two jobs, often working over 50 hours a week. Ms. Vargas Plasencia attended her first immigration court hearing in San Francisco on April 3, 2025, without incident. She attended her second hearing on September 4, 2025. The immigration judge continued her case to October. Although Ms. Vargas Plasencia did not violate her conditions of release, had no change in circumstances, and had ongoing removal proceedings, immigration agents re-arrested her as she was leaving the courtroom. Agents shackled her, briefly detained her in San Francisco, and transported her to a detention center in Bakersfield, California. After a few days there, Ms. Vargas Plasencia, too, was released only because of a federal court order. When she returned to San Francisco, she had to pay tow fees and parking fines for her car, which had been parked at the immigration court. She had also missed work, and despite previously having consistent attendance, received a warning from one of her employers that future absences could result in termination.

**IV.     DHS has offered no reasoned explanation for its dramatic change in policy.**

87.     When it adopted the Re-Detention Policy, DHS provided no explanation for why it reversed course from decades of not re-arresting and re-detaining people absent an individualized assessment of flight risk or danger, and certainly not one that considered the reliance, due process, and Fourth Amendment interests at stake.

88.     Instead, the government merely asserted in opposition to numerous individual habeas cases challenging arbitrary re-detentions that it has the categorical authority under the INA to re-arrest and re-detain any individual in pending removal proceedings because of its general policy preferences and available bed space in detention facilities, without consideration of any facts specific to the individual being re-detained. *See, e.g.*, *Singh v. Andrews*, No. 1:25-cv-00801-KES-SKO (HC), 2025 WL 1918679, at *7 (E.D. Cal. July 11, 2025) (summarizing the government's position that it has the authority to re-detain noncitizens without any procedural protections or evaluation of a noncitizen's individual circumstances). These arguments generally failed, and courts repeatedly ordered the release of the noncitizens DHS had detained. *See, e.g.*, Dkt. 33; *Valdez v. Joyce*, No. 25 Civ. 4627 (GBD), 2025 WL 1707737, at *3 n.6 (S.D.N.Y. June

18, 2025); *Singh*, 2025 WL 1918679, at *7.

89.     DHS attorneys then spent much of the summer attempting to persuade district courts to adopt various explanations for DHS's onslaught of re-arrests of people in Section 240 proceedings, despite often appearing unsure of the explanation themselves. *See, e.g.*, *Singh*, 2025 WL 1918679 at *4 (noting "uncertain basis" for petitioner's detention); *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *1 (D. Mass. July 24, 2025) (describing government's inability to identify documents substantiating detention where authority was "plainly uncertain"); *Hernandez v. Wofford*, No. 1:25-cv-00986-KES-CDB, 2025 WL 2420390, at *4 (E.D. Cal. Aug. 21, 2025) (arguing that re-detention was justified under § 1225(b)(1) although dismissal of removal proceedings was not yet final).

90.     Starting in late July or early August, DHS attorneys began providing a new post hoc explanation: that—contrary to 30 years of statutory interpretation—§ 1225(b)(2), and not § 1226(a)—applies to noncitizens in removal proceedings who entered without inspection, even those whom DHS itself had previously released from custody under the release mechanisms exclusive to § 1226(a). DHS attorneys have gone on to argue that § 1225(b)(2) has always required the mandatory detention of noncitizens within the scope of this subsection.

91.     DHS's new interpretation of § 1225(b)(2) appears to stem from two pronouncements. *First*, in arguing for this new rationale, DHS attorneys have urged courts to adopt and extend *Matter of Q. Li*, a May 2025 BIA decision holding that a noncitizen who entered the country without inspection, was issued humanitarian parole after a brief initial detention, and whose parole was terminated when she was placed in removal proceedings years later, was subject to mandatory detention under § 1225(b)(2). *Matter of Q. Li*, 29 I. & N. Dec. 66 (BIA 2025). Although the reasoning in *Matter of Q. Li* applies only to noncitizens released on humanitarian parole, DHS has relied on the case to argue that all noncitizens apprehended near the United States border have always been subject to § 1225(b)(2)—regardless of their manner of entry, the basis for their release from custody, how long they have been at liberty in the United States, and whether they are in removal proceedings.

92.     *Second*, on July 8, 2025, DHS adopted and promulgated its own even more

expansive interpretation of § 1225(b)(2). In an internal document emailed to ICE employees called *Interim Guidance Regarding Detention Authority for Applicants for Admission* (the "July 8 Memo"), DHS took the position that § 1225(b)(2), and not § 1226(a), applies to all noncitizens present in the United States without admission or parole, including all noncitizens who have ever entered without inspection. The July 8 Memo stated that "[t]his change in legal interpretation may ... warrant re-detention of a previously released [noncitizen] in a given case."

