UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRESCIA GARRO PINCHI, et al., | Case No.  25-cv-05632-PCP |
| Plaintiffs, | |
| v. | **ORDER PROVISIONALLY CERTIFYING CLASS AND STAYING AGENCY ACTION** |
| KRISTI NOEM, et al., | Re: Dkt. Nos. 48, 49 |
| Defendants. | |

Plaintiffs Frescia Garro Pinchi, Juany Galo Santos, and Jose Teletor Sente are noncitizens who entered the United States without lawful admission and were apprehended near the border. After briefly detaining them, the Department of Homeland Security (DHS) placed each plaintiff in removal proceedings and released them into the interior of the country, which required DHS to find that they were unlikely to abscond or endanger the public. Until this year, DHS's longstanding practice was not to re-detain a noncitizen whom it had previously released without first making an individualized determination that the individual's material circumstances had changed, such that they posed a flight or security risk. But in May, DHS began re-arresting large numbers of noncitizens without making such individualized determinations, often at immigration courthouses. Ms. Garro Pinchi was one such noncitizen. After she attended a routine removal hearing at the San Francisco immigration court, agents of Immigrations and Customs Enforcement (ICE)—an agency within DHS—arrested and detained her without any evidence that her circumstances had changed. In this case, Ms. Garro Pinchi and her fellow plaintiffs challenge DHS's new "re-detention policy" on behalf of a putative class and subclass of similarly situated noncitizens. Now before the Court are plaintiffs' motions to provisionally certify the putative class and subclass and to stay the re-detention policy under § 705 of the Administrative Procedure Act (APA). For the reasons below, the Court grants both motions.

1

## STATUTORY FRAMEWORK

Two statutes—8 U.S.C. §§ 1225 and 1226—provide for civil detention of noncitizens (or "aliens") pending removal proceedings.

Under § 1225, a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018) (quoting 8 U.S.C. § 1225(a)(1)). All noncitizens "who are applicants for admission" or who are "otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers" to assess whether they may be admitted into the country. 8 U.S.C. § 1225(a)(3). An inspecting officer must then determine whether an applicant for admission is covered by either § 1225(b)(1) or (b)(2). *See Jennings*, 583 U.S. at 287. Section 1225(b)(1) applies to noncitizens who, upon arriving, are initially deemed inadmissible under 8 U.S.C. § 1182(a)(6)(C) or (a)(7) due to fraud, misrepresentation, or lack of valid documentation. *See* 8 U.S.C. § 1225(b)(1)(A)(i). It also applies to certain noncitizens designated by the Secretary of Homeland Security who are later determined to be inadmissible under § 1182(a)(6)(C) or (a)(7) and were not continuously present in the United States for the two-year period prior to that determination. *See id.* § 1225(b)(1)(A)(iii).[1] Section 1225(b)(2) covers all other "applicant[s] for admission" who are "seeking admission," with limited exceptions for "crewm[e]n" and "stowaway[s]." *See id.* § 1225(b)(2)(A)–(B).

Subsections (b)(1) and (b)(2) both authorize detention pending removal proceedings in certain circumstances. Noncitizens covered by § 1225(b)(1) are subject to an expedited removal process and will be "removed from the United States without further hearing or review" unless they claim a right to asylum. *Id.* § 1225(b)(1)(A)(i)–(ii). If a noncitizen states an intent to apply for asylum and an immigration officer determines that there is a credible fear of persecution, the noncitizen "shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). Noncitizens covered by § 1225(b)(2) are not subject to expedited removal.

---

[1] The authority to designate groups of noncitizens for expedited removal "once belonged to the Attorney General, who is still named in the statute," but has since been transferred to DHS. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 109 n.3 (2020) (citing 6 U.S.C. § 251(2)).

United States District Court
Northern District of California

1    Instead, they are placed in standard removal proceedings under 8 U.S.C. § 1229a, which include

2    an evidentiary hearing before an immigration judge, the right to counsel, and the right to seek

3    review by the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.*

4    § 1225(b)(2)(A); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020); *see also*

5    *Valencia Zapata v. Kaiser*, No. 25-CV-07492-RFL, 2025 WL 2741654, at *1 (N.D. Cal. Sept. 26,

6    2025). Section 1225(b)(2) mandates that noncitizens "shall be detained" pending such proceedings

7    unless they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). "In

8    other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are

9    subject to mandatory detention while their full removal proceedings are pending." *Salcedo Aceros*

10   *v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503, at *3 (N.D. Cal. Sept. 12, 2025). DHS may

11   release noncitizens detained under either § 1225(b)(1) or (b)(2) only on temporary parole "for

12   urgent humanitarian reasons or significant public benefit." *Jennings*, 583 U.S. at 300; *see* 8 U.S.C.

13   § 1182(d)(5)(A). By regulation, release is available only where "the aliens present neither a

14   security risk nor a risk of absconding." 8 C.F.R. § 212.5(b).

15        For noncitizens who are "already in the country," § 1226 authorizes detention "pending the

16   outcome of removal proceedings" in certain circumstances. *Jennings*, 583 U.S. at 289. Unlike

17   § 1225(b)(1) and (b)(2), § 1226(a) affords the government significant discretion. After arresting a

18   noncitizen "[o]n a warrant," the government "may continue to detain the arreste[e]" until a final

19   removal decision is made or "may release" them on "bond" or "conditional parole." 8 U.S.C.

20   § 1226(a)(1)–(2). As under § 1225(b)(1) and (b)(2), however, release is available only if "the alien

21   … demonstrate[s] to the satisfaction of [an] officer that such release would not pose a danger to

22   property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R.

23   §§ 236.1(c)(8), 1236.1(c)(8). If a noncitizen wishes to contest the initial custody determination—

24   i.e., the denial or amount of bond—she has a right to do so before an immigration judge. 8 C.F.R.

25   §§ 236.1(d)(1), 1236.1(d)(1). Immigration judges must deny a bond unless "an alien …

26   demonstrate[s], by clear and convincing evidence, that release would not pose a danger to other

27   persons or to property" and "that the alien is likely to appear for any scheduled proceeding or

28   interview." 8 C.F.R. § 1003.19(h)(3). Just as § 1226(a) grants DHS discretion to release covered

3

1    noncitizens, § 1226(b) permits DHS to revoke bond or parole "at any time." 8 U.S.C. § 1226(b).

2         In a handful of circumstances, § 1226(c) departs from § 1226(a)'s discretionary framework

3    to mandate detention of noncitizens who are already in the country. *See* 8 U.S.C. § 1226(c). The

4    government "shall take into custody" noncitizens who are inadmissible or deportable because they

5    committed certain criminal offenses, *id.* § 1226(c)(1)(A)–(C); are inadmissible based on terrorist

6    affiliations or other security concerns, *id.* § 1226(c)(1)(D); or are inadmissible on certain bases and

7    have been charged, arrested, or convicted for specified crimes, including burglary and shoplifting,

8    *id.* § 1226(c)(E). Section 1226(c) authorizes the release of such noncitizens only if the government

9    deems it necessary for witness-protection purposes and finds that "the alien will not pose a danger

10   to the safety of other persons or of property and is likely to appear for any scheduled proceeding."

11   *See* 8 U.S.C. § 1226(c)(4).

12                                    **BACKGROUND**

13        As detailed above, various statutory provisions govern DHS's detention and release of

14   noncitizens pending removal proceedings. No matter which of these provisions applies to a given

15   noncitizen, however, release is available only where a DHS officer or immigration judge has first

16   determined that a noncitizen neither poses a threat to the public nor is likely to abscond. *See* 8

17   C.F.R. §§ 212.5(b), 236.1(c)(8), 1003.19(h)(3), 1236.1(c)(8); 8 U.S.C. § 1226(c)(4); *see also*

18   *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H.*

19   *v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Accordingly, although DHS has the statutory authority

20   to revoke discretionary bond or parole "at any time," 8 U.S.C. § 1226(b), the BIA long ago

21   "recognized an important implicit limitation on DHS's authority." *Saravia*, 280 F, Supp. 3d at

22   1197. "[W]here a previous bond determination has been made by an immigration judge" and

23   reflects a determination that a noncitizen is not a danger to the community or a flight risk, DHS

24   may not re-detain a noncitizen "absent a change of circumstance." *Matter of Sugay*, 17 I. & N.

25   Dec. 637, 640 (B.I.A. 1981).

26        The BIA's decision in *Matter of Sugay* did not directly address DHS's authority to re-

27   detain noncitizens released by a DHS officer, rather than on a bond issued by an immigration

28   judge. *See id.* But DHS has explained that "in practice, [it] follow[ed] *Matter of Sugay* in

4

situations … where a previous release determination was made by DHS. Thus, DHS generally only re-arrest[ed] an alien pursuant to § 1226(b) after a material change in circumstances." Federal Defendants' Supplemental Brief at 1, *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) (No. 17-cv-03615-VC), Dkt. No. 90 at 2; *see also Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) (describing "the government's view that the DHS has … discretionary authority to re-arrest [a noncitizen] in the event of material changed circumstances"); *Saravia*, F. Supp. 3d at 1197 (similar). Plaintiffs have provided declarations from seven immigration attorneys and former immigration judges—many with decades of experience in immigration courts in this district—stating that none had ever observed or even heard of DHS re-detaining a noncitizen absent such a change in the individual's material circumstances.[2] And DHS indicated in its orders releasing noncitizens pursuant to § 1226(a) that such release could be revoked only if "[t]he alien failed to comply with the conditions of release" (which would constitute a material change in circumstances) or following a final removal order, at which point the noncitizen would be subject to mandatory detention under 8 U.S.C. § 1231(a)(2).[3] In short, DHS for decades limited the re-

---

[2] *See* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶ 29; Declaration of Shira Levine, Dkt. No. 48-6 ¶¶ 3–5; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 5; Declaration of Natalia Santanna, Dkt. No. 48-8 ¶¶ 3–4; Declaration of Bill Ong Hing, Dkt. No. 48-9 ¶ 5; Declaration of Jacqueline Marie Brown, Dkt. No. 48-10 ¶ 5; Declaration of Martha Ruch, Dkt. No. 48-11 ¶ 4.

The government objects to the Court's consideration of these and other declarations, as well as certain articles and websites, under the Federal Rules of Evidence. But "the Federal Rules of Evidence do not strictly apply" in the preliminary-relief context. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). "Given that the 'purpose of a [§ 705 stay] is merely to preserve the relative positions of the parties until a trial on the merits can be held,' and 'given the haste that is often necessary if those positions are to be preserved,'" courts must often resolve motions for preliminary relief "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For that reason, the Ninth Circuit has held that district courts "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Id.* (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). "Given the haste" required to prepare a motion for a stay of agency action, and because this evidence documents the existence of and irreparable harm resulting from DHS's challenged policy, considering the evidence is proper here. That is doubly so because the government had an opportunity to contest the accuracy of this evidence and failed to proffer any contrary evidence.

[3] *See* Declaration of Michael Silva, Dkt. No. at 68-1, at 14 (Exhibit C – Order of Release on Recognizance for Ms. Garro Pinchi); *id.* at 26 (Exhibit H – Order of Release on Recognizance for Ms. Galo Santos); Declaration of Michael Silva, Dkt. No. 68-2, at 9 (Exhibit B – Order of Release on Recognizance for Mr. Teletor Sente).

United States District Court
Northern District of California

1    detention of noncitizens released pursuant to its discretionary authority under § 1226(a), revoking

2    a noncitizen's bond or parole under § 1226(b) only if it determined that the noncitizen's individual

3    circumstances had materially changed.

4         That changed this year. In May 2025, DHS officers began re-arresting and re-detaining

5    noncitizens whom DHS had previously released pursuant to § 1226(a) without first making any

6    individualized determination of changed circumstances. The record is replete with evidence of the

7    change in practice, which has resulted in a staggering wave of arrests. Multiple immigration

8    attorneys practicing in this district attested, for example, that ICE suddenly began re-detaining

9    their noncitizen clients absent any material change in the clients' individual circumstances.[4] One

10   attorney identified 33 noncitizen clients re-detained by ICE within a three-month period from July

11   to October 2025.[5] A former immigration judge in San Francisco similarly attested that in May

12   2025, ICE began routinely re-detaining noncitizens as to whom government attorneys could not

13   identify any material change in circumstances.[6] Plaintiffs also submitted declarations from eight

14   noncitizens whom DHS has re-arrested since May after previously releasing them pursuant to

15   § 1226(a) for whom DHS made no apparent determination of changed circumstances.[7] News

16   reports cited by plaintiffs suggest that DHS has re-detained hundreds, if not thousands, of other

17   noncitizens in recent months in ICE's San Francisco area of responsibility alone.[8] And "at least

18

19   [4] *See* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶¶ 10–18; Declaration of Natalia Santanna, Dkt.
     No. 48-8 ¶¶ 5–14; Declaration of Bill Ong Hing, Dkt. No. 48-9 ¶ 7; Declaration of Jacqueline
20   Marie Brown, Dkt. No. 48-10 ¶¶ 8–11; Declaration of Martha Ruch, Dkt. No. 48-11 ¶¶ 7–10.

21   [5] *See* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶¶ 10–18.

     [6] *See* Declaration of Shira Levine, Dkt. No. 48-6 ¶¶ 12–13.
22
     [7] *See, e.g.*, Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 2–3, 12–21; Declaration of
23   Salam Maklad, Dkt. No. 48-12 ¶¶ 2–4, 14–24; Declaration of Gabriela Alondra Vargas
     Plasencia, Dkt. No. 48-13 ¶¶ 3–5, 12–28; Declaration of David Rafael Colon Solano, Dkt. No. 48-
24   14 ¶¶ 2, 6–9; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶¶ 2–3, 8–12;
     Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 3, 14–24; Declaration of Gerardo
25   Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 4, 14–16; Declaration of Keymaris Alvarado-
     Miranda, Dkt. No. 48-18 ¶¶ 2, 8–9.

26   [8] *See* JunYao Yang, *Tracking Where and When ICE Arrests Happen in San Francisco*, Mission
     Local, (June 9, 2025) https://missionlocal.org/2025/06/sf-ice-arrests-tracker/ (documenting arrests
27   of more than 100 people at the San Francisco immigration court and USCIS office); Julie Zhu,
     *ICE Arrests of People with No Criminal Convictions Have Surged in Northern California*, S.F.
28   Chron. (Aug. 18, 2025), https://www.sfchronicle.com/bayarea/article/ice-arrestsdeport-data-
     20818148.php (documenting arrests of more than 2,600 people in ICE's San Francisco area of

362" noncitizens have challenged their re-detention in recent months "in about fifty different courts spread across the United States." *Barco Mercado v. Francis*, No. 25-CV-6582 (LAK), 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025); *see id.* at *13 (collecting cases). As the declarations of the immigration attorneys, former immigration judges, and re-arrested noncitizens demonstrate, many of these arrests occur without notice after noncitizens appear for removal proceedings at immigration courthouses or for check-ins at ICE field offices.[9]

While the extraordinary pace and scale of the change to DHS's re-detention practices are clear, the reasons for it are not. When DHS officers began re-detaining noncitizens without individualized determinations of changed circumstances in May, DHS did not provide a public explanation for its change in practice. Nor has DHS offered any evidence of a contemporaneous internal explanation for the shift. And when initially asked by courts to articulate a rationale for its re-arrest of noncitizens absent changed circumstances, DHS struggled to provide a consistent answer. In some cases, DHS attempted to justify its new practice based on concerns that "recent updates to DHS … enforcement priorities" would create "an inventive [for noncitizens] to flee" or on "the new availability of more bed space in detention facilities." *Singh v. Andrews*, No. 1:25-CV-00801-KES-SKO (HC), 2025 WL 1918679, at *7 (E.D. Cal. July 11, 2025); *see also Valdez v. Joyce*, No. 25 CIV. 4627 (GBD), 2025 WL 1707737, at *3 n.6 (S.D.N.Y. June 18, 2025). In others, DHS grounded its new approach in § 1225(b)(1), arguing that re-detained noncitizens were

---

responsibility); Kelly Waldron & Frankie Solinsky Duryea, *2,123 Lives: Inside the Stats and Stories of Those Arrested by ICE from the S.F. Area*, Mission Local (July 30, 2025), https://missionlocal.org/2025/07/ice-data-immigrants-arrested-sf (reporting 2,123 noncitizens arrested in the San Francisco Area of Responsibility during the first half of 2025); *see also Berkeley Deportation Data Project*, https://deportationdata.org/data/ice.html (documenting more than 700 individuals arrested by ICE in its San Francisco area of responsibility who do not have final removal orders).

[9] *See* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶ 8; Declaration of Shira Levine, Dkt. No. 48-6 ¶ 12; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 18; Declaration of Natalia Santanna, Dkt. No. 48-8 ¶ 8; Declaration of Bill Ong Hing, Dkt. No. 48-9 ¶ 7; Declaration of Jacqueline Marie Brown, Dkt. No. 48-10 ¶¶ 8, 11; Declaration of Martha Ruch, Dkt. No. 48-11 ¶ 6; Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 12–12; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 14; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶¶ 12–18; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 6; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶¶ 8–9; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 14–16; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 12–15; Declaration of Keymaris Alvarado-Miranda, Dkt. No. 48-18 ¶¶ 8–9.

subject to mandatory detention pending expedited removal. *See, e.g.*, *Hernandez v. Wofford*, No. 1:25-CV-00986-KES-CDB (HC), 2025 WL 2420390, at *4 (E.D. Cal. Aug. 21, 2025). For example, one former immigration judge attested that "[a]round the same time that ICE began detaining people in the immigration courthouse" in San Francisco, "the attorneys representing the government … began moving to dismiss" the arrestees' standard removal proceedings "for purposes of placing [them] in expedited removal."[10] In still other cases, including this one, courts noted that the basis for DHS's re-detention of noncitizens absent changed circumstances was simply "uncertain." *See, e.g.*, *Garro Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1035 (N.D. Cal. 2025); *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *1 (D. Mass. July 24, 2025).