93.     Throughout the late summer and fall, DHS has offered its new interpretation of § 1225(b)(2)—and relegation of § 1226(a)—as its justification for re-detaining any noncitizen who entered the country without inspection, generally conceding that the agency did not consider an individual's changed circumstances before deciding to re-detain them. DHS has made this argument even in cases where its agents had—only days or weeks before—issued an administrative arrest warrant under § 1226. *See, e.g., Artiga v. Genalo*, No. 25-CV-5208 (OEM), 2025 WL 2829434, at *6 (E.D.N.Y. Oct. 5, 2025) (administrative warrant for re-arrest issued on September 15, 2025 under § 1226(a)); *Oliveros v. Kaiser*, No. 25-CV-07117-BLF, 2025 WL 2677125, at *2 (N.D. Cal. Sept. 18, 2025) (warrant for re-arrest in 2025 issued pursuant to § 1226(a)); *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *4 (N.D. Cal. Aug. 21, 2025) (administrative warrant for re-arrest issued July 24, 2025 under § 1226(a)).

94.     In the nearly 30 years in which § 1226(a) and § 1225(b)(2) have co-existed in the INA's statutory scheme, DHS has consistently deemed noncitizens who entered the country without inspection and were placed in Section 240 proceedings to be subject to § 1226(a). When the agency released someone who entered without inspection, it generally did so under § 1226(a)(2) and 8 C.F.R. § 236.1(b)(8). By definition, DHS released the members of the Bond/RoR subclass—which includes Ms. Garro Pinchi, Ms. Galo Santos, and Mr. Teletor Sente—pursuant to its authority under § 1226(a) and its accompanying regulations. The documents DHS issued them during their initial detention repeatedly cite § 1226(a) as the statute governing their detention and classify them as already "present" in the country, rather than "arriving." They were at liberty in the interior of the country and in removal proceedings with DHS's explicit permission.

50. DHS has also never revisited the interim regulation it issued in 1997 under § 1226(a), which clarified that the statute applied to the subset of "applicants for admission" who entered the U.S. without inspection. *See* 62 Fed. Reg. ~~Petitioner is now separated from her friends and partner. She suffers from severe medical conditions, including:~~

95. ~~She recently~~ 10312, 10323 (Mar. 6, 1997). That subset of applicants for admission is categorically different from those covered by § 1225(b)(2), who are "seeking" admission—*i.e.,* actively attempting to effect a lawful entry into the country. Indeed, when Congress amended § 1226(a)'s companion provision, § 1226(c), this year, it included noncitizens who entered without inspection as subject to the new mandatory detention provisions—which would not have been necessary if they were already covered by § 1225(b)(2), as DHS now contends. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E).

96. The results of DHS's about-face have been chaotic, cruel, and untethered from DHS's prior consideration of an individual's flight risk or danger to the community to justify re-detention. This government conduct has dismantled decades of settled expectations. On information and belief, Defendants' Re-Detention Policy has resulted in the arbitrary re-detention of more than 100 non-citizens in the San Francisco Area of Responsibility, including Plaintiff/Petitioner Garro Pinchi. Plaintiff/Petitioner Galo Santos and Plaintiff/Petitioner Teletor Sente fear the same will happen to them at their upcoming immigration court hearings. These individuals have done everything the law requires of them: They have attended immigration court hearings and supervision check-ins and complied with various immigration administrative requirements. Yet they were re-arrested and re-detained, or face imminent re-arrest or re-detention.

## V. Defendants' Re-Detention Policy will impose extraordinary and irreparable harm on Plaintiffs/Petitioners and the proposed class members.

97. Plaintiffs/Petitioners and proposed class members face the immediate threat of being re-arrested and re-detained indefinitely the next time they appear for a scheduled immigration court hearing or arrive at an ICE or ISAP office for a scheduled appointment. They face the terror of losing their liberty, of potentially being locked up for weeks, months, or even years in detention facilities thousands of miles away from their loved ones, homes, and

immigration attorneys, and the witnesses and documents that are key to their immigration cases.

98.     Plaintiffs/Petitioners and proposed class members risk separation from their homes and faith communities if and when they are re-detained. They risk losing gainful employment and having their schooling interrupted. They may lose their homes as the loss of their income makes it impossible for them or their loved ones to pay rent or mortgage payments. Indeed, proposed class members who have already been re-detained under the Re-Detention Policy have lost employment, housing, and healthcare.

99.     Plaintiffs/Petitioners and proposed class members further face the trauma of being indefinitely separated from their loved ones, including minor children. The lasting effects of the trauma of family separation on detained noncitizens, as well as their free loved ones, are well documented, as are the effects of the trauma of family detention. Plaintiffs/Petitioners and proposed class members, fearing detention and/or family separation, are experiencing deep emotional and psychological harm because of Defendants' new policy. They are experiencing extreme anxiety, insomnia, fear, and depression as they face the prospect of being ripped away from their families and losing their liberty as a consequence of attending an immigration court hearing, going to a scheduled ICE or ISAP appointment, and otherwise complying with their conditions of release or parole.

     a.  For example, detention caused Ms. Garro Pinchi significant harm. She suffers from serious medical conditions for which she requires frequent medication. When she was re-detained, she did not have access to her medication and experienced withdrawal symptoms, including shakes and shortness of breath. Before she was re-detained, she underwent an operation for a vaginal tumor, which continues to be monitored, requiring and requires medication to prevent recurrence.

     b.  Generalized anxiety disorder, clinical depression, post-traumatic stress disorder: These conditions require medication every 8 hours. She is currently in ICE custody; her medication is at home; and she does not know the name of it.

     c.  As of the submission of this document, she is experiencing physical withdrawal symptoms from her anxiety medication, including shakes and shortness of breath.