Only in July 2025, roughly two months after DHS officers began to "upend[] decades of practice" concerning re-detention, did DHS seem to make up its mind. *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, No. 25-3050, 2025 WL 3552514, at *9 n.13 (7th Cir. Dec. 11, 2025). That month, Acting Director of ICE Todd M. Lyons "issued an internal memorandum explaining that "DHS, in coordination with the Department of Justice (DOJ), ha[d] revisited its legal position on detention and release authorities" and "ha[d] determined that [§ 1225] …, rather than [§ 1226], is the applicable immigration detention authority for all applicants for admission." *Martinez v. Hyde*, 792 F. Supp. 3d 211, 217–18 (D. Mass. 2025); *see also Castañon-Nava*, 2025 WL 3552514, at *9 n.3 (quoting *Hasan v. Crawford*, No. 1:25-CV-1408, 2025 WL 2682255, at *9 (E.D. Va. Sept. 19, 2025)). As a result, the memo explained, "it is the position of DHS that such aliens"— that is, all noncitizens present in the United States without lawful admission—"are subject to [mandatory] detention under [§ 1225(b)] and may not be released from ICE custody except by [§ 1182(d)(5)] parole." *Herrera v. Knight*, No. 2:25-CV-01366, 2025 WL 2581792, at *2 (D. Nev. Sept. 5, 2025) (quoting *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, Am. Immigr. Laws. Ass'n Doc. No. 25071607 (July 8, 2025), https://perma.cc/5GKM-JYGX). In the wake of the memo, DHS began consistently arguing to

---

[10] *See* Declaration of Shira Levine, Dkt. No. 48-6 ¶ 13.

federal district courts that its re-detention of noncitizens whom it had previously released and placed in removal proceedings was required by § 1225(b)(2). *See Barco Mercado v. Francis*, No. 25-CV-6582 (LAK), 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025) (documenting more than 300 cases in which courts have addressed this reasoning).

Whatever the true reason for DHS's abrupt shift, the consequences for noncitizens re-detained pursuant to the new practice have been severe. As the declarations submitted by noncitizens and immigration attorneys show, released noncitizens relied on DHS's prior policy limiting re-detention and ICE's consequent statements that the noncitizens would remain out of custody pending removal proceedings if they complied with the conditions of their release.[11] These noncitizens have sought and received work authorization,[12] secured employment,[13] entered into leases,[14] purchased cars,[15] invested in their education,[16] cultivated and donated to religious

---

[11] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 4; Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 7; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 4; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 5; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 5; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 5; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 3; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 4; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 4; Declaration of Keymaris Alvarado-Miranda, Dkt. No. 48-18 ¶ 7.

[12] *See* Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 6; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 7; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 4; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 7; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[13] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 5; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 5; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 13; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 7; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 5; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 11; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 7–8; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[14] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 6; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 9; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 14; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[15] *See* Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 5; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 15; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[16] *See* Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 16; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   communities,[17] started romantic relationships and married,[18] and worked to start, grow, and

2   financially support families,[19] all based on the expectation of continued liberty that DHS and

3   ICE's prior practice had engendered. Beyond disrupting noncitizens' plans, their re-detention also

4   impacts the family members, children, workplaces, and religious institutions that rely on their

5   support.[20] For example, one noncitizen explained that her partner's extended detention deprived

6   the family of "about $800 per week," making it difficult "to pay [their] living expenses" and to

7   care for her partner's child.[21] Because ICE arrested her partner while he was carrying the keys to

8   the couple's only car, which the noncitizen had been unable to get back, she both incurred

9   hundreds of dollars in towing fees and lost her primary form of transportation to her job.[22] Other

10  single-parent noncitizens feared that re-detention would leave their children, one of whom has

11  complex medical needs requiring significant care, without a home or caregiver.[23]

12          Plaintiff Frescia Garro Pinchi is among the many noncitizens whom DHS has re-detained

13  in recent months without making a determination of changed circumstances. An asylum-seeker

14  fleeing violence in Peru, Ms. Garro Pinchi entered the United States without lawful admission by

15  crossing the southern border in April 2023.[24] The same day, DHS agents arrested her on a warrant

16

17  [17] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 17; Declaration of Jose Waldemar
    Teletor Sente, Dkt. No. 48-4 ¶ 6; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 8; Declaration of
18  Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 5; Declaration of Carolina Ortiz Calderon, Dkt. No.
    48-16 ¶ 8; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 7.
19
    [18] *See* Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 7; Declaration of Maidel Arostegui
20  Castellon, Dkt. No. 48-15 ¶ 6; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 10.

21  [19] *See* Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶¶ 9, 13, 15; Declaration of Jose
    Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 9; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 7;
22  Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 35; Declaration of Carolina
    Ortiz Calderon, Dkt. No. 48-16 ¶ 7; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

23  [20] *See, e.g.*, Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 29–31 (explaining that
    declarant's re-detention caused her to lose one week's wages, which her family needs in order to
24  pay their rent, and that any future arrest would cause her to "lose wages, [her] housing, … access
    to [her] medication," and "the emotional and spiritual support [she] ha[s] built through [her]
25  church and community").

26  [21] Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 32.

27  [22] *Id.* ¶ 33.

    [23] Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 15; Declaration of Jose Waldemar Teletor
28  Sente, Dkt. No. 48-4 ¶¶ 14 –15.

    [24] Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 1–2; Declaration of Michael Silva, Dkt.

pursuant to § 1226(a) and issued a notice to appear, charging her with removability under

§ 1182(a)(6)(a)(i) as "an alien present in the United States without being admitted or paroled."[25]

The notice to appear also ordered Ms. Garro Pinchi to appear for standard removal proceedings in

immigration court.[26] DHS released her on her own recognizance the next day, citing its

discretionary release authority under § 1226(a).[27] For more than two years thereafter, Ms. Garro

Pinchi lived and developed a community in northern California. In addition to working to

financially support her mother and seven-year-old daughter in Peru, she has become an active

member of her church.[28] She has no criminal record and has not violated any condition of her

release.[29]

In early July 2025, Ms. Garro Pinchi attended a routine hearing at the San Francisco

immigration court. During the hearing, DHS orally moved to dismiss her pending removal

proceedings with the express intent to pursue expedited removal proceedings under

§ 1225(b)(1).[30] The immigration judge gave Ms. Garro Pinchi an opportunity to respond to DHS's

motion and set a further hearing later that month.[31] As she exited the courtroom, a group of ICE

agents arrested her and detained her in a holding room in the same building. Only then did the

agents serve her with a warrant authorizing the arrest pursuant to § 1226.[32] ICE transferred Ms.

Garro Pinchi to a processing center later that day.[33]

Hours after her arrest, Ms. Garro Pinchi commenced this action by filing a petition for a

writ of habeas corpus. This Court issued a temporary restraining order, followed by a preliminary

---

No. 68-1 ¶ 1.

[25] Declaration of Michael Silva, Dkt. No. 68-1 ¶¶ 8–9; *id.* at 12 (Exhibit B – Warrant for Arrest); *id.* at 8 (Exhibit A – Notice to Appear)

[26] Declaration of Michael Silva, Dkt. No. 68-1 at 8 (Exhibit A – Notice to Appear)

[27] *Id.* ¶ 9; *id.* at 14 (Exhibit C – Order of Release).

[28] Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 5–7.

[29] *Id.* ¶ 8.

[30] Declaration of Michael Silva, Dkt. No. 68-1 ¶ 12.

[31] *Id.*

[32] *Id.* ¶ 13; *id.* at 16 (Exhibit D – Warrant for Arrest).

[33] *Id.* ¶ 13; *id.* at 18 (Exhibit E – Notice to EOIR).

United States District Court
Northern District of California

1   injunction, requiring her immediate release and enjoining the government from re-detaining her

2   absent prior notice and a hearing before an immigration judge at which the government

3   demonstrated a valid basis for her detention. *See Garro Pinchi v. Noem*, 792 F. Supp. 3d 1025,

4   1038 (N.D. Cal. 2025).

5          Ms. Garro Pinchi then amended her complaint, adding Juany Galo Santos and Jose Teletor

6   Sente as plaintiffs. Like Ms. Garro Pinchi, Ms. Galo Santos and Mr. Teletor Sente are asylum-

7   seekers who entered the country without lawful admission.[34] After a brief period in DHS custody,

8   both received notices to appear—which charged them with removability under § 1182(a)(6)(a)(i)

9   and placed them in standard removal proceedings—before being released on their own

10  recognizance pursuant to § 1226(a).[35] Though neither Ms. Galo Santos nor Mr. Teletor Sente have

11  been re-arrested by DHS, each fears re-detention at upcoming removal hearings and ICE check-

12  ins, as ICE has in recent months arrested many noncitizens at such proceedings.[36] Ms. Galo Santos

13  has a check-in scheduled for next month, followed by a removal hearing the month after that.[37]

14  Mr. Teletor Sente had an initial removal hearing set for November 2025, but that hearing has been

15  repeatedly scheduled in recent months without explanation. It is now set for November 2027.[38]

16  Both ask the Court to issue a writ of habeas corpus prohibiting their re-detention, which they claim

17  would violate their due-process rights under the Fifth Amendment.

18         In addition to the individual claims, the amended complaint included four new claims on

19  behalf of a putative class and subclass. The putative class consists of all noncitizens in the

20  jurisdiction of ICE's San Francisco field office who (1) "entered or will enter the United States

21  without inspection"; (2) "have been or will be charged with inadmissibility under 8 U.S.C. § 1182

22

23  [34] Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 6; Declaration of Jose Waldemar Teletor
    Sente, Dkt. No. 48-4 ¶ 3.

24  [35] Declaration of Michael Silva, Dkt. No. 68-1 at 20 (Exhibit F – Notice to Appear), 26 (Exhibit H
25  – Order of Release); Declaration of Michael Silva, Dkt. No. 68-2 at 6 (Exhibit A – Notice to
    Appear), 9 (Exhibit B – Order of Release).

26  [36] Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 14; Declaration of Jose Waldemar Teletor
27  Sente, Dkt. No. 48-4 ¶ 3.

    [37] Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 14.

28  [38] Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 10–13.

*United States District Court*
*Northern District of California*

and have been or will be released from DHS custody"; (3) "are in removal proceedings under 8 U.S.C. § 1229a"; and (4) "are not subject to detention under 8 U.S.C. § 1226(c)." The putative subclass consists of all class members "whose release from DHS custody was or will be on bond, conditional parole, or their own recognizance under 8 U.S.C. § 1226(a) and/or 8 C.F.R. § 236.1(c)(8)." On behalf of the putative class and subclass, plaintiffs challenge DHS's alleged policy of re-arresting and re-detaining noncitizens previously released from federal custody absent individualized determinations that the noncitizens' material circumstances have changed such that they pose a flight risk or danger to the public. Plaintiffs claim that this "re-detention policy" violates the APA because it is (1) arbitrary and capricious, (2) contrary to class members' Fourth Amendment rights, (3) in excess of DHS's authority to revoke subclass members' bond or parole under § 1226(b), and (4) not in accordance with existing DHS regulations governing the revocation of subclass members' bond or parole under § 1226(b).

The government moved to sever the additional claims and plaintiffs added to the amended complaint from Ms. Garro Pinchi's original habeas claim, arguing that joinder was improper. The Court concluded that joinder of all claims and plaintiffs was proper but exercised its discretion under Federal Rule of Civil Procedure 21 to sever the individual claims from the class claims. Ms. Garro Pinchi, Ms. Galo Santos, and Mr. Teletor Sente's individual claims for relief from custody are now proceeding in three separate actions. Only the class claims remain in this case.

Now before the Court are plaintiffs' motions for provisional certification of the class and subclass and for a stay of DHS's re-detention policy under § 705 of the APA.

## DISCUSSION

### I.    The government's threshold arguments fail.

Before reaching the merits of plaintiffs' motions, the Court must address several threshold arguments raised by the government. None of these arguments requires the denial of plaintiffs' motions.

### A.    Plaintiffs' claims are justiciable.

The government first argues that plaintiffs' claims are not justiciable because plaintiffs lack standing and their claims are unripe and moot. The government is incorrect.

1        **1.      Plaintiffs have standing to pursue prospective relief.**

"In a class action, the plaintiff class bears the burden of showing that Article III standing exists." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011). Because "[a] plaintiff must demonstrate standing separately for each form of relief sought ... a plaintiff who has standing to seek damages for a past injury ... does not necessarily have standing to seek prospective relief." *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Serv., Inc.*, 528 U.S. 167, 185 (2000)). To seek prospective relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). In a class action, "[s]tanding exists if at least one named plaintiff meets the requirements." *Ellis*, 657 F.3d at 978. And "standing in a Rule 23(b)(2) class is assessed at the time the complaint was filed." *Thakur v. Trump*, 148 F.4th 1096, 1105 (9th Cir. 2025).[39]

Here, at least one named plaintiff had standing to pursue APA claims on behalf of the class when the amended complaint was filed. At that time, each of the plaintiffs was (and still remains) subject to the re-detention policy and faced a consequent threat of arrest by DHS, a concrete and particularized injury. The government argues that plaintiffs' injury was merely conjectural because none were detained when they filed the amended complaint and they "identif[ied] no evidence suggesting imminent detention." But plaintiffs have offered evidence showing that, in accordance with its view that § 1225(b)(2) mandates detention of all non-citizens who entered the United States without lawful admission, DHS has arrested hundreds, if not thousands, of noncitizens in ICE's San Francisco area of responsibility in recent months.[40] Many of those arrested were, like

---

[39] Where plaintiffs have filed multiple complaints, as here, the operative complaint governs for standing purposes. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (analyzing standing as of the time the "second amended complaint was filed").

[40] *See* Zhu, *supra* note 8 (documenting arrests of more than 2,600 people); Waldron & Solinsky Duryea, *supra* note 8 (reporting 2,123 noncitizens arrested in the San Francisco Area of Responsibility since January 20, 2025).

United States District Court
Northern District of California

plaintiffs, noncitizens who were previously released and are currently in ongoing removal proceedings.[41] DHS arrested many of these individuals, including Ms. Garro Pinchi, after they attended removal hearings in immigration courts or ICE check-ins.[42] Together, this evidence demonstrates that every plaintiff faced likely re-arrest by DHS at their next removal hearing or ICE check-in.

The government all but admits as much. At the hearing, it expressly conceded that DHS considers each plaintiff's detention to be mandatory under § 1225(b)(2). While DHS is enjoined from re-arresting Ms. Garro Pinchi without prior notice and a hearing pending the final resolution of her separate habeas action, *see Garro Pinchi*, 792 F. Supp. 3d at 1038, the government would not disclaim an intent to re-detain her after the expiration of that preliminary injunction or to re-arrest Ms. Galo Santos and Mr. Teletor Sente at their next appearances in immigration court or at ICE field offices. And when the amended complaint was filed in October 2025, plaintiffs' next hearings and check-ins were imminent: Ms. Garro Pinchi's next check-in was one month away,[43]

---

[41] *See, e.g.*, Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 2–3, 12–21 (describing re-arrest of declarant previously released from DHS custody); Declaration of Salam Maklad, Dkt. No. 48-12 ¶¶ 2–4, 14–24 (same); Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶¶ 3–5, 12–28 (same); Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶¶ 2, 6–9 (same); Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶¶ 2–3, 8–12 (same); Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 3, 14–24 (same); Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 4, 14–16 (same); Declaration of Keymaris Alvarado-Miranda, Dkt. No. 48-18 ¶¶ 2, 8–9 (same); *see also* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶¶ 8–12 (describing DHS's re-detention of 33 such individuals); *Berkeley Deportation Data Project*, https://deportationdata.org/data/ice.html (documenting more than 700 individuals arrested by ICE in its San Francisco area of responsibility who do not have final removal orders).

[42] *See, e.g.*, Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 12–21 (describing arrest at immigration court); Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶¶ 3–5, 12–19 (same); Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶¶ 6–9 (same); Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶¶ 8–12 (same); Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 14–24 (same); Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 14–16 (same); Declaration of Keymaris Alvarado-Miranda, Dkt. No. 48-18 ¶¶ 8–9 (same); Declaration of Salam Maklad, Dkt. No. 48-12 ¶¶ 2–4, 14 (describing arrest at ICE check-in); *see also* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶¶ 8–12 (describing high volume of re-arrests at San Francisco immigration court); Yang, *supra* note 8 (documenting arrests of more than 100 people at the San Francisco immigration court and USCIS office).

[43] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 22 (noting that declarant "ha[s] another in-person check-in in November 2025").

United States District Court
Northern District of California

and Ms. Galo Santos's next check-in and hearing were roughly three months away.[44] Though Mr. Teletor Sente's next hearing was more than one year away, DHS had rescheduled the hearing multiple times in recent months, suggesting that the hearing might again be reset for an earlier date.[45] Plaintiffs have therefore demonstrated an imminent, concrete, and particularized injury in fact. That injury is directly traceable to DHS's challenged policy of re-arresting non-citizens whom it previously released even absent a determination that any changed circumstances warrant detention. And the vacatur plaintiffs seek would redress the imminent threat of detention. So plaintiffs have standing to pursue prospective relief from the re-detention policy in the form of an interim stay and eventual vacatur.