PETITION FOR WRIT OF HABEAS CORPUS     35
     CASE NO.     35

17.100. She has Helicobacter pylori, a bacterium that infects the stomach and is a major cause of stomach cancer and peptic ulcers, requiring She also has a medical condition that requires her to follow a strict dietary regimen prescribed by a medical doctor, and had an appendectomy last year. All of these serious conditions require care and monitoring that were unavailable to her while detained.

d. Gastritis, which required an appendectomy last year.

e. Asthma.

101. Petitioner hold steady employment and works 40 hours per week. She is the primary provider for her mother, daughter, and other relatives in Peru, who live in hiding due to the same factors leading The risk that Defendants will again re-detain Ms. Garro Pinchi under the Re-Detention Policy causes her extreme mental distress. She remains afraid to leave the house because she fears being arrested by ICE again. She experiences intrusive memories of being detained and feels flooded with terror, making it hard to sleep or concentrate. She feels panicked when she has to check in with ICE and ISAP.

102. Likewise, the risk that Defendants will re-detain Ms. Galo Santos at her upcoming ICE check-in and immigration court hearing causes her extreme anxiety and fear. Ms. Galo Santos fears that if she is re-detained, she will be ripped away from her young daughters, for whom she is the sole caregiver and provider. Ms. Galo Santos fears that any separation from her daughters would cause them significant trauma. In particular, one of Ms. Galo Santos' daughters suffers from severe cerebral palsy. As a result of her medical condition, she is almost totally paralyzed, is confined to a wheelchair, cannot speak, and requires assistance with critical daily tasks. Because Ms. Galo Santos is the sole caregiver for her daughter, she fears that any separation from her daughter would lead to a lapse in her medical care and cause her health to suffer.

103. Similarly, Mr. Teletor Sente is experiencing extreme anxiety and fear at the risk that he will be re-detained at his upcoming in-person hearing in November. Mr. Teletor Sente fears that if he is re-detained, his minor son would be left with no one to care for him or provide for him. If Mr. Teletor Sente is re-detained, he will lose his apartment, which means that his minor son will be left with nowhere to live and will be forced to drop out of school and work in order to

survive. Mr. Teletor Sente also fears that his son could be re-detained with him, subjecting him to the traumas of detention and disrupting his education.

## CLASS ACTION ALLEGATIONS

104.   Plaintiffs/Petitioners bring this class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

105.   Plaintiffs/Petitioners seek certification of the following proposed Class and Subclass:

**Class:**  All noncitizens in the jurisdiction of the San Francisco ICE Field Office who (1) entered or will enter the United States without inspection; (2) have been or will be charged with inadmissibility under 8 U.S.C. § 1182 and have been or will be released from DHS custody; and who (3) are in removal proceedings under 8 U.S.C. § 1229a, including any § 1229a proceedings that have been dismissed where the dismissal is not administratively final; and (4) are not subject to detention under 8 U.S.C. § 1226(c).

**Bond/RoR Subclass:**  All members of the Class whose release from DHS custody was or will be on bond, conditional parole, or their own recognizance under 8 U.S.C. § 1226(a) and/or 8 C.F.R. § 236.1(c)(8).

106.   The proposed Class and Subclass satisfy Rule 23(a)(1) because they are so numerous that joinder of all members is impracticable. On information and belief, Defendants have subjected more than 100 people within the San Francisco Area of Responsibility to unlawful re-arrests and re-detentions under the Re-Detention Policy and will continue to do so on a widescale basis until and unless a court order prevents them from doing so.

107.   The proposed Class and Subclass satisfy Rule 23(a)(2) because there are multiple questions of law and fact common to all members of the proposed classes. Those common questions include, but are not limited to:

a.   Whether the Re-Detention Policy is arbitrary and capricious under the APA because Defendants failed to provide a reasoned explanation for the reversal of longstanding agency policy against re-arresting and re-detaining noncitizens absent an individualized and material change of circumstances, and failed to adequately consider important factors relevant to this decision, such as the reliance interest of individuals released from detention and the due process and Fourth Amendment implications of the new policy;

b. Whether the Re-Detention Policy is arbitrary and capricious under the APA because it was adopted and implemented for an improper purpose;

c. Whether the Re-Detention Policy is unlawful under the APA as "contrary to a constitutional right" because it violates the Fourth Amendment's guarantee against unreasonable seizures.