The cases on which the government relies are not to the contrary. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In *Lyons*, for example, the Supreme Court held that a plaintiff previously injured by a Los Angeles police officer's use of a chokehold lacked standing to pursue prospective relief enjoining the use of chokeholds by all officers in the city. 461 U.S. at 98, 105–10. That was because the plaintiff had not established that he would likely be subjected to another police officer's chokehold. To do so, he "would have had not only to allege that he would have another encounter with the police" but also to assert "either … that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter" or "that the City ordered or authorized police officers to act in such manner." *Id.* at 106. Because the plaintiff had not done so, "it [wa]s no more than conjecture" to assert that he would suffer future injury. *Id.* at 108.

This case does not involve such speculation. When plaintiffs filed the amended complaint, it was certain that each "would have another encounter" with DHS at their upcoming removal hearing or ICE check-in, and plaintiffs have established both that DHS "ordered or authorized [its] officers" to arrest previously released noncitizens and that DHS officers have done so consistently

---

[44] *See* Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 14 (noting that declarant "ha[s] an ICE check-in scheduled for January 2026, and a master calendar hearing the following month").

[45] Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶¶ 10–13.

1    and at a high volume in recent months. *Lyons* does not suggest that plaintiffs lack standing in these

2    circumstances.

3        In *Clapper*, the plaintiffs asserted that they would be injured because they feared that the

4    federal government would intercept their communications with foreign contacts using its authority

5    under 50 U.S.C. § 1881a. *See* 568 U.S. at 401. But that would only have occurred if the

6    government chose (1) to surveil plaintiffs' foreign contacts, (2) to do so using its authority under

7    § 1881a "rather than utilizing another method of surveillance," (3) to clear the many procedural

8    hurdles imposed by that statute, and then (4) to "succeed in intercepting the communications of

9    [plaintiffs'] contacts." *Id.* at 410. Even then, plaintiffs would have been injured only if they

10   happened to be the recipients of the communications intercepted. *Id.* That "highly speculative

11   fear" is not present here, given the certainty of plaintiffs' imminent contact with DHS and DHS's

12   express and demonstrated intent to re-arrest all noncitizens situated similarly to plaintiffs.

13       In *Lujan*, the Supreme Court held that plaintiff environmental groups lacked standing to

14   challenge a regulation implementing the Endangered Species Act. 504 U.S. at 557–59. Plaintiffs

15   asserted that the regulation would result in threats to protected species, depriving plaintiffs'

16   members of opportunities to see the species if the members visited the areas in which the species

17   lived. *Id.* at 564. But plaintiffs provided scant evidence that their members would actually visit

18   those areas: They offered only two affidavits from individuals who "profess[ed] … an 'intent' …

19   without any description of concrete plans, or indeed any specification of *when* the [visit] will be."

20   *Id.* (citation modified). Again, this case does not involve a similar level of conjecture. DHS has

21   professed far more than an "intent" to re-arrest noncitizens like plaintiffs—DHS states that it is

22   compelled to do so by statute. And unlike in *Lujan*, plaintiffs have provided precise estimates as to

23   when their injuries will occur: on the dates of their next ICE check-ins or removal hearings.

24       As another court in the District of Columbia recently explained, none of these cases

25   suggest that plaintiffs lack standing where, as here, an agency "ha[s] likely adopted a policy and

26   practice" that it continues to enforce, "plaintiffs are likely among those targeted," and plaintiffs

27   "likely cannot avoid" the conduct that will lead to injury. *Escobar Molina v. U.S. Dep't of*

28   *Homeland Sec.*, No. CV 25-3417 (BAH), 2025 WL 3465518, at *16 (D.D.C. Dec. 2, 2025). "All

these considerations crystallize the 'reality of the threat of repeated injury.'" *Id.* (quoting *Lyons*, 461 U.S. at 107 n.8); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ("[E]xposure to [the challenged] policy is both itself an ongoing harm and evidence that there is 'sufficient likelihood' that Plaintiffs' rights will be violated again."); *Church v. City of Huntsville*, 30 F.3d 1332, 1337–39 (11th Cir. 1994) (explaining that unhoused plaintiffs were "far more likely to have future encounters with the police" under a city's alleged policy of harassing or removing unhoused individuals).

The government contends that, at the very least, Ms. Garro Pinchi lacked standing at the time the amended complaint was filed because she had the benefit of a preliminary injunction prohibiting her re-arrest without prior notice and a bond hearing. *See Garro Pinchi*, 792 F. Supp. 3d at 1038. Even assuming that this temporary relief destroyed her standing to pursue a permanent class-wide injunction, a proposition for which the government provides no support, the other named plaintiffs still have standing to pursue the proposed class claims. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (explaining that only one named plaintiff need have standing to pursue injunctive relief).

## 2. Plaintiffs' claims are ripe.

Plaintiffs' claims are also ripe for review. As the government itself explains, the doctrine of ripeness permits courts to "dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur." *Changler v. State Farm Mt. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Because this inquiry focuses on whether an injury "is real and concrete rather than speculative and hypothetical," it "merges almost completely with standing." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). Plaintiffs' claims are ripe for the same reason they have demonstrated an "injury in fact" sufficient to establish standing. Ms. Garro Pinchi has already experienced a concrete injury due to her arrest pursuant to the re-detention policy. All three plaintiffs face a substantial likelihood of future injury due to their likely re-detention at upcoming ICE check-ins or removal

1   hearings, the soonest of which is in January.[46] Their claims thus "present concrete legal issues ...

2   in actual cases, not abstractions," so they are "ripe within the meaning of Article III." *Planned*

3   *Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 839 (9th Cir.

4   2024) (citation modified).

### 3.    Plaintiffs' claims are not moot.

6        "Generally, an action is mooted when the issues presented are no longer live and therefore

7   the parties lack a legally cognizable interest for which the courts can grant a remedy." *Dep't of*

8   *Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023) (quoting *Alaska Ctr.*

9   *For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999)). "Typically, if a district court

10   certifies a class before the class representative's claim becomes moot, 'mooting the putative class

11   representative's claim will not moot the class action.' But where ... the plaintiff's claim becomes

12   moot before the district court certifies the class, the class action normally also becomes moot.'"

13   *Washington v. Trump*, 145 F.4th 1013, 1025 (9th Cir. 2025) (first quoting *Pitts v. Terrible Herbst,*

14   *Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011); and then quoting *Slayman*, 765 F.3d at 1048).

15        The government argues that Ms. Garro Pinchi's claims are moot because the Court has

16   issued a preliminary injunction enjoining the government from re-detaining her without prior

17   notice and a bond hearing during the pendency of this suit. As a result, the government contends,

18   Garro Pinchi does not face any risk of re-detention and thus has no interest in staying the re-

19   detention policy. But the preliminary injunctive relief granted by this Court is temporary in nature,

20   prohibiting Garro Pinchi's re-detention without a pre-deprivation hearing only "during the

21   pendency of these proceedings." *Garro Pinchi*, 792 F. Supp. 3d at 1038. The government has

22   stated that DHS continues to view her as subject to mandatory detention under § 1225(b)(2), and

23   DHS has not disavowed its intent to re-arrest her upon the expiration of the preliminary injunction.

24   There thus remains a strong possibility that DHS will re-detain her after a final judgment in the

25

---

26   [46] *See* Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 14 (explaining that she fears re-arrest at her upcoming ICE check-in in January 2026); Declaration of Frescia Garro Pinchi, Dkt. No. 48-2

27   ¶ 22–23 (expressing fear of re-arrest at her ICE and ISAP check-ins); Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶¶ 11–13 (explaining that he fears re-arrest at his next

28   appearance in immigration court, which has been repeatedly rescheduled in recent months).

United States District Court
Northern District of California

government's favor. For that reason, she retains a legally cognizable interest in permanently staying the re-detention policy. *Cf. Maher v. Roe*, 432 U.S. 464, 469 n.4 (1977) (holding that a state's regulatory "revision … made only for the purpose of interim compliance with [a] District Court's judgment and order" pending appeal "d[id] not render the case moot" where the state "desire[d] to reinstate the invalidated regulation").

The government also suggests that the Court's order granting Ms. Garro Pinchi's request for a preliminary injunction provided all the relief she sought in her original habeas petition. As a result, the government contends, this case became moot before the filing of the amended complaint, such that the Court lacks subject-matter jurisdiction over the newly added class claims. Not so. Ms. Garro Pinchi's original habeas petition sought, among other things, a declaration that her re-detention violated the First, Fourth, and Fifth Amendments and the APA and a permanent injunction prohibiting DHS from dismissing her standard removal proceedings, placing her in expedited removal proceedings, removing her without a final removal order issued through standard removal proceedings, or re-detaining her without first demonstrating at a hearing before a neutral arbiter that Ms. Garro Pinchi is a flight risk or danger to the community. The Court's order declared only that Ms. Garro Pinchi's re-detention *likely* violated the Fifth Amendment and enjoined her re-arrest only "during the pendency of these proceedings." *Id.* The Court thus did not fully adjudicate Ms. Garro Pinchi's claims, so this case did not become moot before the addition of plaintiffs' class claims in the amended complaint. *Cf. Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("Preliminary injunctions ... do not conclusively resolve legal disputes.").

In sum, plaintiffs' APA claims are justiciable.

**B.    No statutory provision bars the relief plaintiffs seek.**

The government also argues the several statutory provisions foreclose class certification or review of plaintiffs' claims. None of these provisions apply here.

**1.    8 U.S.C. § 1252(b)(9) and (g)**

The government argues without explanation that 8 U.S.C. § 1252(b)(9) and (g) "independently foreclose this Court's jurisdiction over Plaintiffs' claims." The Court disagrees.

"Section 1252(b)(9) bars review of claims arising from 'action[s]' or 'proceeding[s]

United States District Court
Northern District of California

1   brought to remove an alien.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591

2   U.S. 1, 19 (2020) (quoting 8 U.S.C. § 1252(b)(9)). As the Supreme Court has explained, the

3   provision "present[s] a jurisdictional bar" only where plaintiffs are "asking for review of an order

4   of removal, the decision to seek removal, or the process by which removability will be

5   determined." *Id.* (citation modified) (quoting *Jennings*, 583 U.S. at 294). "[I]t is certainly not a bar

6   where, as here, the parties are not challenging any removal proceedings" and are instead

7   challenging a policy concerning re-detention collateral to such proceedings. *Id.*; *see also J.E.F.M.*

8   *v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016) (explaining that § 1252(b)(9) does not apply to

9   "claims that are … collateral to the removal process").

10      "Section 1252(g) is similarly narrow" and "limits review of cases 'arising from' decisions

11  'to commence proceedings, adjudicate cases, or execute removal orders.'" *Regents*, 591 U.S. at 19

12  (quoting 8 U.S.C. § 1252(g)). The Supreme Court has repeatedly "rejected … the Government's

13  suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a

14  general jurisdictional limitation.'" *Id.* (quoting *Reno v. Am.-Arab Anti–Discrimination Comm.*,

15  525 U.S. 471, 482 (1999)). The re-detention policy concerns the circumstances under which DHS

16  arrests previously released noncitizens pending their ongoing removal proceedings. It "is not a

17  decision to 'commence proceedings,' much less to 'adjudicate' a case or 'execute' a removal

18  order," so § 1252(g) does not apply. *Id.*

19                          **2.    8 U.S.C. § 1252(e)**

20      The government next argues that 8 U.S.C. § 1252(e), titled "Judicial review of orders

21  under section 1225(b)(1)," prohibits the Court from certifying or granting relief to the proposed

22  class and subclass. Section 1252(e)(1)(B) provides that "no court may ... certify a class under Rule

23  23 ... in any action for which judicial review is authorized under a subsequent paragraph of this

24  subsection." 8 U.S.C. § 1252(e)(1)(B). The provision applies "[w]ithout regard to the nature of the

25  action or claim and without regard to the identity of the party or parties bringing the action." *Id.*

26  The government argues that this provision applies here because judicial review of plaintiffs'

27  claims is authorized by § 1252(e)(3)(A). Under that subsection, "[j]udicial review of

28  determinations under section 1225(b) ... and its implementation is available in an action instituted

1    in United States District Court for the District of Columbia." 8 U.S.C. § 1225(e)(3)(A). The

2    government contends that because plaintiffs' requested relief would disrupt its implementation of

3    § 1225(b)(2), which provides for mandatory detention of certain noncitizens pending standard

4    removal proceedings, plaintiffs' claims are covered by § 1252(e)(3)(A).

5         Contrary to the government's arguments, § 1252(e) does not deprive this Court of

6    jurisdiction over plaintiffs' class claims. That is because, as the paragraph's title indicates,

7    § 1252(e) concerns review only of "orders *under section 1225(b)(1)*." 8 U.S.C. § 1252(e)

8    (emphasis added). While subsection (e)(3)(A) speaks generally of "[j]udicial review of

9    determinations under section 1225(b)," the paragraph's title suggests that the provision limits

10   jurisdiction only where plaintiffs challenge § 1225(b)(1) or its implementation. *See Yates v. United*

11   *States*, 574 U.S. 528, 540 (2015) ("[T]he title of a statute and the heading of a section are tools

12   available for the resolution of a doubt about the meaning of a statute." (quoting *Almendarez–*

13   *Torres v. United States*, 523 U.S. 224, 234 (1998)).

14        Other parts of § 1252(e)(3) reflect this limited scope. *Bailey v. Hill,* 599 F.3d 976, 980 (9th

15   Cir. 2010) (holding that a statute's "structure and purpose" may provide interpretive guidance).

16   For example, § 1252(e)(3)(A)(ii) authorizes challenges to regulations and other written directives

17   "issued by or under the authority of the Attorney General to implement [§ 1225(b)]." 8 U.S.C.

18   § 1253(e)(3)(A)(ii). That makes sense if it refers to § 1225(b)(1), multiple provisions of which

19   expressly grant implementing authority to the Attorney General. *See, e.g.*, 8 U.S.C.

20   § 1225(b)(1)(A)(iii) (authorizing the Attorney General to designate categories of noncitizens

21   subject to expedited removal "in [her] sole and unreviewable discretion"); *id.* § 1225(b)(1)(B)(i)

22   (authorizing the Attorney general to designate the location of asylum interviews for noncitizens

23   subject to expedited removal); *id.* § 1225(b)(1)(B)(iii)(III) ("The Attorney General shall provide

24   by regulation … for prompt review by an immigration judge of a determination … that the alien

25   does not have a credible fear of persecution."); *id.* § 1225(b)(1)(B)(iv) (authorizing the Attorney

26   general to prescribe regulations to allow noncitizens to consult with a person of their choosing

27   prior to credible-fear interviews); *id.* § 1225(b)(1)(C) (authorizing the Attorney General to

28   "provide by regulation for prompt review" of expedited removal orders for certain noncitizens

United States District Court
Northern District of California

22

"who claim[] under oath … to have been lawfully admitted" or "granted asylum"). But it makes little sense in reference to § 1225(b)(2), which contains no grant of authority for the Attorney General to prescribe regulations and provides only that "the Attorney General may return [an] alien" to the contiguous foreign territory from which they entered the United States pending their removal proceedings. 8 U.S.C. § 1225(b)(2)(C). Similarly, § 1252(e)(3)(D) provides that "[i]t shall be the duty of the [federal courts] … to expedite to the greatest possible extent the disposition of any case considered under this paragraph." 8 U.S.C. § 1252(e)(3)(D). Again, this emphasis on speed makes sense if § 1252(e)(3) concerns only *expedited* removal under § 1225(b)(1), but not if it concerns detention under § 1225(b)(2) pending standard removal proceedings. *See Thuraissigiam*, 591 U.S. at 108 (explaining that Congress created the expedited-removal process due to the backlog of standard removal proceedings, which take years to resolve).

In accordance with its title and structure, the Ninth Circuit has consistently described § 1252(e)(3) as providing a "limited grant of jurisdiction to the D.C. district court" to decide challenges to "regulation[s] that [are] 'entirely linked' to the expedited removal process"—that is, the process established by § 1225(b)(1). *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1156–57 (9th Cir. 2022) (quoting *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667 (9th Cir. 2021)); *accord Shunaula v. Holder*, 732 F.3d 143, 146 (2d Cir. 2013) ("[Section] 1252(e)(3) provides for review of constitutional challenges to the validity of the expedited removal system and statutory challenges to its implementing regulations and written policies."). So have other district courts in this circuit. *Duran v. Bernacke*, No. 2:25-CV-02105-RFB-EJY, 2025 WL 3237451, at *5 (D. Nev. Nov. 19, 2025) (concluding that § 1252(e)(3) did not apply because "Respondents d[id] not assert that Petitioner is subject to expedited removal"); *Innovation L. Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1075 (D. Or. 2018) ("The jurisdiction-stripping provisions of … § 1252(e) apply only to detainees subject to expedited removal proceeding[s] under § 1225(b)(1).").

That Congress would place restrictions on judicial review of decisions implementing § 1225(b)(1) but not (b)(2) is hardly surprising. Congress created the expedited-removal process under § 1225(b)(1) for the purpose of accelerating the removal of certain high-priority categories

of noncitizens who would otherwise remain in the country pending lengthier standard removal proceedings. *See Thuraissigiam*, 591 U.S. at 108. That is why expedited removal proceedings, unlike standard removal proceedings, use "a streamlined process through which certain non-citizens … may be removed … without a hearing before an immigration judge" and without any opportunity for an appeal to the BIA or Article III courts. *Alvarado-Herrera v. Garland*, 993 F.3d 1187, 1190 (9th Cir. 2021). Section 1252(e)(3) limits and channels judicial review in furtherance of this purpose, preventing litigation from delaying the expedited process Congress created in § 1225(b)(1). Put another way, § 1225(b)(1) gives noncitizens only "one bite of the apple" when challenging their expedited removal order, and § 1252(e)(3) was designed to keep it that way. *East Bay*, 993 F.3d at 667 (quoting *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012)). That function is not needed for noncitizens subject to § 1225(b)(2), who are subject to standard removal proceedings.