108.    In addition to these questions common to the entire class, the Bond/RoR Subclass presents an additional question capable of resolution for all members of that Subclass:

a. Whether Defendants' Re-Detention Policy violates the INA and exceeds their statutory authority under 8 U.S.C. § 1226(b).

109.    The proposed Class and Subclass satisfy Rule 23(a)(3) because the Named Plaintiffs'/Petitioners' claims are typical of the claims of the class. Each class member's claims arise from Defendants' adoption of the challenged policy, and each class member has experienced or will experience the same primary injuries.

110.    The proposed Class and Subclass satisfy Rule 23(a)(4) because the proposed class representatives are committed to fairly and adequately defending the rights of all proposed class members. Named Plaintiffs/Petitioners seek the same relief as all members of the class, and their interests are not in conflict with the interests of the class. They have obtained counsel from the ACLU Foundation; ACLU Foundation of Northern California; Centro Legal de la Raza; and Keker, Van Nest & Peters LLP, who have substantial experience litigating class action lawsuits and other complex federal litigation on behalf of noncitizens.

111.    The proposed Class and Subclass also satisfy Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the class so that the relief sought is appropriate as to the class as a whole.

## CLAIMS FOR RELIEF

51.    Ms. Garro Pinchi to seek asylum in the U.S. Her mother has diabetes and is completely dependent on Ms. Garro Pinchi for insulin. Other relatives in Peru are disabled and rely exclusively on Ms. Garro Pinchi for financial support.

## CLAIMS FOR RELIEF

PETITION FOR WRIT OF HABEAS CORPUS                    38
CASE NO.                                            38

**FIRST CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***The Re-Detention Policy is Arbitrary and Capricious***
**Plaintiffs/Petitioners, Class, and Bond/RoR Subclass**

112.    Plaintiffs/Petitioners repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

113.    The Administrative Procedure Act provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary [and] capricious, . . . or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

114.    The Re-Detention Policy is a reviewable final agency action because it is neither tentative nor interlocutory, and legal consequences flow from the policy for Plaintiffs/Petitioners and the proposed Class and Subclass, who have been re-detained under the Re-Detention Policy or who live in fear of being re-detained under the policy in the future.

115.    The Re-Detention Policy departs from longstanding agency precedent, policy, and practice.

116.    In adopting the Re-Detention Policy, Defendants provided no reasoned or adequate explanation for the policy, which is a dramatic shift from recent and longstanding agency policies, and which results in the costly and arbitrary re-detention of individuals who had serious reliance interests in those past policies. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

117.    Moreover, in adopting the Re-Detention Policy, Defendants failed to adequately consider important aspects of the problem and all relevant factors, including the constitutional limitations on the government's authority to re-arrest and re-detain, and the reliance interests of the proposed Class. Defendants instead considered the improper purpose of pressuring noncitizens to abandon their claims for relief and self-deport.

118.    The Re-Detention Policy is therefore arbitrary and capricious in violation of the Administrative Procedure Act.

**SECOND CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)**
***The Re-Detention Policy Violates the INA***

**Plaintiffs/Petitioners and Bond/RoR Subclass**

119.    Plaintiffs/Petitioners repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

120.    The Re-Detention Policy violates 8 U.S.C. § 1226(b) because the statute does not authorize re-detention without a material change in circumstances with respect to a noncitizen's flight risk or danger to the community based on an individualized determination. Further, Defendants' re-interpretation of 8 U.S.C. § 1225(b)(2) and § 1226(a) is contrary to law and is not a valid legal basis for the Re-Detention Policy.

121.    The Re-Detention Policy violates the Administrative Procedure Act because it is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C), (D).

**THIRD CLAIM FOR RELIEF**

**Administrative Procedure Act, 5 U.S.C. § 706(2) – *Accardi* Doctrine**
***Unlawful Failure to Follow/Effective Rescission of 8 C.F.R. § 236.1(c)(8)***
**Plaintiffs/Petitioners and Bond/RoR Subclass**

122.    Plaintiffs/Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

123.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

124.    The *Accardi* doctrine holds that "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions." *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

125.    DHS regulations implementing 8 U.S.C. § 1226(b) authorize revocations of release from custody under the statute only in the "discretion of the district director, acting district director, deputy director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign)." 8 C.F.R. § 1236.1(c)(9).

126.    The Re-Detention Policy permits the revocation of prior custody determinations by government officials not authorized by law to make this determination in violation of the APA and in violation of the *Accardi* doctrine's requirement that agencies comply with their own regulations.

### FOURTH CLAIM FOR RELIEF

#### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
#### *The Re-Detention Policy is Contrary to Constitutional Right*
#### Plaintiffs/Petitioners, Class, and Bond/RoR Subclass

127.    Plaintiffs/Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

128.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

129.    The Fourth Amendment protects the right of all persons present in the United States to be free from unreasonable seizures by government officials. Plaintiffs/Petitioners and members of the proposed class therefore have the right to be free from unreasonable seizures.