Even under DHS's own view of the statutory scheme, plaintiffs do not challenge the expedited-removal process established by § 1225(b)(1). As a result, the claims of the proposed class and subclass are not subject to § 1252(e)(3). And because § 1252(e)(3) does not govern judicial review of plaintiffs' claims, § 1252(e)(1)(B) does not bar the Court from certifying or granting relief to the proposed class and subclass.

### 3.     8 U.S.C. § 1252(f)(1)

The government also argues that class certification or relief is improper under § 1252(f)(1). That subsection states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter ... , other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). The government argues that plaintiffs' claims seek to enjoin or restrain it from detaining at least some individuals whom the government believes are subject to § 1225(b) and other provisions that fall within the covered subchapter. As a result, the government contends, § 1252(f)(1) bars the Court from awarding the relief sought as to all class members, making

24

1    certification inappropriate.

2         Plaintiffs' class claims do not seek a form of relief that is barred by § 1252(f)(1). Both the

3    Supreme Court and the Ninth Circuit have explained that § 1252(f)(1) applies narrowly to

4    "injunctive relief." *See Biden v. Texas*, 597 U.S. 785, 798–99 (2022); *Reno v. Am.-Arab Anti-*

5    *Discrimination Comm.*, 525 U.S. 471, 481 (1999); *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972,

6    989–90 (9th Cir. 2025). "[A]n injunction is a judicial process or mandate operating in

7    personam"—that is, it "is directed at someone, and governs that party's conduct." *Immigr. Defs. L.*

8    *Ctr.*, 145 F.4th at 990 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). Here, plaintiffs seek to

9    vacate DHS's re-detention policy pursuant to the APA and to stay the policy pending final

10   resolution of their APA claims. Though vacatur and stays "ha[ve] some functional overlap with an

11   injunction" in that they "can have the practical effect of preventing some action," they "achieve[ ]

12   this result by ... suspending the source of authority to act ... not by directing an actor's conduct."

13   *Nken*, 556 U.S. at 428–29. Vacatur or stays under the APA are thus "a less drastic remedy" than

14   injunctions, as they merely "re-establish the status quo absent the ... agency action" under

15   challenge. *Immigr. Defs.*, 145 F.4th at 990 (quoting *Texas v. United States*, 40 F.4th 205, 219–20

16   (5th Cir. 2022)). For that reason, the Ninth Circuit has squarely held that "§ 1252(f)(1) does not

17   bar [a] district court's stay pursuant to § 705 of the APA pending further review of the merits of

18   [p]laintiffs' APA challenge." *Id.* It follows that § 1252(f)(1) would not prohibit the Court from

19   granting plaintiffs' ultimate request to permanently vacate the re-detention policy. *See Texas*, 40

20   F.4th at 219–20; *see also Immigr. Defs.*, 145 F.4th at 990 (expressing agreement with *Texas*).

21        The government argues that, in addition to seeking to stay and to vacate the re-detention

22   policy, plaintiffs request declaratory relief that might have a "coercive" effect and therefore violate

23   § 1252(f)(1). "[T]hat argument is foreclosed by [Ninth] [C]ircuit precedent holding that

24   § 1252(f)(1) does not 'bar classwide declaratory relief.'" *Al Otro Lado v. Exec. Off. for Immigr.*

25   *Rev.*, 138 F.4th 1102, 1124–25 (9th Cir. 2025) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1119

26   (9th Cir. 2010)), *cert. granted on other grounds sub nom. Noem v. Al Otro Lado*, No. 25-5, 2025

27   WL 3198572 (U.S. Nov. 17, 2025).

28        Neither § 1252(f)(1) nor any other provision prohibits class certification or relief as to

25

plaintiffs' APA claims. The Court therefore turns to the substance of plaintiffs' motions.

## II.    The Court provisionally certifies the proposed class and subclass.

For the purpose of pursuing preliminary relief, plaintiffs ask the Court to provisionally certify the following class and subclass:

> ***Class:*** All noncitizens in the jurisdiction of the San Francisco ICE Field Office who (1) entered or will enter the United States without inspection; (2) have been or will be charged with inadmissibility under 8 U.S.C. § 1182 and have been or will be released from DHS custody; and who (3) are in removal proceedings under 8 U.S.C. § 1229a, including any § 1229a proceedings that have been dismissed where the dismissal is not administratively final; and (4) are not subject to detention under 8 U.S.C. § 1226(c)."
>
> ***Subclass:*** All members of the Class whose release from DHS custody was or will be on bond, conditional parole, or their own recognizance under 8 U.S.C. § 1226(a) and/or 8 C.F.R. § 236.1(c)(8).

Plaintiffs Garro Pinchi, Galo Santos, and Teletor Sente propose to represent both the class and subclass.

Under Rule 23, plaintiffs seeking to certify a class must first show that they satisfy four "prerequisites":

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"];
> (2) there are questions of law or fact common to the class ["commonality"];
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and
> (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a). If these prerequisites are satisfied, plaintiffs must also demonstrate that they satisfy at least one requirement of Rule 23(b). *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Here, plaintiffs seek provisional certification under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure

United States District Court
Northern District of California

that the[se] requirements are satisfied," and "[p]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025) (first quoting *Olean*, 31 F. 4th at 664; and then quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). While "a class may be divided into subclasses," Fed. R. Civ. P. 23(c)(5), "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action," *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981). The Ninth Circuit "ha[s] approved provisional class certification for purposes of preliminary [relief] proceedings." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020).

For the reasons explained below, plaintiffs have demonstrated that the proposed class and subclass are sufficiently numerous and share common questions of law or fact and that the named plaintiffs are typical and adequate class representatives. Plaintiffs have also satisfied the requirements of Rule 23(b)(2) for both the proposed class and the proposed subclass. The Court therefore provisionally certifies the class and subclass to be represented by plaintiffs and their counsel.

### A.    Class and Subclass Definition

As an initial matter, the Court must determine the scope of the putative class and subclass. The government argues that the proposed class and subclass definitions fail two baseline requirements. The Court disagrees.

First, the government insists that "[a] class must be defined clearly enough that the court can determine who is included and who is not" based on "objective, administratively feasible criteria." But the only case the government cites for that proposition says the opposite. In *True Health Chiropractic, Inc. v. McKesson Corp.*, the Ninth Circuit explained that it had previously rejected the "argument … that identification of class members must be 'administratively feasible'" because "there is no [such] free-standing requirement above and beyond the requirements specifically articulated in Rule 23." 896 F.3d 923, 929 (9th Cir. 2018) (quoting *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017)); *see also Briseno*, 844 F.3d at 1133 ("[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively

feasible way to identify class members is a prerequisite to class certification.").

In any event, plaintiffs' proposed class and subclass definitions *are* administratively feasible. Because plaintiffs seek only prospective relief pursuant to Rule 23(b)(2), there is need to identify every person who falls within the putative class or subclass at a particular moment, as plaintiffs need not provide notice to class members. *See Wal-Mart*, 564 U.S. 338. All that matters, then, is whether DHS itself can determine if particular noncitizens are members of the class or subclass at the time DHS encounters them. If so, DHS can feasibly administer any relief granted to the class or subclass. Based on plaintiffs' proposed class and subclass definitions, the information that DHS needs to make such determinations consists of whether a noncitizen entered the United States without inspection; the basis for a noncitizen's charge of inadmissibility; whether DHS previously released the noncitizen and, if so, pursuant to what authority; the status of the noncitizen's removal proceedings; and whether the noncitizen is subject to detention under 8 U.S.C. § 1226(c). The government has not explained why DHS could not feasibly obtain such information upon encountering a noncitizen. And the record suggests that DHS maintains regular records of this information for noncitizens subject to its re-detention policy.[47]

Second, the government argues that the proposed class and subclass definitions are "overbroad and circular" because they sweep in noncitizens who are subject to the re-detention policy but who "have never been detained, may never be detained, and face no credible threat of enforcement." Essentially, the government argues that the class and subclass may not include members who will not suffer "any concrete or imminent injury" stemming from their individual arrest or detention. But the Ninth Circuit allows class certification under Rule 23(b)(2) where some class members are subject to but not harmed by a challenged procedure. *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1044–45 (9th Cir. 1998). That is because Rule 23(b)(2) "does not require [courts] to examine the viability or bases of class members' [individual] claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice

---

[47] For example, the government submitted two declarations from a DHS Deportation Officer enclosing notices to appear, warrants for arrest, and orders of release on recognizance for the named plaintiffs that include this information. *See* Declaration of Michael Silva, Dkt. No. at 68-1, at 8–26; Declaration of Michael Silva, Dkt. No. 68-2, at 6–9.

United States District Court
Northern District of California

applicable to all of them." *Rodriguez*, 591 F.3d at 1125, *abrogated on other grounds as recognized by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). As a result, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id.*

This makes practical sense given the nature of the relief available under Rule 23(b)(2). In damages actions, defining a class to include members without individualized injuries runs the risk of compensating individuals who suffered no harm. Where plaintiffs seek purely prospective relief, however, there is no similar risk of granting redress without an attendant injury. That is because the only benefit a class member receives from prospective relief under Rule 23(b)(2) is avoiding the harmful conduct that would otherwise injure them. For example, the only noncitizens who would benefit from vacatur of the re-detention policy are those whom DHS would otherwise re-arrest. Noncitizens whom DHS does not attempt to re-detain gain nothing, even if they are technically class members. So there is no basis for the government's concern that the proposed class and subclass definition would result in overbroad relief.

For these reasons, the government's arguments as to the proposed class and subclass definition fail.

### B.    Rule 23(a)

Both the proposed class and proposed subclass satisfy the Rule 23(a) prerequisites.

#### 1.    Numerosity

Plaintiffs have demonstrated that their proposed class and subclass are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Determining whether joinder is impracticable "requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The Ninth Circuit has held that a proposed class is sufficiently numerous where joinder of all class members "would impose very substantial logistical burdens." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). And while "[t]he Ninth Circuit has not offered a precise numerical standard[,] district courts generally hold … 'that the numerosity requirement is usually satisfied where the class comprises 40 or more members, and generally not satisfied when the class

comprises 21 or fewer members.'" *J.L. v. Cissna*, No. 18-CV-04914-NC, 2019 WL 415579, at *8 (N.D. Cal. Feb. 1, 2019) (quoting *Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. 12-cv-5080-CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013)).

Plaintiffs easily satisfy the numerosity requirement. They have submitted declarations from 10 noncitizens who fall within the class and a declaration from attorney identifying 33 additional clients who fall within the class and have received preliminary injunctive relief compelling their release.[48] In addition to these 43 identified class members, most of whom also fall within the subclass, plaintiffs have submitted evidence that ICE has arrested hundreds or thousands of noncitizens within ICE's San Francisco area of responsibility in recent months.[49] It is reasonable to infer that at least a small fraction of those noncitizens fall within the class and subclass because they entered the country without admission, were deemed inadmissible under 8 U.S.C. § 1182 and placed in removal proceedings before being released pursuant to § 1226(a), and are not subject to mandatory detention under § 1226(c). *See Uschold v. Carriage Servs., Inc.*, No. 17-CV-04424-JSW, 2020 WL 1466172, at *11 (N.D. Cal. Mar. 6, 2020) ("In analyzing numerosity 'a court may make common-sense assumptions and reasonable inferences.'" (quoting *Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, 15–cv–0224–YGR, 2016 WL 314400, at *6 (N.D. Cal. 2016)). Plaintiffs have therefore demonstrated that there are at least 40 and likely several hundred class and subclass members.

Several additional factors render joinder impracticable and weigh in favor of finding numerosity. First, the membership or the class will "change[] continually over time" as, for example, noncitizens enter the class upon being placed in removal proceedings under § 1229a or leave the class upon the conclusion of their removal proceedings. *See A.B.*, 30 F.4th at 838. Second, the class and subclass consist of noncitizens spread across ICE's vast San Francisco area

---

[48] *See* Dkt. Nos. 48-2 to -4 and 48-12 to -18; Dkt. No. 48-5 ¶ 11.

[49] *See* Yang, *supra* note 8 (documenting arrests of more than 100 people at the San Francisco immigration court and USCIS office); Zhu, *supra* note 8 (documenting arrests of more than 2,600 people); Waldron & Solinsky Duryea, *supra* note 8 (reporting 2,123 noncitizens arrested in the San Francisco Area of Responsibility since January 20, 2025; *see also Berkeley Deportation Data Project*, https://deportationdata.org/data/ice.html (documenting more than 700 individuals arrested by ICE in its San Francisco area of responsibility who do not have final removal orders).

United States District Court
Northern District of California

of responsibility, which covers northern California, Hawaiʻi, Guam, and Saipan. *See J.L.*, 2019 WL 415579, at *8 (explaining that courts consider "the geographical spread of class members" in assessing numerosity); *Bentley v. United of Omaha Life Ins. Co.*, No. CV157870, 2018 WL 3357458, at *7 (C.D. Cal. May 1, 2018) (same). Finally, plaintiffs seek only declaratory and injunctive relief. *See Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 2696424, at *18 (N.D. Cal. Sept. 22, 2025) (noting that "the numerosity requirement is relaxed in injunctive relief cases"); *Chinitz v. Intero Real Est. Servs.*, No. 18-cv-05623-BLF, 2020 WL 7391299, at *8 (N.D. Cal. July 22, 2020).

None of the government's arguments concerning numerosity are meritorious. The government raises concerns about "indeterminacy" because plaintiffs cannot prove a "precise class size," yet it points to no authority imposing such a requirement. As noted above, the Ninth Circuit has held that classes with continuously changing membership, which are inherently indeterminate, are if anything *more* likely to satisfy the numerosity requirement. *See A.B.*, 30 F.4th at 838. The government also points to differences in class members' "factual pattern," including their "status, location, arrest and alleged re-detention." Such differences do not bear on numerosity, which simply concerns the practicability of joining the individuals who fall within the proposed class definition.

Accordingly, the class and subclass are sufficiently numerous to satisfy Rule 23(a)(1).

### 2. Commonality

Plaintiffs have also demonstrated commonality. "Commonality mandates there be a common question of law or fact among the class members where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024) (citation modified). In other words, commonality exists where "the evidence establishes that a common question is capable of class-wide resolution." *Noohi*, 146 F.4th at 863. "To satisfy commonality, even a single common question is enough." *Small*, 122 F.4th at 1198 (citation modified) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)).

Each of the proposed class and subclass's claims turns on a common question, the answer

United States District Court
Northern District of California

to which "will resolve an issue that is central to the validity of each one of the [class and subclass members'] claims in one stroke." *Wal-Mart*, 564 U.S. at 350. As to plaintiffs' claim that the re-detention policy arbitrary and capricious, for example, there is a "common issue, with a common answer, as to whether a sufficiently reasoned explanation was provided" for the policy. *Thakur v. Trump*, 787 F. Supp. 3d 955, 1003 (N.D. Cal. 2025). That the individual circumstances surrounding class members' release, arrest, and detention may differ does not destroy this common question. Either the re-detention policy is insufficiently reasoned and "is unlawful as to every [class member] or it is not. That inquiry does not require [the Court] to determine the effect of those policies ... upon any individual class member (or class members) or to undertake any other kind of individualized determination." *Parsons v. Ryan*, 754 F,3d 657, 678 (9th Cir. 2014).

Similarly, differences in the circumstances of subclass members do not destroy the common question of whether the application of the re-detention policy as to noncitizens released pursuant to § 1226(a) violates DHS's statutory authority under § 1226(b). Either § 1226(b) authorizes such re-detention without individualized determinations or it does not.

The same is true for plaintiffs' claim that the re-detention policy violates the APA because it is contrary to class members' Fourth Amendment rights. To be sure, whether a seizure comports with the Fourth Amendment's requirement of "objective reasonableness … is inherently fact specific" and varies based on the circumstances of each case. *Green v. City & County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014); *see also Graham v. Connor*, 490 U.S. 386, 394 (1989). But the relevant circumstances focus on what was known to the government official at the time of the seizure, not the unknown characteristics of the individual being seized. *See Recchia v. L.A. Dep't of Animal Servs.*, 889 F.3d 553, 560 (9th Cir. 2018) ("[I]n assessing reasonableness, we look at what was known to the officers at the time of seizure."). And here, for every class member, the relevant circumstances known to DHS officers are the same: The noncitizen being arrested was previously determined not to pose any flight risk or danger to the public, and DHS has made no determination that the individual's circumstances have changed since then. For every class member, then, there is a common question with a common answer as to the reasonableness of re-arresting a noncitizen based on that knowledge.

1    Plaintiffs have therefore demonstrated commonality for both the proposed class and the

2    proposed subclass.

3        **3.    Typicality**

4    Plaintiffs have also established that "the claims or defenses of the representative parties are

5    typical of the claims or defenses of the class" and subclass. Fed. R. Civ. P. 23(a)(3). Under Rule

6    23's "permissive standards, representative claims are 'typical' if they are reasonably coextensive

7    with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at

8    685. "Typicality focuses on the class representative's claim—but not the specific facts from which

9    the claim arose—and ensures that the interest of the class representative aligns with the interests of

10    the class." *Small*, 122 F.4th at 1201–02. "Measures of typicality include whether other members

11    have the same or similar injury, whether the action is based on conduct which is not unique to the

12    named plaintiffs, and whether other class members have been injured by the same course of

13    conduct." *Id.* at 1202.