130.    As a corollary to that right, the Fourth Amendment prohibits re-arrest on the same charges/probable cause without a material change in circumstances.

131.    The Re-Detention Policy violates the Fourth Amendment because it authorizes immigration agents to undertake unreasonable seizures by re-arresting Plaintiffs/Petitioners and the proposed class members for the same civil immigration charges as their initial arrest without a material change in circumstances.

### FIFTH CLAIM FOR RELIEF

#### Violation of the Fifth Amendment to the United States Constitution
*(Plaintiffs'/Petitioners' Detention Violates* **Substantive** *Due Process*—Detention)
~~PETITIONER REPEATS~~ Plaintiffs/Petitioners Garro Pinchi, Galo Santos, and Teletor Sente

~~18.~~132.    Plaintiffs/Petitioners repeat and re-~~alleges~~allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

~~19.~~133.    The Due Process Clause of the Fifth Amendment protects all "person[s]" from deprivation of liberty "without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process ~~Clause~~clause protects." *Zadvydas*, 533 U.S. at 690.

~~20.~~134.    Immigration detention is constitutionally permissible only when it furthers the government's legitimate goals of ensuring ~~the~~a noncitizen's appearance during removal

proceedings and preventing danger to the community. ~~*See id.*~~

135. ~~Petitioner is not~~ Ms. Garro Pinchi, Ms. Galo Santos, and Mr. Teletor Sente were previously released on their own recognizance ("conditional parole") by Defendants. These previous releases constituted a ~~flight risk or danger~~ determination by Defendants that they were neither dangerous to the community ~~Respondents'~~ nor flight risks.

~~21.~~136. None of Ms. Garro Pinchi, Ms. Galo Santos, or Mr. Teletor Sente have become a danger or flight risk since their release from custody. Their re-detention ~~of Petitioner is therefore unjustified and unlawful.~~thus does not serve a legitimate goal. Accordingly, ~~Petitioner is being detained in violation of~~their re-detention would violate the Due Process Clause ~~of the Fifth Amendment.~~

<span style="color:green">**SIXTH CLAIM FOR RELIEF**</span>

~~52. Moreover, Petitioner's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Id.* (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Here, the purpose of Petitioner's detention appears to be "not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons"—namely, to meet newly-imposed DHS quotas and transfer immigration court venue away from an IJ who refused to facilitate DHS's new expedited removal scheme. *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring).~~

~~**SECOND CLAIM FOR RELIEF**~~

**Violation of the Fifth Amendment to the United States Constitution**
**(<span style="color:blue">*Plaintiffs'/Petitioners' Detention Violates*</span> Procedural Due Process ~~— Detention~~)**

~~53. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.~~

~~54. As part of the liberty protected by the Due Process Clause, Petitioner has a weighty liberty interest in avoiding re-incarceration after his release. *See Young v. Harper*, 520 U.S. 143, 146–47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482–83 (1972); *see also Ortega*, 415 F. Supp. 3d at 969–70 (holding that a noncitizen has a protected liberty interest in remaining out of custody following an IJ's bond determination).~~

~~PETITION FOR WRIT OF HABEAS CORPUS            42~~
~~CASE NO.~~            42

3109854

55. Accordingly, "[i]n the context of immigration detention, it is well-settled that due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Hernandez*, 872 F.3d at 990 (cleaned up); *Zinermon*, 494 U.S. at 127 (Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."). In the immigration context, for such hearings to comply with due process, the government must bear the burden to demonstrate, by clear and convincing evidence, that the noncitizen poses a flight risk or danger to the community. *See Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011); *see also Martinez v. Clark*, 124 F.4th 775, 785, 786 (9th Cir. 2024).

56. Petitioner's re-detention without a pre-deprivation hearing violated due process. Over two years after deciding to release Petitioner from custody on her own recognizance, Respondents re-detained Petitioner with no notice, no explanation of the justification of her re-detention, and no opportunity to contest her re-detention before a neutral adjudicator before being taken into custody.

57. Petitioner has a profound personal interest in her liberty. Because she received no procedural protections, the risk of erroneous deprivation is high. And the government has no legitimate interest in detaining Petitioner without a hearing; bond hearings are conducted as a matter of course in immigration proceedings, and nothing in Petitioner's record suggested that she would abscond or endanger the community before a bond hearing could be carried out. *See, e.g., Jorge M.F. v. Wilkinson*, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021); *Vargas v. Jennings*, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020) ("the government's concern that delay in scheduling a hearing could exacerbate flight risk or danger is unsubstantiated in light of petitioner's strong family ties and his continued employment during the pandemic as an essential agricultural worker").

**THIRD CLAIM FOR RELIEF**

**Violation of the Fourth Amendment to the United States Constitution**

**(Unlawful Arrest)**

58.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

59.    The Fourth Amendment protects the right of persons present in the United States to be free from unreasonable seizures by government officials.

60.    As a corollary to that right, the Fourth Amendment prohibits government officials from conducting repeated arrests on the same probable cause.