14    Plaintiffs are typical of the proposed class and subclass for the same reasons they share

15    common questions of law and fact with the class and subclass. *See Wal-Mart*, 564 U.S. at 349 n.2

16    (noting that, in the context of Rule 23(b)(2) classes, "[t]he commonality and typicality

17    requirements of Rule 23(a) tend to merge"). Like every member of the class, each of the plaintiffs

18    is a noncitizen within ICE's San Francisco area of responsibility who entered the United States

19    without admission, was deemed inadmissible under § 1182 and placed in removal proceedings

20    before being released, and is not subject to mandatory detention under § 1226(c). And like every

21    member of the subclass, the plaintiffs were all released pursuant to § 1226(a).[50] Each of the three

22    plaintiffs faces the same risk of re-arrest by DHS pursuant to the re-detention policy faced by all

23    members of the class and subclass.[51] "The named plaintiffs thus allege the same or a similar injury

24

25    [50] *See* Declaration of Michael Silva, Dkt. No. 68-1 ¶¶ 7–10, 17–20 (deportation officer describing
26    entry, initial arrest, and release of Ms. Garro Pinchi and Ms. Galo Santos); Declaration of Michael
      Silva, Dkt. No. 68-2 ¶¶ 7–9 (same as to Mr. Teletor Sente)

27    [51] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 22–23 (expressing fear of re-arrest at
      her ICE and ISAP check-ins); Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 14 (explaining
28    that she fears re-arrest at her upcoming ICE check-in in January 2026); Declaration of Jose
      Waldemar Teletor Sente, Dkt. No. 48-4 ¶¶ 11–13 (explaining that he fears re-arrest at his next

United States District Court
Northern District of California

as the rest of the putative class; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims." *Parsons*, 754 F.3d at 685.

The government contends that the existence of some differences among class and subclass members and the plaintiffs destroys typicality. The government notes, for example, that Ms. Galo Santos and Mr. Teletor Sente have not yet been re-arrested pursuant to the re-detention policy. But that does not make them atypical. The class and subclass include many individuals who have not yet been arrested but, like Ms. Galo Santos and Mr. Teletor Sente, face a risk of re-arrest under the re-detention policy. In any case, "[i]t does not matter that the named plaintiffs may have in the past suffered varying injuries ... Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member." *Id.* at 686; *see also Ellis*, 657 F.3d at 985 n. 9 ("Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality."). For that reason, potential differences as to the circumstances under which plaintiffs and other class and subclass members may be re-arrested—such as the location of potential re-arrest, the statute governing such arrest, or the existence of any changed circumstances that might have justified such arrest if considered by DHS—do not destroy typicality.

### 4.    Adequacy

Plaintiffs have established that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? If either answer is no, the representative is inadequate." *Small*, 122 F.4th at 1202 (citation modified). To satisfy these criteria, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

appearance in immigration court, which has been repeatedly rescheduled in recent months).

United States District Court
Northern District of California

United States District Court
Northern District of California

As to the proposed class counsel, plaintiffs assert that counsel has no conflicts with the interests of the class or subclass and is competent to vigorously prosecute the action on behalf of the class. The government does not argue otherwise.

As to the proposed class representatives, plaintiffs all assert that they are members of the class, have no conflicts with the class's interests, and will vigorously prosecute this action on behalf of the class. The government contends that plaintiffs are not adequate class representatives because they "lack any understanding of their responsibilities," as shown by their failure to explain in their declarations "what those responsibilities actually entail." Not so. Each of the three plaintiffs stated their understanding that, "as a class representative, [they] represent the interests of everyone in the class," must "stay informed about what is happening with [the] case and stay in touch with [class counsel]," and are "committed to being a class representative."[52] The government argues that the Court should not credit the declarations because each includes an identical statement and thus is likely "canned." The government is correct that plaintiffs did not write their own declarations. Because none of the plaintiffs speak English fluently, it was necessary for someone else to prepare the declarations on their behalf.[53] It is unsurprising that the individual who prepared and translated each declaration would use similar language in each. That does not indicate that plaintiffs failed to understand or agree with the contents of the declarations—to the contrary, each plaintiff attested under penalty of perjury that the declarations were read to them in Spanish, that they fully understood the contents, and that the statements were true. The declarations "indicate[] clearly that [each plaintiff] understands [their] duties and is currently willing and able to perform them. The Rule does not require more." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).[54]

---

[52] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 24; Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 16; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 16.

[53] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 25; Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 17; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 17.

[54] The government also argues that plaintiffs are not adequate class representatives because their pursuit of individual habeas relief means they lack any actual or imminent injury in fact and "will not suffer the same injury as the class members." This argument fails for the reasons already explained above with respect to justiciability.

1    Accordingly, both the proposed class and subclass satisfy the Rule 23(a) prerequisites.

2    **C.    Rule 23(b)(2)**

3    Plaintiffs also satisfy the requirements of Rule 23(b)(2). "Rule 23(b)(2) applies only when

4    a single injunction or declaratory judgment would provide relief to each member of the class."

5    *Wal-Mart*, 564 U.S. at 360; *see also id.* ("The key to the (b)(2) class is the indivisible nature of the

6    injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be

7    enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation

8    modified). "These requirements are unquestionably satisfied when members of a putative class

9    seek uniform injunctive or declaratory relief from policies or practices that are generally

10   applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is the case here. Plaintiffs seek

11   to vacate DHS's re-detention policy as to every member of the putative class and subclass.

12   The government's arguments to the contrary are unavailing.

13   First, the government argues that the Court cannot grant a stay that provides relief to each

14   member of the proposed class and subclass because § 1252(f)(1) bars such class-wide relief. As

15   explained above, however, § 1252(f)(1) does not apply here.

16   Second, the government argues that plaintiffs may not pursue class-wide habeas relief

17   because the Supreme Court "has never held that class relief may be sought in a habeas

18   proceeding." *A.A.R.P. v. Trump*, 145 S. Ct. 1034, 1036 (2025) (Alito, J., dissenting). But plaintiffs

19   do not seek class-wide habeas relief. Indeed, because the Court granted the government's motion

20   to sever plaintiffs' individual habeas claims, plaintiffs no longer seek *any* habeas relief in this

21   case. Their remaining class claims request only a stay and vacatur of DHS's re-detention policy

22   under the APA based on its alleged lack of reasoning, which would not have the same effect as a

23   writ of habeas corpus. Where the latter would mandate noncitizens' release from custody, the

24   former merely suspends the challenged policy while leaving DHS free to promulgate new policies

25   providing for re-detention so long as any new policy is sufficiently reasoned and comports with

26   applicable law.

27   Accordingly, plaintiffs have established that they satisfy all the prerequisites of Rule 23(a)

28   and the requirements of Rule 23(b)(2) with respect to the proposed class and subclass. The Court

United States District Court
Northern District of California

1    provisionally certifies the class and subclass, and provisionally certifies plaintiffs and their counsel

2    to represent the class and subclass, for the purposes of the motion for a stay of agency action.

3    **III.    The Court stays the re-detention policy during the pendency of these proceedings.**

4        "[T]o prevent irreparable injury," § 705 of the APA authorizes "the reviewing court … to

5    postpone the effective date of an agency action … pending conclusion of the review proceedings."

6    5 U.S.C. § 705. A stay is "an exercise of judicial discretion," and "the party requesting a stay bears

7    the burden of showing that the circumstances justify an exercise of that discretion." *Nken v.*

8    *Holder*, 556 U.S. 418, 433–34 (2009) (citation modified). Four factors guide courts' consideration

9    of whether the circumstances warrant a stay:

> (1) whether the stay applicant has made a strong showing that he is
> likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay will
> substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.

13    *Id.* at 433–34 (citation modified). These factors "substantially overlap with the *Winter* factors for a

14    preliminary injunction." *Immigr. Defs.*, 145 F.4th at 986. As in the preliminary-injunction context,

15    "[t]he first two factors are the most critical." *Id.* (quoting *Nken*, 556 U.S. at 434). "[I]f a plaintiff

16    can only show that there are serious questions going to the merits[,] a lesser showing than

17    likelihood of success on the merits[,] then a [stay] may still issue if the balance of hardships

18    tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Id.* (citation

19    modified) (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

20    "Where the government is the opposing party," those final two factors—that is, "the balancing of

21    the harm and the public interest"—"merge." *Id.*

22        Here, plaintiffs seek a § 705 stay of the re-detention policy. Because they have established

23    that each of the four factors weighs in their favor, the Court exercises its discretion to issue the

24    stay.

25        **A.    Plaintiffs are likely to succeed on the merits of their APA claims.**

26        Plaintiffs challenge DHS's alleged re-detention policy under the APA, which "sets forth

27    the procedures by which federal agencies are accountable to the public and their actions subject to

28    review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). With limited

exceptions, judicial review under the APA is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Judicial review is available to any "person suffering legal wrong because of [the] agency action, or adversely affected or aggrieved by [such] action." *Id.* § 702. As relevant here, the APA requires courts to "hold unlawful and set aside agency action" if they find such action to be "arbitrary [or] capricious"; "contrary to constitutional right"; or "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(A)–(C). Plaintiffs claim that the re-detention policy is a reviewable final agency action that is (1) arbitrary and capricious, (2) contrary to class members' Fourth Amendment rights, and (3) in excess of DHS's statutory authority to revoke subclass members' bond or parole under 8 U.S.C. § 1226(b). Because the Court concludes that plaintiffs' arbitrary-and-capricious claim is likely to succeed, it need not address the other claims.

### 1. The re-detention policy is reviewable under the APA.

"In general, there is a strong presumption that Congress intends judicial review of administrative action.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir. 2011) (citation modified). The government nevertheless argues that the re-detention policy is unreviewable because (1) it is not "final agency action," 5 U.S.C. § 704; (2) various statutory provisions "preclude judicial review," *id.* § 701(a)(1); (3) the policy "is committed to agency discretion by law," *id.* § 701(a)(2); and (4) plaintiffs have "[an]other adequate remedy in a court," 5 U.S.C. § 704. Each argument fails.

### a. The re-detention policy is "final agency action" under § 704.

Plaintiffs have sufficiently established that the re-detention policy is reviewable "final agency action." 5 U.S.C. § 704.

"For there to be 'final agency action,' there must first be 'agency action.'" *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 575 (9th Cir. 2019). The government argues that plaintiffs have identified "no rule, order, guidance, or directive that would be subject to judicial review." In essence, this "threshold suggestion that there is not even federal government action in the first place"—i.e., that DHS's re-detention of non-citizens without conducting individualized determinations of changed circumstances "[i]s somehow a non-event under the APA"—is an

38

argument that there is no "agency action." *S.F. Herring Ass'n*, 946 F.3d at 575.

The APA defines "agency action" to "includ[e] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 701(b)(2). "This definition 'is meant to cover comprehensively every manner in which an agency may exercise its power." *S.F. Herring Ass'n*, 946 F.3d at 576 (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). As relevant here, the term "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); *see also id.* § 701(b)(2).

Plaintiffs have demonstrated the existence of a re-detention policy that falls squarely within the APA's definition of a "rule" and is therefore "agency action." As detailed above, they offer voluminous evidence that, before May 2025, DHS's practice for more than 40 years was to re-detain a noncitizen whom it had previously released only after making an individualized determination that the noncitizen's circumstances had materially changed since their release, such that the noncitizen posed a flight risk or danger to the public.[55] Before this year, government

---

[55] *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981) (instructing that noncitizens previously released on bond pursuant to an immigration judge's order should not be redetained absent a finding of changed circumstances); Federal Defendants' Supplemental Brief at 1, *Saravia ex rel. A.H. v. Sessions*, 280 F.Supp.3d 1168 (N.D. Cal. 2017) (No. 17-cv-03615-VC), Dkt. No. 90 at 2 (explaining that "[i]n practice, DHS follows *Matter of Sugay* in situations … where a previous release determination was made by DHS" and "[t]hus … only re-arrests an alien pursuant to § 1226(b) after a material change in circumstances"); Declaration of Jordan Weiner, Dkt. No. 48-5 ¶ 29 (attesting that immigration attorney with 10 years of experience never observed or heard of any released noncitizen being re-arrested at immigration court without an individualized assessment of changed circumstances prior to May 2025); Declaration of Shira Levine, Dkt. No. 48-6 ¶¶ 3–5 (attesting that attorney who practiced in San Francisco area immigration courts from 2015 to 2021 and served as an immigration judge from 2021 to 2025 was "not aware of any instances, prior to May 2025, in which immigrants in nondetained proceedings were detained absent a change in their individualized circumstances"); Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 5 (attesting that immigration attorney with 14 years of experience, "until May 2025, had never encountered or even heard of immigrants in non-detained proceedings ever being detained absent a change in their individualized"); Declaration of Natalia Santanna, Dkt. No. 48-8 ¶¶ 3–4 (immigration attorney practicing in the San Francisco area since 2012 attesting that "before May 2025, [she] never experienced clients being re-detained without a change in their individual circumstances"); Declaration of Bill Ong Hing, Dkt. No. 48-9 ¶ 5 (immigration attorney with 51 years of experience attesting that "[p]rior to approximately May 2025, [he] had not represented a client who was rearrested or re-detained by [ICE] without an intervening change in circumstances

attorneys repeatedly told courts in this district that this was DHS's policy. *See Ortega*, 415 F.

Supp. 3d at 969 (N.D. Cal. 2019); *Saravia*, F. Supp. 3d at 1197. Then, in May 2025, DHS officers

departed from that practice and began re-detaining released noncitizens on a large scale without

making such individualized determinations, as evidenced by the declarations of immigration

attorneys, former immigration judges, and detained noncitizens.[56] As plaintiffs assert, it is beyond

belief that DHS officers would abruptly and uniformly depart from decades-long re-detention

practices in such a novel way absent DHS's authorization or instruction to do so. And in the

months since May, both the Acting Director of ICE and attorneys for DHS have stated that DHS

believes § 1225(b)(2) authorizes this novel re-detention practice, further suggesting that the

change in May occurred due to top-down guidance.[57] At the very least, Acting Director Lyons's

---

since their initial release"); Declaration of Jacqueline Marie Brown, Dkt. No. 48-10 ¶ 5 (immigration attorney practicing in the San Francisco Bay Area for 20 years attesting that "[b]efore May 2025, [she] had never encountered a situation where ICE re-arrested or redetained one of [her] clients without identifying some intervening change in circumstances since the person's initial release"); Declaration of Martha Ruch, Dkt. No. 48-11 ¶¶ (immigration attorney with 10 years of experience attesting that "[p]rior to approximately May 2025, [she] did not experience clients in non-detained § 240 proceedings being re-detained by [ICE] without a change in their individual circumstance").

[56] *See* Declaration of Jordan Weiner, Dkt. No. 48-5 ¶¶ 10–18 (describing 33 incidents of released non-citizens being redetained under such circumstances since May 2025); Declaration of Shira Levine, Dkt. No. 48-6 ¶¶ 12–13 (former immigration judge attesting that ICE began conducting civil immigration arrests at the San Francisco immigration court for the first time in May 2025 and that, around the same time, the government began moving to dismiss immigration cases without arguing that there were changes in individual circumstances in order to detain noncitizens and place them in expedited removal); Declaration of Natalia Santanna, Dkt. No. 48-8 ¶¶ 5–14 (describing two clients of declarant who were re-detained after being released without any individualized determination of changed circumstances); Declaration of Bill Ong Hing, Dkt. No. 48-9 ¶ 7 (immigration attorney attesting that ICE began re-detaining declarant's non-citizen clients "regardless of their individual circumstances"); Declaration of Jacqueline Marie Brown, Dkt. No. 48-10 ¶¶ 8–11 (immigration attorney attesting that ICE began re-detaining her non-citizen clients "regardless of individual factors" and describing re-detention of client who "did not have a change in circumstances related to flight risk or danger"); Declaration of Martha Ruch, Dkt. No. 48-11 ¶¶ 7–10 (describing re-arrest of client without change in individual circumstances); *See, e.g.*, Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶¶ 2–3, 12–21 (describing re-arrest of declarant previously released from DHS custody); Declaration of Salam Maklad, Dkt. No. 48-12 ¶¶ 2–4, 14–24 (same); Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶¶ 3–5, 12–28 (same); Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶¶ 2, 6–9 (same); Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶¶ 2–3, 8–12 (same); Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 3, 14–24 (same); Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 4, 14–16 (same); Declaration of Keymaris Alvarado-Miranda, Dkt. No. 48-18 ¶¶ 2, 8–9 (same).

[57] *See Martinez*, 792 F. Supp. 3d at 217–18 (describing Acting Director of ICE's internal memorandum articulating this view); *Herrera v. Knight*, 2025 WL 2581792, at *2 (same); *Pablo*

40

1    internal memorandum conclusively establishes that DHS had a written policy as to the meaning of

2    § 1225(b)(2) as of July 2025.