It is axiomatic that seizures have purposes. When those purposes are spent, further seizure is unreasonable. . . . [T]he primary purpose of an arrest is to ensure the arrestee appears to answer charges. . . . Once the arrestee appears before the court, the purpose of the initial seizure has been accomplished. Further seizure requires a court order or new cause; the original probable cause determination is no justification.

*Williams v. Dart*, 967 F.3d 625, 634 (7th Cir. 2020) (cleaned up); *see also United States v. Kordosky*, No. 88-CR-52-C, 1988 WL 238041, at *7 n.14 (W.D. Wis. Sept. 12, 1988) ("Absent some compelling justification, the repeated seizure of a person on the same probable cause cannot, by any standard, be regarded as reasonable under the Fourth Amendment.").

61.    In the immigration context, this prohibition means that a person who immigration authorities released from initial custody cannot be re-arrested "solely on the ground that he is subject to removal proceedings" and without some new, intervening cause. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1196 (N.D. Cal. 2017), *aff'd sub nom.*, *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Courts have long recognized that permitting such rearrests could result in "harassment by continual rearrests." *United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971).

62.    DHS agents arrested Petitioner in 2023 after she entered the United States, charged her with a violation of civil immigration law, and released her on his own recognizance with a notice to appear in immigration court. Petitioner appeared in immigration court as instructed, answered the charges, and diligently pursued an application for relief from removal.

63.    DHS re-arrested Petitioner on May 27, 2025, based on nothing more than the 2024 civil charge of violating immigration law for which she had *just appeared* in court. Petitioner had not engaged in any conduct in the intervening time that made her a flight risk or danger to the

PETITION FOR WRIT OF HABEAS CORPUS                    44
CASE NO.                                              44

community. No material change in circumstances justified Petitioner's re-arrest.

64.    Petitioner's re-arrest and detention by Respondents after she had already appeared in court on his civil immigration charge and absent any material change in circumstances is thus an unreasonable seizure in violation of the Fourth Amendment.

**FOURTH CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act**

65.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

66.    The Administrative Procedure Act prohibits federal action that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

**THE GOVERNMENT'S POLICY TARGETING PEOPLE ATTENDING THEIR IMMIGRATION HEARINGS AT IMMIGRATION COURT FOR ARREST VIOLATES THE LONGSTANDING COMMON LAW PRIVILEGE AGAINST CIVIL ARRESTS IN AND AROUND COURTHOUSES. THAT PRIVILEGE EXTENDS TO** Plaintiffs/Petitioners Garro Pinchi, Galo Santos, and Teletor Sente

67.    Plaintiffs/Petitioners repeat and re-allege parties, witnesses, and all people attending the courts on business.

68.    Congress did not displace this privilege when it enacted the Immigration and Nationality Act, and the privilege was incorporated as a limit on ICE's arrest authority. The government's courthouse arrest policy therefore is in excess of statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

69.    The policy is also arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

70.    The government has provided no reasoned or adequate explanation for the policy, which is a dramatic shift from recent and longstanding agency policy and practice.

71.    Additionally, in adopting the policy, the government failed to adequately consider all relevant factors and crucial aspects of the issue. The policy will deter individuals from appearing as parties and witnesses at immigration and other judicial proceedings, preventing the adjudication of meritorious claims, impeding the administration of justice, and hindering cooperation with law

PETITION FOR WRIT OF HABEAS CORPUS          45
CASE NO.                                                45

1    ~~enforcement.~~

2    ~~22.1.    The policy is also in excess of the agency's authority, and arbitrary and capricious,~~

3    ~~because it violates the agency's own regulations making clear that the government cannot~~

4    ~~terminate a person's Section 240 proceedings absent a showing that the "[c]ircumstances of the~~

5    ~~case have changed after the notice to appear was issued." 8 C.F.R. § 239.2(a)(7), (c); *see United*~~

6    ~~*States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).~~

7    ~~72.    Petitioner's arrest and detention pursuant to the government's policy is a final~~

8    ~~agency action that violates the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).~~

9    ~~**FIFTH CLAIM FOR RELIEF**~~

10    ~~**Violation of the First and Fifth Amendments to the United States Constitution**~~

11    ~~**(Right to Access Courts and Petition for Redress)**~~

12    ~~23.~~137.    ~~Petitioner repeats and re-alleges~~ the allegations contained in the preceding

13    paragraphs of this Petition as if fully set forth herein.

14    138.    The Fifth Amendment guarantees noncitizens present in the country with due

15    process rights, including the right to not be deprived of a liberty or property interest without notice

16    and a hearing before a neutral decision-maker.