3        The government has offered nothing to rebut plaintiffs' evidence of the sudden and drastic

4    change in DHS officers' re-detention practices. Quite the opposite: At the hearing on plaintiffs'

5    motions, it confirmed that DHS's prior policy was to re-detain noncitizens only after making an

6    individualized determination of materially changed circumstances and that DHS officers began

7    departing from that practice *en masse* in May. Yet in its brief, the government insists that this

8    uniform reversal of DHS's approach was not the result of any "agency action." It contends that

9    DHS has "neither formally promulgated nor concretely applied" any policy, and that plaintiffs

10   merely challenge "an aggregation of individual enforcement actions and resource judgments." In

11   other words, the government suggests that DHS officers across the country awoke one morning in

12   May and independently decided to start violating their employer's decades-long policy. Were that

13   true, the government could have provided some evidence to that effect, such as declarations from

14   DHS leaders disclaiming the existence of a new policy or from DHS officers attesting to their

15   individual choice to re-detain noncitizens absent changed circumstances. It has not done so.

16       Given plaintiffs' extensive evidence of a policy change at DHS in May 2025 and the

17   government's failure to provide any contrary evidence in support of its contention that no such

18   change was made, the record strongly supports the Court's factual finding, for purposes of this

19   motion, that in or around May 2025 DHS specifically approved a new policy of detaining

20   noncitizens whom DHS had previously released without conducting individualized determinations

21   as to material changes in circumstance, and that DHS later justified the statement based on its new

22   interpretation of § 1225(b). Such an internal policy—which has "general applicability" and "future

23   effect" as to noncitizens, "prescribe[s] … [ICE's re-detention] policy," and that is purportedly

24   "designed to implement" and "interpret" § 1225(b)—falls squarely within the APA's definition of

25

26   _____

27   *Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 2935630, at *8–10 (N.D. Cal. Oct. 15, 2025) (describing and rejecting the government's interpretation of § 1225(b)); *Hinestroza v.*

28   *Kaiser*, No. 25-CV-07559-JD, 2025 WL 2606983, at *2 (N.D. Cal. Sept. 9, 2025) (describing the "tsunami of similar cases" in which the government asserted this interpretation of § 1225(b)).

United States District Court
Northern District of California

41

1    a "rule." 5 U.S.C. § 551(4); *see also id.* § 701(b)(2).

2          To the extent the government argues that plaintiffs must provide direct evidence of a

3    written policy, it is wrong. The APA's text contains no requirement that agency action be formally

4    promulgated, *see Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (collecting cases

5    holding as much), or memorialized in writing, *see Am. Ass'n of Univ. Professors v. Trump*, No.

6    25-cv-07864-RFL, 2025 WL 3187762, at *29 (N.D. Cal. Nov. 14, 2025) (holding that agencies'

7    decision to "adopt[]a concerted playbook of suspending and terminating [grantees'] funds …,

8    though unwritten, constitutes an agency action"); *Garcia v. Unknown Parties*, No. CIV 23-468-

9    TUC-CKJ, 2024 WL 1619370, at *6 (D. Ariz. Apr. 15, 2024) (collecting similar cases). Nor does

10   the APA's text require that plaintiffs prove the existence of such action through direct rather than

11   circumstantial evidence. *See Amadei*, 348 F. Supp. 3d at 166 ("[C]ourts have found a defendant

12   agency's behavior relevant to inferring the existence of a policy."); *see also Am. Ass'n of Univ.

13   Professors*, 2025 WL 3187762, at *29; *cf. Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 325

14   (2025) (Thomas, J., concurring) (explaining the "conventional rule of civil litigation" that "a

15   plaintiff can proceed with direct or circumstantial evidence" (citation modified)). For the reasons

16   noted above, plaintiffs' circumstantial evidence here establishes the likely existence of a DHS

17   policy—informal or unwritten though it may be—of re-detaining noncitizens without

18   individualized determinations of changed circumstances. At this preliminary stage of the

19   proceedings, where plaintiffs do not yet have the benefit of a full administrative record, that is

20   enough.

21          The government also suggests that DHS officers' change in practice is the result of "a self-

22   executing statutory mandate" imposed by § 1225(b)(2), not any action by DHS. But "[t]he term

23   'agency action' encompasses an agency's interpretation of the law." *W. Coast Truck Lines, Inc. v.

24   Am. Indus., Inc.*, 893 F.2d 229, 233 (9th Cir. 1990); *see also* 5 U.S.C. § 551(13) (defining "agency

25   action" to include a "rule"); *id.* § 551(4) (defining "rule" to include "an agency statement …

26   designed to … interpret … law"). At the hearing, the government conceded that "[w]hat is

27   happening is ICE has interpreted the detention statutes such that individuals that fall

28   under § 1225(a)(1)"—i.e., noncitizens present in the United States without lawful admission—"are

subject to mandatory detention under § 1225(b)(2)(A)." Or as the government rephrased it: "[T]he policy that ICE is implementing is actually a legal interpretation of" § 1225(b)(2). This admitted re-interpretation of the statute to authorize the re-detention of previously released noncitizens regardless of their individual circumstances is agency action. Even were DHS merely "restat[ing]" an interpretation of § 1225(b)(2) that "already exists in the relevant body of statutes, regulations, and rulings," its novel "*application and enforcement*" of that interpretation to re-detain noncitizens absent changed circumstances would be "agency action." *S.F. Herring Ass'n*, 946 F.3d at 577.

In a final bid to avoid the conclusion that plaintiffs challenge "agency action," the government mischaracterizes their claims in two ways.

First, the government casts plaintiffs' claims as seeking "programmatic oversight" over a broad "aggregation" of different DHS actions. The Supreme Court has warned courts against allowing such challenges. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004) (explaining that "[g]eneral deficiencies in compliance" with a broad statutory mandate "lack the specificity requisite for agency action"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990) (holding that plaintiffs did not challenge a single "agency action" where their claims sought a disparate array of "programmatic improvements" in the Bureau of Land Management's overall "program" of "reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans"). This is not one of them. Plaintiffs do not impermissibly "seek wholesale improvement" of DHS's "program" of apprehending or removing noncitizens. *Lujan*, 497 at 891. Instead, they challenge a "specific[]" and "*discrete* agency action," *Norton*, 542 U.S. at 66—DHS's change in policy authorizing the re-detention of previously released noncitizens without individualized determinations as to any material change in circumstances.

Second, the government argues that plaintiffs have challenged a nonexistent policy of re-detaining noncitizens pursuant to § 1226(a)–(b), rather than DHS's conceded policy of interpreting § 1225(b)(2) to mandate such re-detention. This argument conflates *what* plaintiffs challenge (i.e., the nature of the policy) with *why* they challenge it (i.e., the substance of their legal claims). What plaintiffs challenge, in both their amended complaint and motion for a stay, is DHS's policy of re-detaining noncitizens whom it previously released without first making an individualized

determination that their material circumstances have changed.[58] Plaintiffs challenge that policy without regard to the statutory authority DHS invokes to justify it, and nothing in the amended complaint or motion for a stay suggests otherwise. Nor does plaintiffs' provisional class definition require that a particular statute govern class members' detention. Instead, it merely states that class members "are *not* subject to detention under 8 U.S.C. § 1226(c)." That group includes noncitizens subject to either § 1225(b)(2) or § 1226(a)–(b).[59] So plaintiffs' challenge captures the re-detention policy whether framed as an exercise of DHS's discretionary authority under § 1226(a)–(b) or as implementing § 1225(b)(2)'s statutory mandate. Plaintiffs rely on § 1226(a)–(b) only to argue that the re-detention policy is arbitrary and capricious and in excess of DHS's statutory authority as applied to members of the subclass. Again, those arguments about *why* the policy violates the APA do not alter *what* plaintiffs challenge. Whatever legal basis DHS asserts for the re-detention policy, plaintiffs have established that it exists and constitutes "agency action" within the meaning of § 704.

The government does not meaningfully dispute that, if the re-detention policy is "agency action," it is also "final agency action." Nor could it. Agency action is final under the APA "if it both (1) marks the consummation of the agency's decisionmaking process," i.e., is not "of a merely tentative or interlocutory nature," and "(2) is one by which rights or obligations have been determined, or from which legal consequences will flow." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (citation modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). In assessing whether these criteria are satisfied, courts "look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate

---

[58] *See* Amended Complaint, Dkt. No. 38 ¶ 6 (first defining "the 'Re-Detention Policy'" as "authorizing re-arrest and re-detention of noncitizens untethered from any basis in—or individualized assessment of—their flight risk or danger to the community"); Motion for Stay of Agency Action, Dkt. No. 48 at 3 (moving "to stay or postpone … the Department of Homeland Security's policy of re-arresting and re-detaining certain noncitizens in removal proceedings in the absence of any individualized determination that they had become a flight risk or a danger to the public").

[59] *See* Motion for Provisional Class Certification, Dkt. No. 49 at 11 (emphasis added). Only the provisional subclass's membership is limited to noncitizens who were released pursuant to § 1226(a). *Id.*

United States District Court
Northern District of California

effect on the day-to-day operations of the subject party." *Id.* "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Tohono O'odham Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1200 (9th Cir. 2025) (quoting *Franklin*, 505 U.S. at 797).

There is no question that DHS has completed its decisionmaking process. As discussed above, the record supports plaintiffs' assertion that DHS "state[d] a definitive position" that it must re-detain noncitizens regardless of their individual circumstances—a position that it has repeatedly reiterated before this Court and other courts—and "then sen[t] officers out into the field to execute on the directive." *S.F. Herring Ass'n*, 946 F.3d at 579; *see also J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1067 (N.D. Cal. 2018) (explaining that guidance was final agency action where agency began concretely implementing the guidance). The government "ha[s] further made it clear that they will not turn back from their view" that § 1225(b)(2) compels the re-detention policy. *Am. Ass'n of Univ. Professors*, 2025 WL 3187762, at *30. Instead, DHS has "repeatedly declared its authority" to re-detain noncitizens without individualized determinations of changed circumstances, "enforced its [policy] against individual [noncitizens]," and "refused to change its position when pressed" in countless habeas actions. *S.F. Herring Ass'n*, 946 F.3d at 575. "Where an agency takes such steps, its decisionmaking processes are clearly consummated." *Id.* at 579.

The result of DHS's decisionmaking process "is one that will directly affect the parties." *Tohono O'odham Nation*, 138 F.4th at 1200 (quoting *Franklin*, 505 U.S. at 797). It already has: Ms. Garro Pinchi was arrested pursuant to the re-detention policy more than five months ago. DHS's abrupt change of course in May 2025 to begin re-arresting noncitizens like Ms. Garro Pinchi without finding material changes in their individual circumstances shows that the re-detention policy had an "immediate effect on [DHS's] day-to-day operations." *Ctr. for Biological Diversity*, 58 F.4th at 417.

Thus, on this factual record, the re-detention policy is "final agency action" reviewable under § 704.

**b.** **No statute "preclude[s] judicial review" of the re-detention policy within the meaning of § 701(a)(1).**

Section 701(a)(1) of the APA provides that relief from agency action is not available where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The government argues that various statutory provisions preclude review of plaintiffs' claims, including 8 U.S.C. § 1252(b)(9), (g), and (e)(3). As explained above, however, none of these provisions apply here.

**c.** **The re-detention policy is not "committed to agency discretion by law" within the meaning of § 701(a)(2).**

Under § 701(a)(2) of the APA, judicial review is not available where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The government incorrectly argues that plaintiffs' claims fall within this narrow exception.

"[T]he APA's basic presumption of judicial review can only be overcome if there is clear and convincing evidence that Congress intended to preclude judicial review." *Washington v. United States Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021). So "where substantial doubt about the congressional intent exists, th[at] general presumption … is controlling." *Block v. Community Nutrition Institute,* 467 U.S. 340, 351 (1984). Accordingly, "[s]ection 701(a)(2)'s exception for action committed to agency discretion is read 'quite narrowly.'" *Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States*, 145 F.4th 1158, 1163 (9th Cir. 2025) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). "[A]gency action is 'committed to agency discretion' only in 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)). In other words, "judicial review is unavailable when there is 'no law to apply.'" *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). And the Supreme Court "generally limit[s] the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Commerce*, 588 U.S. at 772 (citation modified).

This is not the "rare circumstance[]" where "there is no law to apply." *Johnson*, 145 F.4th at 1163 (citation modified). As to plaintiffs' claim that the re-detention policy is arbitrary and

capricious, "agency practice provide[s] a 'meaningful standard by which this court may review its exercise of discretion.'" *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)). DHS's prior practice of re-detaining only those noncitizens whom it individually determined to have a material change in circumstances provides such a standard. Even if DHS's recent departure from that practice "could conceivably fall within its broad discretion" under the relevant statutes, "judicial review under the APA concerns not only the particular outcome the agency reaches, but also the process in which the agency engages and the reasoning the agency articulates when it reaches that outcome." *Jajati v. United States Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024). DHS's prior practice provides a benchmark against which to measure "whether the agency justified its choice on specious grounds, failed to satisfy the general requirements of reasoned agency decisionmaking, or failed to comply with its own regulations." *Id.* (citation modified). In other words, the prior practice provides "law to apply" in determining whether the new agency action is arbitrary and capricious.

Further, the government has not established that "courts traditionally have regarded" immigration enforcement decisions "as committed to agency discretion" to such a degree that they are beyond judicial review under the APA. *Dep't of Commerce*, 588 U.S. at 772 (citation modified). To the contrary, the Ninth Circuit "ha[s] held that there are meaningful standards of review and have declined to apply § 701(a)(2)" in "several immigration cases." *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) (collecting cases and holding that denial of U-visa petitions is subject to judicial review). So § 701(a)(2)'s exception for action committed to agency discretion does not bar judicial review here.

### d.    Plaintiffs have no other adequate remedy in a court.

The government also suggests, in a single sentence, that § 704 precludes plaintiffs' APA claims because "[p]laintiffs have another remedy available in the form of individual habeas actions or potential claim for damages." Section 704 limits APA review to agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Supreme Court has emphasized that this provision "should not be construed to defeat the [APA's] central purpose of

United States District Court
Northern District of California

1    providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487

2    U.S. 879, 903 (1988). Instead, "Congress intended by that provision simply to avoid duplicating

3    previously established special statutory procedures for review of agency actions." *Darby v.*

4    *Cisneros,* 509 U.S. 137, 146 (1993). The government has identified no such procedures by which

5    plaintiffs could have pursued their claims outside the APA. It suggests that habeas offers such a

6    procedure, but habeas petitioners may challenge only the fact or duration of confinement.

7    Plaintiffs could not use habeas to challenge the process by which DHS determines whether it will

8    re-detain noncitizens. Indeed, the government has moved to dismiss this case by arguing that the

9    plaintiffs' challenge to the re-detention policy is not cognizable in habeas.[60] And though the

10   government contends that plaintiffs have a "potential claim for damages," it makes no effort to

11   identify a cause of action for which plaintiffs could seek damages resulting from the re-detention

12   policy. *See Goldey v. Fields*, 606 U.S. 942, 942 (2025) (explaining that the Supreme Court has

13   declined to imply any new constitutional cause of action for damages against federal officers since

14   1980 and instructing that it would be improper to do so "in all but the most unusual

15   circumstances"); *see also Brown v. Gilliam*, No. EDCV-21-477, 2022 WL 19775026, at *3 (C.D.

16   Cal. Dec. 6, 2022) ("Given the Supreme Court's recent guidance, recognizing a new *Bivens* cause

17   of action is plainly disfavored, if not insurmountable."). The Court therefore concludes that there

18   is no risk that "a legal remedy under the APA would impermissibly provide for duplicative

19   review." *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1173 (9th Cir. 2018) (quoting *City of*

20   *Oakland v. Lynch*, 798 F.3d 1159, 1165 (9th Cir. 2015)).

21       Because the re-detention policy is reviewable under the APA, the Court turns to the merits

22   of plaintiffs' claim that the policy is arbitrary and capricious.

23              **2.    The re-detention policy is likely arbitrary and capricious.**

24       Section 706(2)(A) of the APA authorizes courts to "set aside" agency action that is

25   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

26   706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned

27

28   [60] *See* Motion to Dismiss Plaintiffs' Class Action Complaint and Amended Petition, Dkt. No. 66, at 28–31.

decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citation modified). "That means an agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation modified). If "the agency has … entirely failed to consider an important aspect of the problem," the agency's decisionmaking is insufficiently reasoned. *Id.* at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Important aspects include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54; *cf. Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.")

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, an agency that "changes its existing position" must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)). An agency undertaking "policy change" must also provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 222 (quoting *Fox Television Stations*, 556 U.S. at 515–16). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (citation modified) (quoting *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 981 (2005)).

Plaintiffs have established a likelihood that the re-detention policy is arbitrary and capricious because (1) DHS failed to provide any reason for the policy when first implementing it; (2) DHS's post hoc rationalizations for the policy, even if considered, rest on an erroneous view of the law; (3) those post hoc rationalizations ignore an "important aspect of the problem"; and (4) DHS failed to consider noncitizens' "serious reliance interests."

         **a.**     **DHS likely did not provide a reasoned explanation for the re-detention policy at the time of its implementation.**

1    There is no evidence in the record that DHS offered a reasoned explanation for its changed

2    approach at the time it began implementing the re-detention policy. Indeed, the government makes

3    no effort to show otherwise.[61] Instead, it reiterates its argument that the re-detention policy does

4    not exist at all. That argument fails for the reasons explained above. If it is the government's

5    position that no policy existed, the government can and must adduce evidence to rebut plaintiffs'

6    evidence to the contrary, such as declarations from defendants attesting to that fact.