17    139.    Ms. Garro Pinchi, Ms. Galo Santos, and Mr. Teletor Sente have already been

18    determined not to pose a flight risk or danger to the community. They have a protected liberty

19    interest in their continued freedom from detention and are entitled to due process before the

20    government can deprive them of their liberty by re-detaining them. The Due Process Clause

21    prohibits Plaintiffs'/Petitioners' re-detention without a pre-deprivation hearing before a neutral

22    decision-maker in which the government bears the burden of demonstrating that a

23    Plaintiff/Petitioner poses a flight risk or danger to the community.

24    **SEVENTH CLAIM FOR RELIEF**

25    ~~73.    The First and Fifth Amendments to the United States Constitution guarantee the~~

26    ~~rights to access the courts and to petition for redress of grievances, which includes the right to~~

27    ~~participate as a party or witness in judicial and administrative proceedings.~~

28    ~~74.    The Constitution as a corollary prohibits systemic official action that bans or~~

obstructs meaningful access to the courts, including the filing or presenting of legal claims. *See Christopher v. Harbury*, 536 U.S. 403 (2002).

75.    Petitioner's arrest and detention have interfered with her ability to access immigration court and participate in his immigration proceedings including pursuing his applications for asylum, withholding of removal, and relief under the Convention Against Torture.

76.    The government's arrest of Petitioner therefore deprived her of his First and Fifth Amendment rights to meaningfully access court and to petition for redress of grievances.

77.    Petitioner has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**

**Violation of the ~~Administrative Procedure Act, 5 U.S.C. §§ 702, 706~~ Fourth Amendment to the United States Constitution**

**(Dismissal/Expedited Removal)**

~~Petitioner repeats~~ ***Plaintiffs'/Petitioners' Re-Arrest Constitutes an Unreasonable Seizure Plaintiffs/Petitioners Garro Pinchi, Galo Santos, and Teletor Sente***

~~24.~~140.    Plaintiffs/Petitioners repeat and re-~~alleges~~allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

78.    8 U.S.C. § 1225(b)(1) covers the "[i]nspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). Section 1225(b)(1)(A)(iii)(II) further clarifies that "[a]n alien described in this clause is an alien who is not described in subparagraph (F), who has not … been physically present in the United States continuously for the 2-year period." 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

79.    The government's own records make clear that Petitioner entered the United States on April 14, 2023. Because Petitioner has been in the United States for more than two years, 8 U.S.C. § 1225(b)(1) cannot be applied to her.

80.    Dismissal of Petitioner's 240 proceedings case for the purpose of placing her in expedited removal would exceed statutory authority and be contrary to the Fifth Amendment's guarantee of due process in violation of 5 U.S.C. § 706(2)(A)-(B).

81.    Placing Petitioner in expedited removal proceedings would be contrary to the Fifth Amendment's guarantee of due process in violation of 5 U.S.C. § 706(2)(A)-(B).

SEVENTH CLAIM FOR RELIEF

Violation of the Fifth Amendment to the United States Constitution

(Procedural Due Process – Dismissal/Expedited Removal)

82. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

141. Petitioner has a liberty interest in protection from deportation. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (a noncitizen's interest in deportation proceedings "is, without question, a weighty one" because "she stands to lose the right 'to stay and live and work in this land of freedom'") (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)); *Orantes-Hernandez v. Smith*, 541 F. The Fourth Amendment protects the right of all persons present in the United States to be free from unreasonable seizures by government officials. Plaintiffs/Petitioners therefore have the right to be free from unreasonable seizures.

142. As a corollary to that right, the Fourth Amendment prohibits re-arrest on the same charge without a material change in circumstances.

83. Ms. Garro Pinchi was re-arrested on the same charge without a material change in circumstances. Her re-arrest violated the Fourth Supp. 351, 377 n.32 (C.D. Cal. 1982) ("It is well-settled that the right to a deportation hearing is of constitutional scope because deportation 'involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned perhaps to life itself.'") (quoting *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950)). Accordingly, "[a] person who faces deportation is entitled under our constitution to a full and fair deportation hearing," *Hartooni v. I.N.S.*, 21 F.3d 336, 339–40 (9th Cir. 1994), because "without such a hearing, there would be no constitutional authority for deportation." *Wong Yang Sung*, 339 U.S. at 49.

84. Depriving Petitioner of her liberty interest is unconstitutional under the Fifth Amendment unless it is "accompanied by sufficient procedural protections." *See Johnson v. Ryan*, 55D F.4th 1167, 1179–80 (9th Cir. 2022) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

85. Dismissing Petitioner's Section 240 proceedings for the purpose of placing her in expedited removal would violate due process by failing to provide adequate procedural protections

PETITION FOR WRIT OF HABEAS CORPUS                48
                        CASE NO.                              48

3109854

1

to her weighty interests.

2       86.    Placing Petitioner in expedited removal would violate due process by failing to

3   provide adequate procedural protections to her weighty interests.

4                                    **PRAYER FOR RELIEF**

5   Petitioner respectfully requests that this Court:

6       1.    Assume jurisdiction over this matter;

7       1.    Issue a writ of habeas corpus ordering Respondents to immediately release

8             Petitioner from custody;

9       143.    Declare that Petitioner's arrest and detention violate the Due Process Clause of the

10  Fifth Amendment, the .

11      144.    The circumstances related to Ms. Galo Santos's flight risk or danger to the

12  community have not changed since her prior release from custody. Re-arresting her would violate

13  the Fourth Amendment, the First.