7    The government also suggests that the Court cannot review the reasons (or lack thereof) for

8    the re-detention policy because the APA limits such review to "the grounds upon which [DHS]

9    itself based its action." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943). Here,

10    there is no administrative record showing the grounds for DHS's decision, so the government

11    contends that review is impossible. But it is the *government's* responsibility to disclose the

12    grounds for its decision. *See Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021) (explaining

13    that the agency generally designates the administrative record, which may be supplemented only

14    in limited circumstances). Because "the courts cannot exercise their duty of review unless they are

15    advised of the considerations underlying the action under review … the orderly functioning of the

16    process of review requires that the grounds upon which the administrative agency acted by clearly

17    disclosed and adequately sustained." *Chenery*, 318 U.S. at 94. That is particularly true where, as

18    here, an agency changes its position. The Supreme Court has consistently instructed that "an

19    agency changing its course … is obligated to supply a reasoned analysis for the change," *State*

20

---

21    [61] The government has not argued that the BIA's May 2025 decision in *Matter of Q. Li* provided a
contemporaneous reason for DHS's re-detention policy, and for good reason. *See* 29 I. & N. Dec.

22    66 (BIA 2025). As the government acknowledged at the hearing, the BIA is an agency within the
Department of Justice, not DHS. In any case, *Matter of Q. Li* does not articulate a rationale for

23    DHS's re-detention policy. There, the BIA held that all "applicant[s] for admission" under 8
U.S.C. § 1225(a)(1)—that is, all noncitizens present in the United States without lawful

24    admission—are subject to mandatory detention under § 1225(b)(2)(A). *See id.* at 66. The BIA
therefore concluded that a noncitizen whom DHS had arrested without a warrant and released on

25    conditional parole pursuant to 8 U.S.C. § 1182(d)(5)(A) was not entitled to bond when DHS later
re-detained her. *See id.* at 67–70. But the petitioner in *Matter of Q. Li* had been re-detained after

26    DHS received notice from Interpol that she was wanted for arrest in Spain "for travel document
forgery and human smuggling crimes." *Id.* at 67. In other words, DHS re-detained her only after

27    learning new information suggesting that she had engaged in criminal activity and might pose a
danger to the public. *Matter of Q. Li* therefore did not present the question of whether DHS may or

28    must re-detain an "applicant for admission" absent such a change in material circumstances.

United States District Court
Northern District of California

1   *Farm*, 463 U.S. at 42, and "may not … depart from prior policy sub silentio," *Fox Television*

2   *Stations*, 556 U.S. at 515. Given that DHS did not publicly articulate a reason for its re-detention

3   policy at the time it was implemented and that the government has since declined to disclose any

4   records showing such a reason, the natural conclusion is that no contemporaneous rationale

5   existed. *Cf. Goffney*, 995 F.3d at 748 ("[A]n agency's statement of what is in the record" or not in

6   the record "is subject to a presumption of regularity."). This alone makes the re-detention policy

7   arbitrary and capricious. *See Encino Motorcars*, 579 U.S. at 221–22.

**b.**      **Even if considered, DHS's post hoc rationalization for the re-detention policy is likely based on legal error.**

10         Though DHS did not offer any contemporaneous explanation when implementing the re-

11  detention policy, it has since attempted to justify the policy by arguing that § 1225(b)(2)

12  authorizes the re-detention of noncitizens who were previously released into the interior of the

13  country regardless of their individual circumstances. This post hoc rationalization for the re-

14  detention policy likely does not cure the lack of contemporaneous reasoning.

15         As an initial matter, "courts may not accept … post hoc rationalizations for agency action."

16  *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) (quoting

17  *State Farm*, 463 U.S. at 50). This "foundational principle of administrative law" "instills

18  confidence that the reasons given" for agency action "are not simply convenient litigating

19  positions." *Regents*, 591 U.S. at 23. It also prevents agencies from "forcing both litigants and

20  courts to chase a moving target," as DHS has attempted to do here. *Id.* Because DHS "must defend

21  its actions based on the reasons it gave when it acted," its "belated justifications" are irrelevant.

22         Even if the Court were to consider DHS's post hoc rationale, however, it is deficient. The

23  government argues that DHS's re-detention of noncitizens who have not been lawfully admitted

24  into the United States is compelled by § 1225(b)(2). In recent months, federal district courts have

25  rejected this novel interpretation of § 1225(b)(2) no fewer than 350 times. *See Barco Mercado*,

26  2025 WL 3295903, at *4. Make that 351.

27         Section 1225 defines a noncitizen "who 'arrives in the United States,' or 'is present' in this

28  country but 'has not been admitted,' … as 'an applicant for admission.'" *Jennings v. Rodriguez*,

51

583 U.S .281, 287 (2018) (quoting 8 U.S.C. § 1225(a)(1)). Section 1225(b)(2)(A) provides that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). In DHS's view, every "applicant for admission" is necessarily "seeking admission" and therefore subject to mandatory detention.

There are numerous problems with DHS's interpretation of § 1225(b)(2). If every applicant for admission was necessarily a noncitizen "seeking admission," as DHS suggests, then the phrase "an alien seeking admission" in § 1225(b)(2) would have no meaning—it would instead read simply "the alien." *See Pablo Sequen*, 2025 WL 2935630, at *9. Further, the statute's use of "seeking admission" "implies some sort of present-tense action." *Martinez v. Hyde*, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1011 (9th Cir. 2020) ("The use of the present progressive, like use of the present participle, denotes an ongoing process."). Read in isolation, the phrase could plausibly refer to a broad set of actions taken to pursue lawful status in the United States, such as active participation in removal proceedings or the filing of an asylum application. *See Bernal v. Albarran*, No. 25-CV-09772-RS, 2025 WL 3281422, at *3 (N.D. Cal. Nov. 25, 2025). But DHS's own regulations implementing § 1225(b)(2) suggest a far narrower meaning, referring to the class of noncitizens subject to mandatory detention under the statute as "arriving alien[s]." *See* 8 C.F.R. § 235.3(c)(1); *see also Martinez*, 2025 WL 2084238, at *6. Other implementing regulations define "arriving alien" as, in relevant part, "an applicant for admission *coming or attempting to come into the United States at a port-of-entry*." 8 C.F.R. § 1.2 (emphasis added). Together, the text of § 1225(b)(2) and the relevant regulations indicate that § 1225(b)(2) applies only to applicants for admission who are actively "seeking admission" by requesting entry into the United States upon arrival. That category does not include the plaintiffs or class members, all of whom have already entered the United States, been apprehended by DHS, and been released into the interior of the country.

The use of the word "otherwise" in § 1225(a)(3) does not indicate that those who are "applicant[s] for admission" are a subset of those who are "seeking admission." Section

1225(a)(3) provides that "[a]ll aliens … who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The government has previously taken the position that "or otherwise" in § 1225(a)(3) suggests that the preceding phrase (i.e. "applicants for admission") is entirely subsumed by the phrase that follows (i.e. noncitizens "seeking admission or readmission to or transit through the United States"). But that position misreads "otherwise." "Otherwise" generally means, "in a different way or manner" or "in different circumstances." *Otherwise*, Webster's Ninth New Collegiate Dictionary 835 (1984). So § 1225(a)(3)'s use of "or otherwise" simply means that immigration officers must inspect any noncitizen who is "seeking admission or readmission to or transit through the United States," whether the noncitizen is an applicant for admission *or* differently situated. To be sure, § 1225(a)(3) acknowledges some overlap between the categories of "applicants for admission" and noncitizens "seeking admission," with the latter serving as "a 'catch-all' to describe non-citizens who *must be inspected*." *Cordero Pelico v. Kaiser*, 2025 WL 2822876, at 14 (N.D. Cal. Oct. 3, 2025) (*quoting Al Otro Lado*, 138 F.4th at 1119). But that does not suggest that either category totally subsumes the other. There may be noncitizens "seeking admission" who are not applicants for admission. "For example, those applying for a visa at a consulate abroad would be seeking admission but not be applicants for admission, since they are neither present in the country nor arriving in it." *Id.* (citing *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 741 (BIA 2012)). And there are noncitizens, such as members of the class, who are applicants for admission but not currently "seeking admission" because they have already been released into the United States.

DHS's interpretation of § 1225(b)(2) is also in significant tension with other portions of the statutory scheme. *Depot U.S.A. v. Jackson*, 587 U.S. 435, 441 (2019) (looking to "the overall statutory scheme" to guide interpretation). Section 1225(b)(2) requires detention of noncitizens who cannot prove to an immigration officer that they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Yet § 1226(c) separately requires detention for noncitizens who are "inadmissible" on specific grounds. A noncitizen who is "inadmissible" for one of the specific grounds laid out in § 1226(c) would by necessity be unable to make the clear

1    showing of admissibility required to avoid detention under § 1225(b)(2). So interpreting

2    § 1225(b)(2) to cover every "applicant for admission," including noncitizens subject to § 1226,

3    would largely nullify § 1226(c).

4          Perhaps most significantly, interpreting § 1225(b)(2) to encompass all "applicants for

5    admission" would have the effect of nullifying a subsection in § 1226 added by Congress just this

6    year. That subsection was amended by the Laken Riley Act, Pub. L. No. 119-1, § 2, 139 Stat. 3, 3

7    (2025) (adding 8 U.S.C. § 1226(c)(1)(E)), which added a specific ground on which the

8    government must detain a noncitizen. The additional specific ground "includes noncitizens who

9    are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C)

10    [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one

11    of certain enumerated crimes." *Salcedo Aceros*, 2025 WL 2637503, at \*10 (N.D. Cal. Sept. 12,

12    2025). But according to the government's logic, many of the noncitizens charged with one of the

13    enumerated crimes whose detention Congress mandated in the Laken Riley Act were already

14    subject to mandatory detention under § 1225(b)(2), whether or not they had been so charged,

15    simply because they are present without admission or parole or lacked proper documentation at the

16    time of entry. The Court declines to adopt an interpretation of § 1225(b)(2) that would almost

17    entirely negate another provision of the same statutory scheme enacted just this year. *See Marx v.*

18    *Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024)

19    ("When Congress substantively revises a statute's text, 'we presume it intends its amendment to

20    have real and substantial effect.'" (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995))).

21          The government acknowledges that DHS's interpretation of § 1225(b)(2) would render

22    § 1226(c)(1)(E) redundant but argues that this merely reflects a "congressional effort to be doubly

23    sure" that certain noncitizens are detained. *See Barton v. Barr*, 590 U.S. 222, 239 (2020). As

24    evidence, the government cites the statement of a single Senator suggesting that Congress enacted

25    the Laken Riley Act in reaction to the President's perceived underutilization of his authority to

26    detain noncitizens. *See* 171 Cong. Rec. 4, S45-45 (daily ed. Jan. 8, 2025) (statement of Senator

27    Thune). But this statement merely shows that "Congress (or rather, one member of Congress)

28    thought the Laken Riley Act was necessary to constrain executive discretion. That would only be

United States District Court
Northern District of California

necessary if the executive previously *had* discretion—a position at odds with [DHS's] current construction of section 1225(b)(2)(A)." *Bernal*, 2025 WL 3281422, at *4.

The government also relies on a recent BIA decision, *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). There, the BIA held that a noncitizen who is an "applicant for admission" is necessarily "seeking admission" such that § 1225(b)(2) covers all "applicants for admission," including those who have been released into and resided in the United States for several years. *See id.* at 221–25. Because "agencies have no special competence in resolving statutory ambiguities," "the BIA decision is entitled to little deference." *Salcedo Aceros*, 2025 WL 2637503, at *9 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). Instead, the BIA's interpretation is owed deference only to the extent that "the validity of its reasoning" and "its consistency with earlier and later pronouncements" give it "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

The BIA's reasoning fails to persuade because, as explained above, its interpretation of § 1225(b)(2) needlessly renders the phrase "seeking admission" superfluous, conflicts with DHS's own implementing regulation, and nullifies much of § 1226(c), including Congress's most recent amendments thereto. Any persuasive power the BIA's decision might have is further undercut by its inconsistency with the BIA's earlier pronouncements:

> Prior to its September 5 decision [in *Yajure Hurtado*], the BIA issued three non-precedential decisions taking the *opposite* position. In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time."

*Salcedo Aceros*, 2025 WL 2637503, at *9 (citations omitted) (first citing *Martinez*, 2025 WL 2084238, at *8; then quoting *Loper Bright*, 603 U.S. at 386).

DHS's construction "would also seem to shrink the discretionary detention provision, section 1226, beyond recognition." *Bernal*, 2025 WL 3281422, at *5. In contrast to § 1225(b)(2)'s mandate that covered noncitizens be detained with limited exceptions, § 1226 affords the government significant discretion concerning detention of noncitizens arrested on a warrant, providing that the Attorney General "may" continue to detain noncitizens or "may" release them.

1    *Compare* 8 U.S.C. § 1225(b)(2)(A) *with id.* § 1226(a)(1)–(2); *see Jennings*, 583 U.S. at 300

2    (noting that "the word 'may' ... implies discretion" (citation modified)). As another court in this

3    district has explained:

> For many years, the understanding—shared by the Executive and the
> Supreme Court—was that section 1226, not section 1225, governed
> immigration arrests conducted within the interior of the United States.
> *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being
> applicants for admission, aliens who are present without having been
> admitted or paroled ... will be eligible for bond and bond
> redetermination."); [*Jennings*, 583 U.S. at 289] ("In sum, U.S.
> immigration law authorizes the Government to detain certain aliens
> seeking admission into the country under §§ 1225(b)(1) and (b)(2). It
> also authorizes the Government to detain certain aliens *already in the
> country pending the outcome of removal proceedings* under §§
> 1226(a) and (c).") (emphasis added). [DHS's] construction of the
> statute would wreak havoc on this shared understanding. [Its] view is
> that virtually every noncitizen in the interior of the country is both an
> "applicant for admission" and is "seeking admission," making all of
> them subject to mandatory detention under the statute. Because a
> noncitizen cannot simultaneously be subject to mandatory detention
> and discretionary detention, the result is that section 1226 will apply
> only to an extremely small group of noncitizens: those present in the
> United States who have been admitted but who now lack legal status.
> *See, e.g., Jennings*, 583 U.S. at 289–90. The statutory scheme is
> devoid of any indication that Congress meant for section 1226 to be
> that narrow.

18    *Bernal v. Albarran*, 2025 WL 3281422, at *5.

19        Rather than cover every applicant for admission, § 1225(b)(2) is best read to mandate

20    detention only of applicants for admission who are "seeking admission" upon their initial arrival

21    in the United States. Applicants for admission whom DHS has apprehended and released into the

22    country's interior are instead subject to the largely discretionary detention framework of § 1226.

23    As the Seventh Circuit recently explained, this "difference in treatment between a noncitizen at the

24    border and one already in the United States fits within the broader context of our immigration

25    law." *Castañon-Nava*, 2025 WL 3552514, at *9. "The distinction between an alien who has

26    effected an entry into the United States and one who has never entered runs throughout

27    immigration law." *Id.* (first quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)); *see also Leng*

28    *May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a

United States District Court
Northern District of California

distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality.").

DHS's post hoc rationalization for its re-detention policy—that is, its view that § 1225(b)(2) requires it to re-arrest noncitizens whom it previously released into the United States regardless of their individual circumstances—is thus legally erroneous. "A decision based upon such a misreading of the law must necessarily be capricious and arbitrary." *Rodriguez-Roman v. I.N.S.*, 98 F.3d 416, 429 (9th Cir. 1996) (quoting *Sovich v. Esperdy*, 319 F.2d 21, 30 (2d Cir. 1963) (Medina, J., concurring)); *see also Safe Air for Everyone v. E.P.A.*, 488 F.3d 1088, 1101 (9th Cir. 2007).

### c.    DHS failed to consider released noncitizens' serious reliance interests.

The re-detention policy is likely also arbitrary and capricious due to DHS's failure to consider the "serious reliance interests" engendered by its previous policy. When an agency changes its policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Here, plaintiffs offer declarations establishing that class members relied on DHS's prior policy by structuring their lives around the expectation that they would retain their physical liberty unless they violated the conditions of their release or their material circumstances otherwise changed.[13] For example, they have sought and received work authorization,[62] secured

---

[62] *See* Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 6; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 7; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 4; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 7; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

employment,[63] entered into leases,[64] purchased cars,[65] invested in their education,[66] cultivated and donated to religious communities,[67] started romantic relationships and married,[68] and worked to start, grow, and financially support families,[69] all based on the expectations of continued liberty that DHS engendered. "The consequences of the [re-detention policy]" also "radiate outward to [noncitizens'] families, including their … children, to the schools where [they] study and teach, and to the employers who have invested time and money in training them."[70] *Id.* at 31. "These are certainly noteworthy concerns" that DHS was obliged to consider, even if it ultimately concluded that such reliance "was unjustified" or "entitled to no or diminished weight." *Id.* at 31–32 (addressing similar reliance interests of DACA recipients who had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance on the DACA program"). The government does not argue that DHS ever considered

---

[63] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 5; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 5; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 13; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 7; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 5; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 11; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶¶ 7–8; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[64] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 6; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 9; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 14; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[65] *See* Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 5; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 15; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[66] *See* Declaration of David Rafael Colon Solano, Dkt. No. 48-14 ¶ 4; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 16; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[67] *See* Declaration of Frescia Garro Pinchi, Dkt. No. 48-2 ¶ 17; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 6; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 8; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 5; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 8; Declaration of Gerardo Roman Valencia Zapata, Dkt. No. 48-17 ¶ 7.

[68] *See* Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 7; Declaration of Maidel Arostegui Castellon, Dkt. No. 48-15 ¶ 6; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 10.

[69] *See* Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶¶ 9, 13, 15; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶ 9; Declaration of Salam Maklad, Dkt. No. 48-12 ¶ 7; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 35; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶ 7; Declaration of Lisa Knox, Dkt. No. 48-7 ¶ 15.