14      145.    The circumstances related to Mr. Teletor Sente's flight risk or danger to the

15  community have not changed since his prior release from custody. Re-arresting him would violate

16  the Fourth Amendment, and the Administrative Procedure.

17                                   **PRAYER FOR RELIEF**

18  Plaintiffs/Petitioners, on behalf of themselves and the members of the proposed classes,

19  respectfully request that the Court grant the following relief:

20      a.    Issue an order pursuant to the All Writs Act, 28 U.S.C. § 1651, to protect this Court's

21            jurisdiction over the litigation by barring Defendants from deporting any

22            Plaintiffs/Petitioners or transferring any Plaintiffs/Petitioners to a jurisdiction different

23            from the one in which they are presently detained, pending the duration of these

24            proceedings;

25      2.    Declare that dismissing Petitioner's Section 240 proceedings would violate the Due

26            Process Clause of the Fifth Amendment;

27      3.    Declare that placing Petitioner in expedited removal proceedings would violate the

28            Due Process Clause of the Fifth Amendment;

PETITION FOR WRIT OF HABEAS CORPUS          49
                    CASE NO.          49

4.    Enjoin Respondents from transferring Petitioner outside this District or deporting Petitioner pending these proceedings;

b.    Enjoin Respondents Grant class certification of the proposed Class and Subclass;

c.    Exercise the Court's authority under 5 U.S.C. § 705 to provide relief pending review of the Re-Detention Policy;

b.d. Issue writs of habeas corpus prohibiting Defendants from re-arresting or re-detaining Petitioner Plaintiffs/Petitioners unless her their re-detention is ordered at a custody hearing before a neutral arbiter in which the government bears the burden of proving, by clear and convincing evidence, that a Plaintiff/Petitioner is a flight risk or danger to the community;

5.    Order that Respondents may not dismiss Petitioner's Section 240 proceedings;

6.    Order that Respondents may not place Petitioner in expedited removal proceedings or remove Petitioner except based on a final, executable removal order issued through Section 240 removal proceedings;

e.    Declare that the Re-Detention Policy is arbitrary and capricious, in excess of statutory authority, contrary to law, and contrary to constitutional right;

f.    Vacate and set aside the Re-Detention Policy;

c.g. Award Petitioner his costs and Plaintiffs/Petitioners reasonable attorneys' attorney's fees in this action as provided for by the Equal Access to Justice Act and 28 U.S.C. § 2412 and costs; and

d.h. Grant such any other and further relief as the Court deems just and proper equitable, including individual injunctions when requested as necessary to secure the rights of class members.

1   ~~Date: July 3~~Dated: October 10, 2025    ~~Respectfully Submitted,~~

2   ~~/s/ Abby Sullivan Engen~~

3   ~~CENTRO LEGAL DE LA RAZA~~
4   ~~3400 E. 12th Street~~
    ~~Oakland, CA 94601~~
5   ~~Telephone: (510) 244-4312~~
    ~~asullivanengen@centrolegal.org~~
6   ~~ATTORNEY FOR PETITIONER~~ KEKER,
7   VAN NEST & PETERS LLP

8   By:    /s/ Erin E. Meyer
9          ERIN E. MEYER
           JULIA L. ALLEN
10         CLAIRE C. BONELLI
           ELLEN WATLINGTON
11         JACQUIE P. ANDREANO
           KAYLA CROWELL
12
13         Attorneys for Plaintiffs-Petitioners

14  Dated: October 10, 2025
           AMERICAN CIVIL LIBERTIES UNION
15         FOUNDATION OF NORTHERN

16         /s/ Bree Bernwanger
17         BREE BERNWANGER
           MICHELLE (MINJU) Y. CHO
18         NEIL K. SAWHNEY
           LAUREN M. DAVIS
19
           Attorneys for Plaintiffs-Petitioners
20
21  Dated: October 10, 2025
           CENTRO LEGAL DE LA RAZA
22
23         /s/ Abby Sullivan Engen
           ABBY SULLIVAN ENGEN
24         JESSE NEWMARK
           NIKOLAS DE BREMAEKER
25
           Attorneys for Plaintiffs-Petitioners
26
27
28  ~~PETITION FOR WRIT OF HABEAS CORPUS~~    ~~51~~
                    ~~CASE NO.~~                51
    CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
                    Case No. 5:25-cv-5632-PCP
    3109854

Dated: October 10, 2025

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

/s/ Judy Rabinovitz
JUDY RABINOVITZ

Attorneys for Plaintiffs-Petitioners

PETITION FOR WRIT OF HABEAS CORPUS                    52
CASE NO.                    52
CLASS ACTION COMPLAINT AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
Case No. 5:25-cv-5632-PCP

3109854