[70] *See, e.g.*, Declaration of Juany Galo Santos, Dkt. No. 48-3 ¶ 15; Declaration of Jose Waldemar Teletor Sente, Dkt. No. 48-4 ¶¶ 14 –15; Declaration of Gabriela Alondra Vargas Plasencia, Dkt. No. 48-13 ¶ 32–33; Declaration of Carolina Ortiz Calderon, Dkt. No. 48-16 ¶¶ 29–31.

United States District Court
Northern District of California

1    these reliance interests. This, too, likely renders the re-detention policy arbitrary and capricious.

2          d.        **The government failed to consider noncitizens' protected liberty**
3                    **interests under the Fifth Amendment.**

4          Plaintiffs also argue that DHS failed to consider an "important aspect of the problem"

5    when implementing the re-detention policy. *All. for the Wild Rockies*, 68 F.4th at 492 (quoting

6    *State Farm*, 463 U.S. at 43). Whether something is an important factor that must be considered

7    "turns on what [the] relevant substantive [law] makes 'important.'" *Nat'l Urb. League v. Ross*,

8    977 F.3d 770, 777 (9th Cir. 2020) (first alteration in original) (quoting *Or. Nat'l Res. Council*, 92

9    F.3d at 798). The Ninth Circuit has made clear that the relevant substantive law includes agencies'

10   constitutional obligations. *See id.* (holding that "the Enumeration Clause demonstrates a 'strong

11   constitutional interest in accuracy'" that the Census Bureau was required to consider (quoting

12   *Utah v. Evans*, 536 U.S. 452, 478 (2002)). Here, plaintiffs have at least raised serious questions

13   going to the merits with respect to DHS's obligation to consider noncitizens' procedural and

14   substantive due-process rights under the Fifth Amendment.

15         The Due Process Clause protects all persons in the United States, including noncitizens,

16   from deprivations "of life, liberty, or property" by the federal government "without due process of

17   law[.]" U.S. Const. amend V; *see also Zadvydas*, 533 U.S. at 690. "Freedom from

18   imprisonment—from government custody, detention, or other forms of physical restraint—lies at

19   the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Even when the

20   government has discretion to detain an individual, its subsequent decision to release the individual

21   creates "an implicit promise" that she will be re-detained only if she violates the conditions of her

22   release. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Conditional release "is valuable and must

23   be seen as within the protection of the [Due Process Clause]." *Id.* The liberty of a noncitizen

24   released pending removal proceedings, "although indeterminate, includes many of the core values

25   of unqualified liberty[.]" *Id.* Subject to the conditions of their release, noncitizens "can be

26   gainfully employed and [are] free to be with family and friends and to form the other enduring

27   attachments of normal life." *Id.* The termination of that liberty would "inflict[] a 'grievous loss'"

28   both on noncitizens and their loved ones. *Id.*; *see also Cordero Pelico*, 2025 WL 2822876, at *6–

7; *Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025). Courts in this district thus consistently hold that if DHS has released a noncitizen pending civil removal proceedings, the noncitizen has a protected liberty interest in remaining out of immigration custody. *See, e.g., Roa v. Albarran*, No. 25-cv-07802-RS, 2025 WL 2732923, at *5 (N.D. Cal. Sept. 25, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-cv-06248-BLF, 2025 WL 2419263, at 6 (N.D. Cal. Aug. 21, 2025); *Guillermo M. R. v. Kaiser*, No. 25-cv-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17, 2025).

The Due Process Clause typically "requires some kind of a hearing *before* the State deprives a person of liberty." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis added). The government may avoid this requirement where, on balance, the interests at stake and the risk of an erroneous deprivation absent a hearing suggest that no such procedure is needed to protect the individual's liberty. *See Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 2935630, at *6 (N.D. Cal. Oct. 15, 2025) (citing *Mathews v. Eldrige*, 424 U.S. 319, 335 (1976)). Thus, DHS might theoretically be able to conclude that the Due Process Clause would not entitle every released noncitizen to a hearing before being re-detained. But DHS likely had an obligation to at least consider the "important" question of whether its re-detention policy would deprive some noncitizens of their liberty interest in conditional release without sufficient process.

Even where the government provides adequate procedural safeguards, "nonpunitive government detention violates the Due Process Clause unless the detention is ordered 'in certain special and narrow circumstances, where a special justification outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Valencia Zapata*, 2025 WL 2741654, at *11 (quoting *Zadvydas*, 533 U.S. at 690). The Supreme Court has recognized only two such circumstances justifying civil immigration detention pending removal proceedings: where it is necessary to "ensure[] the appearance of aliens at future immigration proceedings" or to "prevent[] danger to the community." *Zadvydas*, 533 U.S. at 690. Accordingly, as the Ninth Circuit has explained, the government "has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative

conditions." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

By regulation, DHS may release noncitizens only if it determines that they do not pose a danger to the community or a flight risk. *See* 8 C.F.R. §§ 212.5(b), 236.1(c)(8), 1003.19(h)(3), 1236.1(c)(8); *see also* 8 U.S.C. § 1226(c)(4). So DHS's release of the noncitizens now subject to its re-detention policy, including all class and subclass members, necessarily included a finding that they were neither flights risks nor dangers to the community. As a result, DHS "has no legitimate interest" in detaining those noncitizens unless their individual circumstances have changed such that they now pose a flight risk or danger to the community. *See Hernandez*, 872 F.3d at 994; *Valencia Zapata*, 2025 WL 2741654, at *12. And while the Supreme Court has held that noncitizens "convicted of particular crimes" described in § 1226(c) "may reasonably be presumed to pose a risk of flight or a danger to the community," that is not true for non-citizens without such criminal records. *Valencia Zapata*, 2025 WL 2741654, at *12 (citing *Demore v. Kim*, 538 U.S. 510, 527 (2003)). DHS's re-detention of non-citizens without determining that their individual circumstances have materially changed thus carries a significant risk—now actualized in many cases—of violating their substantive due process rights. *See, e.g.*, *id.*; *Bautista Pico*, 2025 WL 3295382, at *3; *Leiva Flores v. Albarran*, No. 25-cv-09302-AMO, 2025 WL 3228306, at *5 (N.D. Cal. Nov. 19, 2025).

The government argues that DHS had no need to consider noncitizens' procedural or substantive due-process rights, but it does not contend that DHS addressed these important aspects of the problem.[71] Its failure to do so raises serious questions as to the merits of plaintiffs' claim that the re-detention policy arbitrary and capricious.

In sum, the re-detention policy is likely arbitrary and capricious for three independent reasons, and plaintiffs have raised serious questions concerning a fourth. As a result, plaintiffs "ha[ve] made a strong showing that [they are] likely to succeed on the merits" of their APA claims. *Nken*, 556 U.S. at 434.

---

[71] To the extent the government suggests that DHS need not consider these issues because noncitizens subject to its re-detention policy categorically lack constitutional due-process rights with respect to their detention, that argument is incorrect. *See Pablo Sequen*, 2025 WL 2935630, at *6 – 7; *Valencia Zapata*, 2025 WL 2741654, at *7.

**B.**    **Plaintiffs have established that class members will likely suffer irreparable harm absent a stay.**

Plaintiffs have demonstrated a likelihood that class members will suffer irreparable harm in the absence of a stay. As the Court has already detailed, DHS has re-detained hundreds and possibly thousands of class members in recent months pursuant to its re-detention policy, and it avows that it will continue doing so. "Deprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018). And for many class members whom DHS arrests under the policy, like Ms. Garro Pinchi, their arrest likely violates their rights under the Due Process Clause of the Fifth Amendment. *See Garro Pinchi*, 792 F. Supp. 3d at 1032–37; *Bautista Pico*, 2025 WL 3295382, at *2 (collecting cases from "[e]very court in this district," and many outside this district, concluding that noncitizens re-detained by DHS in recent months "established a likelihood of success on the merits … of their procedural due process claim"). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). So "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified).

The government has not disputed that re-detention irreparably harms noncitizens. It argues only that plaintiffs' assertions of their likely detention are too speculative and conclusory. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). This argument parallels the government's arguments concerning justiciability and fails for the same reasons—plaintiffs have established that DHS has re-arrested and intends to continue re-arresting large numbers of noncitizens in northern California, particularly at immigration courthouses and ICE field offices, and that plaintiffs have upcoming hearings and check-ins at such courthouse and field offices. While DHS cannot re-detain Ms. Garro Pinchi without notice and a hearing during the pendency of these proceedings, its "interim compliance with [this] Court's … [preliminary injunction] order" no more obviates the threat of detention than "render[s] her case moot." *See Maher*, 432 U.S. at 469 n.4. In any event, plaintiffs "clearly" demonstrate a risk of irreparable harm absent a stay where, as here, the record shows "that at least some individuals" in the class

United States District Court
Northern District of California

1    "would be detained" without such preliminary relief. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145

2    (9th Cir. 2013).

3         **C.      The balance of the equities and public interest favor a stay.**

4         The final two factors—the balancing of harms and the public interest—merge because the

5    government is the opposing party. *See Nken*, 556 U.S. at 435. As discussed above, plaintiffs have

6    established that members of the class face nearly certain re-arrest pursuant to the re-detention

7    policy, and the class consequently has a strong interest in staying the policy. Further, "[t]he public

8    interest is served by compliance with the APA." *California v. Azar*, 911 F.3d 558, 581 (9th Cir.

9    2018). And "it is always in the public interest to prevent the violation of a party's constitutional

10   rights," *Baird*, 81 F.4th at 1042, such as the likely deprivation of countless class members'

11   protected liberty interests without due process.

12        On the other side of the scale, the government argues that it has a "significant and

13   compelling interest in enforcing the United States' immigration laws, detaining aliens, and

14   removing aliens." To be certain, courts must be wary of the "serious, perhaps irreparable,

15   consequences" that may flow from interference with "the Executive's ability to implement

16   immigration policy … as it sees fit." *Immigr. Defs.*, 145 F. 4th at 985 (quoting *A.A.R.P.*, 145 S. Ct.

17   at 1367). But alleged injuries to the Executive's immigration agenda that are articulated "in

18   general terms" without "concrete evidence" of prejudice to the government amount to only a

19   "weak" showing of governmental harm. *Id.* at 985, 994. The only concrete prejudice the

20   government identifies is that a stay would prevent it from "implement[ing] … the plain statutory

21   language requiring detention of non-admitted aliens." As explained above, however, the applicable

22   statutes do not require the re-detention of noncitizens absent a determination that their material

23   circumstances have changed. And "the mere existence of the Executive Branch's desire to enact a

24   policy is not sufficient" to show that a stay would prejudice the government. *Immigr. Defs.*, 145 F.

25   4th at 985; *see also Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). That many of DHS's

26   re-arrests pursuant to the policy likely violate noncitizens' due-process rights further diminishes

27   the weight of its interest in avoiding a stay. *See Rodriguez*, 715 F.3d at 1145 (holding that the

28   government "cannot suffer harm from an injunction that merely ends an unlawful practice"

1   implicating "constitutional concerns").

2        On balance, these factors also weigh in favor of granting a stay. Plaintiffs have therefore

3   satisfied each of the *Winter* factors and established that the Court may grant a stay of the re-

4   detention policy. The Court exercises its discretion to do so.

5        **D.    The Court limits the scope of the stay to ICE's San Francisco area of
            responsibility.**

6

7        Though plaintiffs move to stay the re-detention policy in its entirety, the government asks

8   the Court to confine the stay to plaintiffs and members of the provisional class. The Court agrees

9   that a limited stay is appropriate here.

10       Section 705 of the APA authorizes "a reviewing court" to "issue all necessary and

11  appropriate process to postpone the effective date of an agency action … pending conclusion of

12  the review proceedings." 5 U.S.C. § 705. Thus, as the D.C. Circuit recently explained, § 705 stays

13  "operate on the legal source of authority for an agency to act" by suspending "an agency action,"

14  rather than "simply insulat[ing] certain parties from enforcement measures." *Make The Rd. N.Y. v.*

15  *Noem*, No. 25-5320, 2025 WL 3563313, at *35 (D.C. Cir. Nov. 22, 2025); *cf. Nken*, 556 U.S. at

16  428–29 (explaining that a stay pending appeal "temporarily suspend[s] the source of authority to

17  act" but does "not … direct[] an actor's conduct"). And the text of § 705 contemplates that a

18  reviewing court will stay "the" effective date of an agency action, suggesting that stays operate on

19  the challenged policy as a whole. After all, "[i]f a court orders that an agency action shall not

20  apply against certain individuals, but that the agency can apply that action against everyone else,

21  *the* effective date of the action has not been postponed." *Make The Rd.*, 2025 WL 3563313, at *35.

22  And while § 705 provides that stays operate only "to the extent necessary to prevent irreparable

23  injury," 5 U.S.C. § 705, "[t]hat just means that courts should stay the effective date only of those

24  portions of the agency action that are inflicting injury." *Make the Rd.*, 2025 WL 3563313, at *35.

25       The Supreme Court's decisions in APA cases reinforce this text. "Over the decades, th[e]

26  Court has affirmed countless decisions that vacated agency actions … rather than merely

27  providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs."

28  *Corner Post, Inc. v. Board of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024)

United States District Court
Northern District of California

(Kavanaugh, J., concurring); *see also Regents*, 591 U.S. at 9, 36 n.7; *Whitman v. American Trucking Ass'ns., Inc.*, 531 U.S. 457, 486 (2001); *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 364–365 (1986). Similarly, in the past decade, the Supreme Court has twice issued stays under § 705 that suspended agency actions in their entirety without narrowing relief to particular parties. *See NFIB v. OSHA*, 142 S. Ct. 661, 664 (2022); *West Virginia v. EPA*, 577 U.S. 1126, 1126 (2016).

The government nevertheless argues that this Court lacks authority to stay the re-detention policy as a whole in light of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). There, the Supreme Court considered "whether Congress has granted federal courts the authority to universally enjoin the enforcement of an executive or legislative policy." *Id.* at 839. To answer that question, the Court examined the Judiciary Act of 1789, the statutory source of federal courts' authority to issue equitable remedies. *Id.* at 841. Because the Judiciary Act of 1789 "endow[s] federal courts with jurisdiction over 'all suits … in equity,'" the Supreme Court concluded that the statute authorizes injunctive relief only to the extent such relief was "'traditionally accorded by courts of equity' at our country's inception." *Id.* (first quoting § 11, 1 Stat. 78; and then quoting *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Looking to the equitable authority possessed "by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act," as well as by "founding-era courts of equity," the Supreme Court held that the Judiciary Act of 1789 authorizes only party-specific relief. *Id.* at 841–47 (quoting *Grupo Mexicano*, 527 U.S. at 318–19). In other words, injunctive relief covered by *CASA* may sweep only as broadly as needed to "offer complete relief *to the plaintiffs before the court.*" *Id.* at 852.

The reasoning and holding in *CASA* were grounded in and limited to the statute at issue there. The opinion says nothing that calls into question the longstanding practice of vacating (or staying) agency action under the APA. To the contrary, *CASA* expressly declined to address "the distinct question whether the [APA] authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10.

Still, the Ninth Circuit has held that *CASA*'s "complete-relief principle for crafting

65

United States District Court
Northern District of California

injunctive relief provides some useful guidance for crafting interim equitable relief" under § 705. *Immigr. Defs.*, 145 F.4th at 995. Under this principle, the Ninth Circuit has explained, a nationwide § 705 stay is appropriate only where a narrower stay would not remediate the irreparable harm to plaintiffs or "is not a workable solution under the [applicable] statute." *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir. 2025). As explained above, this approach appears to be at odds with the text of § 705 and is not compelled by *CASA*. "In fact, there is good reason to think that Congress did not intend to incorporate [the] 'background equitable principles'" that drove its reasoning in *CASA* "into the APA." *Make The Rd.*, 2025 WL 3563313, at *35 (quoting *Corner Post*, 603 U.S. at 839 (Kavanaugh, J., concurring)). "Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA and related statutory review provisions go further by empowering the judiciary to act directly against the challenged agency action." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) (citation modified) (quoting J. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018)). And in contrast to the founding-era history underlying *CASA*'s reasoning about courts' authority under the Judiciary Act of 1789, the D.C. Circuit has explained that courts in the period of the APA's enactment routinely granted relief that was not party-specific. *See Make The Rd.*, 2025 WL 3563313, at *36 (first citing *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16–17 (1942); and then citing *Chicago, Rock Island & Pac. Ry. Co. v. United States*, 284 U.S. 80, 87, 96, 100 (1931)).

But this Court sits in the Ninth Circuit, not the D.C. Circuit. Accordingly, it is bound by the Ninth Circuit's importation of *CASA*'s complete-relief principle into the APA context. Plaintiffs have established irreparable harm to class members only from DHS's implementation of the re-detention policy within ICE's San Francisco area of responsibility, where all class and subclass members are located. A stay limited to that area will thus afford complete relief to the parties for the demonstrated harms, and plaintiffs have not argued that such a limited stay would be unworkable. The Court therefore stays DHS's re-detention policy only within ICE's San Francisco area of responsibility.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to provisionally certify the class and subclass

is GRANTED. Plaintiffs' motion to stay DHS's re-detention policy pending final resolution of their APA claims is also GRANTED. The Court hereby postpones the effective date of the re-detention policy within ICE's San Francisco area of responsibility until the entry of a final judgment in this action.

**IT IS SO ORDERED.**

Dated: December 19, 2025

P. Casey Pitts
United States District Judge